- VOLUME C -

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| OSI PHARMACEUTICALS, INC., PFIZER INC. and GENENTECH, INC., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| vs. | : | |
| TEVA PHARMACEUTICALS USA, INC. And MYLAN PHARMACEUTICALS, INC., | : | |
| Defendants. | : | NO. 09-185 (SLR) |

- - -

Wilmington, Delaware
Wednesday, March 16, 2011
9:30 o'clock, a.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, U.S.D.C.J.

- - -

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL
BY: JACK B. BLUMENFELD, ESQ.

-and-

Valerie J. Gunning
Leonard Dibbs
Official Court Reporters

APPEARANCES (Continued):

KAYE SCHOLER LLP
BY: LEORA BEN-AMI, ESQ. and
BENJAMIN C. HSING, ESQ. and
DANIEL BOGLIOLI, ESQ.
SAPNA PALLA, ESQ.
(New York, New York)

Counsel for Plaintiffs

PHILLIPS, GOLDMAN & SPENCE, P.A.
BY: JOHN C. PHILLIPS, JR., ESQ.

-and-

WILEY REIN LLP
BY: JAMES H. WALLACE, JR., ESQ.,
MARK A. PACELLA, ESQ.,
ADRIENNE JOHNSON, ESQ. and
MATTHEW J. DOWD, ESQ.
(Washington, D.C.)

Counsel for Defendant
Mylan Pharmaceuticals Inc.

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 9:30 a.m.)

THE COURT: All right. What's next on our agenda?

MR. PACELLA: Your Honor, we did have one issue with an exhibit that plaintiffs intend to use with Dr. Arnold, who I believe is the next witness. And the issue is some time over the weekend, we got a document that purports to be a compilation. It's 192 pages long. It has all sorts of chemical structures and dates and refers to numerous lab notebooks and the date.

It's a compilation, but under the pretrial order, the exhibits were supposed to have been disclosed by the, I believe the 1st of March. We got this just over this weekend, and as you probably imagine, your Honor, we've been quite busy with a lot of things, have not had a chance to verify this.

The exhibit number is 548. So we object on that basis, your Honor. It's just unreasonable for us to try to verify the accuracy and completeness of a 197-page document compiled from numerous exhibits.

THE COURT: All right.

MR. HSING: Your Honor, may I respond?

Your Honor, this exhibit, 548, is really a summary of the laboratory notebooks that have been produced in this case, and all of the laboratory notebooks are exhibits on the trial exhibit list. So instead of having your Honor going through each and every notebook to look at the particular compounds, we just kind of summarized them and put them in a summary exhibit so they're admissible under Rule 1006 of the Federal Rules of Evidence. They've had the exhibit for more than three days. And all of the underlying compounds are in the exhibits with a citation to the underlying exhibit as well as the page number of the exhibit.

So everything is very well set out. There's really absolutely no confusion at all. So I'm not sure why it's objectionable.

THE COURT: Well, as I heard the objection, it was only because it was so large and because it takes their time to go through and confirm that you did your job right. So I mean it strikes me that if you really want this exhibit in, you need to take some time to go over with them the fact that you did this correctly.

I don't know. Is this coming in theoretically this morning?

MR. HSING: Yes, your Honor. It's coming in

through Dr. Arnold, just as I said, merely a summary.

THE COURT: It's not merely a summary when it's 192 pages and you just gave it to them.

MR. HSING: Your Honor, we did not give it to them last night. They've had it since at least Sunday afternoon. And everything is set out very clearly, with citations to each of the underlying exhibits and the page numbers. So --

THE COURT: Well, as you are going through with Dr. Arnold, do you have the original exhibits here?

MR. HSING: I do have the original exhibits.

THE COURT: All right. Then if you go through this summary and his exam and demonstrate for the defendants that the summary is from an exhibit that was on the list, then you can get it in. But for me just to say it's okay is not appropriate. So I will let you do it the hard way.

MR. HSING: That's fine.

THE COURT: All right.

MS. BEN-AMI: Your Honor, there's another issue with the witness after Dr. Arnold. That would be Dr. Bridges, who you've heard about from the prior art, he's going to testify. They have objected to pretty much every demonstrative. I think the main classes that they're objecting to relate to the issue of contemporaneous art and failure of others. And so I think they didn't raise it. I

don't know if they've changed their mind overnight. But we believe that this is completely appropriate.

I don't know if they want to raise it now. I won't argue it if they've dropped it.

THE COURT: All right. I mean, demonstratives don't generally come in, and they generally are supposed to reflect the testimony. So what is the objection?

MR. DOWD: Your Honor, Matthew Dowd.

Our objection was that many of the demonstratives show the chemical structures that aren't in the underlying documents, and we can deal with that on cross-examination. And additionally the other documents, most of those documents are not prior art. And when we met and conferred last night, our understanding was that plaintiffs were relying on the documents and information contained in the documents to show the state of the art at the time of the invention. And these multiple documents are not prior art. But we could deal with that on cross-examination, your Honor.

THE COURT: All right.

MS. BEN-AMI: Thank you, your Honor.

THE COURT: All right.

MR. HSING: Your Honor, our next witness is going to be Lee Arnold, Dr. Lee Arnold. He's one of the inventors of the reissue of the '065 patent. He will

testify about the invention of erlotinib and the discovery and the work that went behind it. And he will go through the laboratory notebooks and the number of compounds that were made during the project and the underlying data.

So plaintiffs call Dr. Lee Arnold.

THE COURT: All right.

PLAINTIFFS' TESTIMONY

... LEE DANIEL ARNOLD, having been duly sworn as a witness, was examined and testified as follows ...

DIRECT EXAMINATION

BY MR. HSING:

Q. Dr. Arnold, please state your name for the record.

A. Lee Daniel Arnold.

Q. And where do you live?

A. I live at 55 Chestnut Street in Mount Sinai, New York.

Q. Are you the inventor of the reissue '065 patent?

A. Yes, I am.

Q. Can you take a look at JTX-1? Is this the patent, the reissued '065 patent?

A. Yes, it is.

MR. HSING: Your Honor, I would like to move JTX-1 into evidence.

MR. PACELLA: No objection.

THE COURT: All right.

(JTX-1 was received into evidence.)
BY MR. HSING:
Q. Who is the other inventor, Dr. Arnold?
A. Doctor Rodney Schnur.
Q. And Dr. Rodney Schnur is deceased?
A. Yes, he is.
Q. When did he pass away?
A. May 19th, 1996.
Q. Dr. Arnold, the reissued '065 patent discloses erlotinib; is that correct?
A. That's correct.
Q. And who first made erlotinib?
A. It was made in my lab.
Q. And when?
A. It was made in November of 1994.
Q. Dr. Arnold, are you proud to be the inventor of erlotinib?
A. Absolutely.
Q. And why?
A. Well, at this point, over half a million patients have been treated with erlotinib, and it has given over a hundred thousand years of life extension to cancer patients and changed the way that lung cancer is treated.
Q. Dr. Arnold, I want to briefly go through your education and professional background.

Please describe your educational background.

A. I received my Bachelor of Science at the University of Waterloo in Waterloo, Ontario. Then after two-and-a-half years of research experience in biochemistry and biophysics, I moved to university of Alberta, where I did my Ph.D. in organic chemistry. After that time, then I did an industrial research fellowship at a company called Syntex in Mitologia, Canada.

Q. And please briefly describe your employment history.

A. I moved from being an industrial research fellow at Syntex in Mitologia to research scientist at Pfizer Central Research in Groton, Connecticut. After that, I joined BASF Bio Research in Worcester, Massachusetts to help establish a medicinal chemistry group there and oversee two cancer programs at that time.

Then Abbott acquired BASF Bio Research, and I stayed with Abbott Bio Research for another several years before taking a position as Vice President of U.S. Research at OSI Pharmaceuticals in New York.

Q. And when did you join Pfizer?

A. In December of 1990.

Q. And when did you leave Pfizer?

A. In November of 1995.

Q. And when were you with OSI?

A. From May of, or April of 2003 to May of 2007.

Q. And what did you do after you left OSI?
A. I started a consulting company, working with startup biotechs, and one of those has moved forward and is called Coferon. And I've accepted a chief scientific officer position with Coferon in June of 2009.
Q. Dr. Arnold, other than your reissued '065 patent, do you own any other patents or patent applications?
A. Yes. About 55.
Q. Now, I want to talk about your reissued '065 patent.
Dr. Arnold, were you involved with the EGFR project while you were at Pfizer?
A. Yes. I was the first medicinal chemist on the program and led much of the effort.
Q. And what is EGFR?
A. EGFR is the acronym for epidermal growth factor receptor, and it's a receptor tyrosine kinase that's involved in transmitting signals from the outside of the cell to the inside of the cell.
Q. And what happened during this transmission?
A. Typically, a growth factor will bind to the outside of the EGFR to the receptor portion, and that will bring two molecules of EGFR or one of its family members together. And then it will -- each one of the partners will phosphorylate the other or transfer a phosphate to it, and that initiates a cascade of signalling events within the

cell, leading to increased survival and increased cell proliferation and growth of the tumor.

Q. Now, Dr. Arnold, what is an EGFR tyrosine kinase inhibitor?

A. It's a -- generally, a small molecule that has to penetrate into the cell and bind the catalytic portion of the kinase and inhibit its enzymatic activity in transferring a phosphate.

Q. And what do you mean by a small molecule?

A. Well, for example, Tarceva has a molecular weight of 393 as compared to antibodies, which are in the range of 140,000. So much smaller and it allows it to be dosed orally and to have oral activity.

Q. So are there EGFR inhibitors which are not tyrosine kinase inhibitors?

A. Yes, there are.

Q. And can you provide an example?

A. Sure. I think the best known example is Erbitux, which is a monoclonal antibody that binds to EGFR on the outside of the cell and can block the growth factor binding to its receptor and it can also cause internalization of the receptor from the cell surface so it disappears, and it can also cause an immune response against cells expressing EGFR.

Q. And erlotinib is not an antibody; is that correct?

A. No, it's not.

Q. Now, do you see the board right next to you? Is that a structure of erlotinib?
A. Yes, it is.
Q. So why is -- that whole molecule is considered a small molecule?
A. Yes, it is.
Q. What was the EGFR project at Pfizer?
A. Our goal in the EGFR project was to identify a potent, selective, well tolerated, orally efficacious small molecule inhibitor of EGFR kinase as a potential therapeutant for human cancer.
Q. Okay. And what characteristics were you looking for in such compounds?
A. Well, so we wanted it to be low molecular weight. We wanted it to be orally bioavailable so that we could change the way chemotherapies were given and have people take a pill once a day, ideally. It needed to be quite selective because within the human genome, there are over 500 kinases, and we wanted to specifically inhibit one. And we also needed to have good toleration, which is usually translated into a therapeutic index that gives you safety along with efficacy.
Q. And you mentioned that specific one. Are you referring to the EGFR tyrosine kinase?
A. Yes.

Q. Now, when did the EGFR project begin at Pfizer?
A. Well, it was begun in collaboration with OSI and the program formally started in September of 1991 with the development of the cell-based assay that was going to be used in the high through-put screening.
Q. Now, do you have a demonstrative outlining the history of the EGFR project?
A. Yes, I do.
MR. HSING: Can we have Arnold Slide No. 3, please?
BY MR. HSING:
Q. So what does this slide say?
A. This indicates the start of the EGFR project. As I mentioned, this is the point at which the cell-based assay was developed.
Q. You mentioned a high through-put screening. What is that?
A. So this was an approach where we could screen thousands of molecules per week at this point in time against EGFR and identify hit molecules that could be starting points for our medicinal chemistry effort. And so the beauty of high through-put screening was that it removes the bias from which molecules get tested and you basically test everything.
Q. And when did that initiate?

A. That was started in December of 1991.
Q. And what was OSI's role in the collaboration?
A. OSI's primary duty was to conduct the high through-put screens on the various collaborative oncology programs, and so the high through-put screen was run using robotics at OSI.
Q. What do you mean by robotics?
A. So we literally had robots that were transferring microtiter plates containing human cancer cells into incubators, out of incubators, adding test compounds, working up the enzyme linked immunoabsorbent assay to detect reductions in the amount of phosphotyrosine within these cells. And that was a reflection of the inhibition of EGFR in this tumor cell line.
Q. And so OSI was screening compounds; is that correct?
A. That's correct.
Q. Now --
A. We screened --
Q. I'm sorry. Go ahead.
A. I'm sorry. So we screened about 340,000 compounds.
Q. Who provided the compounds to OSI?
A. These were within the Pfizer compound collection, so they came in from the various research sites within Pfizer and had been accumulated over many decades from the medicinal chemistry efforts.

Q. And was there any decision made as to what compound to screen?
A. No. We screened everything in the high through-put screen.
Q. So basically every compound at Pfizer?
A. Yes. At that time, there was about 340,000 compounds in the compound collection.
Q. Dr. Arnold, what were your duties and responsibilities while you were working on this EGFR project at Pfizer?
A. Initially, the duties were to assess the high through-put screening hits for their validity, for their integrity, their purity, and then make sure that they were valid starting points for medicinal chemistry effort. Then my duties after that were to design the initial medicinal chemistry program. The approach that we would use, the German Swiss lead series, we would follow up on and interact with the oncology biologists to move the program forward.
Q. What did you mean by hits?
A. Well, a high through-put screening hit was a compound that was tested in these 96 microtiter plates that reduced the cellular phosphotyrosine and showed EGFR inhibition, but there could be many mechanisms for that.

So many of the hits get discarded because they're toxic to the cells or they act by non-selective mechanisms, et cetera. And so each one of the high

through-put screening hits needs to be scrutinized before we can determine whether it's a suitable lead for a medicinal chemistry effort.

Q. Dr. Arnold, what were Dr. Schnur's duties and responsibilities while he was working on the EGFR project?

A. Well, Rodney joined later in the program, in early 1994. Initially, he joined because he wanted to help advance the indolinyl quinazoline series quickly to a development candidate. But his goals as a medicinal chemist were very similar to mine at that point, where we were working on optimizing various lead series and trying to find the best potential therapeutant.

Q. Now, what was found through the high through-put screening of Pfizer's --

A. The most notable hit was UK 95276, which is an anilinoquinazoline.

Q. Do you have a slide showing the structure of that compound?

A. Yes.

Q. Okay. Now, this compound is called UK 95276. What does UK stand for?

A. That indicates that this compound was first made by a chemist at Pfizer's Sandwich U.K. facility.

Q. And when was this UK 95276 identified?

A. This was identified in November of 1992 in high

through-put screening.

Q. Do you have a timeline showing that?

A. Yes.

Q. Now, let's go back to the structure of UK 95276. Now, this compound belongs to the 4-anilinoquinoline series of compounds; is that correct?

A. That's correct.

Q. Now, Dr. Arnold, at some point in time, Pfizer became aware of a Zeneca '722 patent application; is that correct?

A. Yes, it is.

Q. And when was that application uncovered? Do you know?

A. I believe it was on December 30th of 1992.

MR. HSING: Can we go to Arnold No. 7, please?

BY MR. HSING:

Q. So, Dr. Arnold, is it correct that the '722 application discloses the structure of UK 95276?

A. Yes, it does.

Q. Now, was UK 95276 identified as a hit before the publication of the Zeneca '722 application?

A. Yes, it was.

Q. Dr. Arnold, what happened after UK 95276 was identified as a hit at Pfizer?

A. Well, it definitely alerted us to the fact that there was competition in the area and that Zeneca, or ICI, as they were called at the time, had discovered the lead compound

earlier, and so that we would have some competition in working in that lead series.

Q. So what did you do with the compound UK 95276?

A. Well, we intensely scrutinized it initially for its mechanism of action to make sure it was irreversible, that it wasn't toxic. And you have to realize at this time in the field, to find such a potent selective EGFR inhibitor, or a kinase inhibitor of any type was virtually unheard of. And the fact that it bound to the same site as ATP, which is a co-substrate for thousands of enzymes, was very surprising because we had assumed you could never get something potent and selected working through that mechanism.

So we actually spent several months on it, characterizing it, looking at how it based in cells, how it worked against the enzyme, and confirming the mechanism of action before we initiated our efforts. And then we undertook a medicinal chemistry effort.

Q. What do you mean by medicinal chemistry effort?

A. So because the molecule was so surprising, we wanted to understand basically what made it tick, what made it so exceptional, and what were the critical features that it embodied that gave it these unique properties.

Q. Now, did you make any modification to this compound, the UK compound?

A. Yes. In fact, we modified every region of the

molecule.

Q. Now, Dr. Arnold, did OSI Pfizer continue to screen compounds after UK 95276 was identified as a hit?

A. Yes, we did. I think this was identified around 120,000 compounds into the 340,000 compound file.

Q. Now, why did OSI Pfizer continue to screen compounds after this compound was identified as a hit?

A. Well, our objective was to find the best possible EGFR inhibitor as a therapeutant and so we wanted to make sure that we didn't leave any stone unturned and that we considered all possible series. With the finding of the Zeneca application publishing, it would have been more convenient to work on a series that didn't have any competition.

Q. Now, during the EGFR project was there any scepticism about the project at Pfizer?

A. Yes, a good deal, actually.

EGFR isn't just expressed by cancer cells but unfortunately it's also expressed by a wide variety of normal cells. As the name implies, it's expressed in epidermal cells. So we had a lot of fears about the effects it would have whether the animal skin would fall off, whether the gastrointestinal tract would fail to regenerate.

And so nobody had ever advanced a small molecule, EGFR kinase inhibitor. And we were quite concerned about the

potential side effects of just inhibiting EGFR even if we succeeded of our goal of a very potent selective agent.

Q. Dr. Arnold, can you turn to 353, please?

A. Yes.

Q. What is this exhibit?

A. This is the Project Operating Plan written for year one of the EGFR program at Pfizer.

Q. Do you recall -- are you a co-author of this project plan?

A. Yes, I am.

Q. When was this written?

A. This was written in October 4th of 1993.

I believe there's an error in the date that's on the bottom corner.

Q. What was -- what do you think is the correct date?

A. I believe this should be October 4th, 1993.

Q. I see.

MR. HSING: Your Honor, I would like to move Plaintiff's Exhibit 353 into evidence.

MR. PACELLA: No objection.

BY MR. HSING:

Q. Do you see a paragraph starting with the word unfortunately?

A. Yes, I do.

Q. It says, unfortunately, UK 95276 and closely related 4, anilinoquinazolines were recently disclosed as EGFR inhibitors in a patent from ICI. The narrow scope of this patent may, however, make identification of a related but novel series possible.

The ICI patent, is that referring to Zeneca's '722 patent application?

A. Yes, it does.

Q. If you take a look at the next paragraph.

There is a reference to initially strategy. Do you see that?

A. Yes, I do.

Q. Can you describe to the court what you were trying to convey in this paragraph at the time?

A. Sure. Well, first of all, it outlines that we're taking several tactics to find molecules with improved potency and selectivity over the UK95276, that we wanted to improve on this lead and generate proprietary compounds that were outside the confines of the ICI patent.

We were going to look at substituents in the two position, quinazoline ring. We were going to look at deviations from the 4, anilino substituents and also repositioning, or the deletion of the heterocyclic nitrogens of the quinazoline ring were going to be explored.

Q. Did this paragraph outline the research strategy to

modify UK95276 to make additional compounds?
A. Yes, it did at the time.
Q. Can you take a look at Plaintiff's Exhibit 291?
A. Yes.
Q. What is Plaintiff's Exhibit 291?
A. This is a summary that I drafted for the chemistry plans to the EGFR project team outlining the areas that we were going to explore initially.
MR. HSING: Your Honor, I would like to move Plaintiff's Exhibit 291 into evidence.
MR. PACELLA: No objection.
THE COURT: Thank you.
(Plaintiff's Exhibit 291 was entered into evidence.)
MR. HSING: Can we blow up the portion where the compound is?
BY MR. HSING:
Q. What is that compound, Dr. Arnold?
A. This is UK95276.
Q. There's a reference to high speed synthesis of different 4 substituents, what does that mean?
A. This refers to a technology that I was pioneering in my lab for lead optimization and for rapidly exploring analogs of a lead compound.
And basically what we would do in that type of

approach would be to make hundreds of molecules in parallel so that we could get a large bolus of information from the biological data teaching us about structure activity relationships in a very rapid way.
Q. I think you said earlier this is a 4, anilinoquinazoline, is that correct?
A. Yes.
Q. Do you see that compound is a flip of the structure that's -- the Erlotinib structure that's shown on the board?
A. Yes, it is. There is a bond rotation above this carbon, nitrogen bond, otherwise, the framework is the same.
Q. Do you have a demonstrative to show this compound in the same configuration as Erlotinib configuration there so we can have something to show that is comparable -- they are equivalent or comparable?
A. Yes, I do.
MR. HSING: Can we have the next slide?
BY MR. HSING:
Q. Can you explain to the court what is shown on Arnold slide 10?
A. Sure.
This is the UK95276 again with just the bond rotation above this linking bond. It outlines the early research strategy and modifications around UK95276 that were being explored.

Q. Can you describe for the Court the modifications that were being made, the strategy for making those modifications?

A. Certainly.

First of all, we were using various techniques including high speed synthesis to look at a range of four substituents, and so we explored all kinds of replacements of this ring system, as well as extensions of the chain -- changing substituents on the ring and changing the very nature of the ring.

We also looked at the linker atom, which in this case is an NH, an amino nitrogen. And we looked at substituting the hydrogen with alkyl groups.

We looked at constraining it to the other ring. We looked at changing the nature of this atom to an oxygen, a sulfur and a carbon.

Then on the quinazoline ring system, we looked at two substitutions between the two nitrogens of the ring. And we also looked at other changes to the quinazoline ring system looking at basically substituents in virtually every open position, 5, 6, 7 and 8 positions as well as looking at alternative heterocycles in which the rings, either this one or this one, are contracted to a five membered ring and with different hetero atoms within them. And whether or not there was even a ring here or as an appendage.

So, we basically explored almost every possible variation you could imagine.

Q. Dr. Arnold, did you prepare a demonstrative exhibit showing examples of the compounds that were made pursuant to this research strategy?

A. : Yes.

MR. HSING: Could can we have Arnold 11?

BY MR. HSING:

Q. Can you tell us what this slide shows?

A. This slide illustrates some of the examples of many things that we explored.

So, first, starting with the variations in the linking atom. This illustrates how we replaced it with a sulfur, an oxygen, an oxygen with an adjacent carbon bearing hydrogen and also a nitrogen with a couple of carbons inserted before the aromatic ring system.

Q. Now, there is some reference to some CP numbers. What are those?

A. The CP numbers were an abbreviation for Charles Pfizer. They indicated that these compounds were made at the Pfizer Groton site, and the approximate order of the numbers correlates with the chronology of the synthesis of the compounds.

Q. When you made the change to the linkers, these compounds, are they still 4-anilinoquinazolines?

A. No. None of these are 4-anilinoquinazolines.
Q. There is reference to Plaintiff's Exhibit numbers. These are the notebooks in which you can find these compounds, is that correct?
A. That's correct.
Q. Can we go to the next slide, please?
Can you explain to the court what is here?
A. This outlines some of the variations in looking at replacement of the 4-anilino moiety. None of these replacements are actually 4-anilinos.
This is an indolinyl, tetrohydroquinalynyl, isoquinalnyl, benzotriazolyl, benzoimidazolyl, and isoindolino.
Q. These are compounds that were made in Pfizer lab, is that correct
A. These were made in my lab.
Q. These were recorded in the notebooks at Pfizer, is that correct?
A. That's correct.
Q. And the compounds, CP numbers correspond to the Plaintiff's Exhibit numbers underneath each of the compounds, is that correct.
A. That's correct.
Q. Are these 4-anilinoquinazolines?
A. None of these are.

Q. Can you go to the next slide and explain to the court what is here?
A. This describes the range of substituents that we explored at the two position of the quinazoline ring system in which we introduced trichloromethyl, amino, anilino, chloro and oxygen and sulfur linked substituents.
Q. And these compounds, again, they are recorded in laboratory notebooks, correct?
A. Yes, they are.
Q. Can you go to the next one?
What is this described here?
A. As the yellow indicates here, these are replacements of the quinazoline core in which in the first example we eliminated the first nitrogen what would be the three position. The second compound, we've eliminated the nitrogen that was at this position. And then these compounds, we've done a ring contraction but retained one nitrogen.
And these compounds, we basically moved the nitrogen positions around, and if necessary moved the attachment point to explore the effects on the activity.
Q. Now, the compounds in the fourth column, are they 4-anilinoquinazolines?
A. None of the compounds in the fourth column are anilinoquinazolines or even quinazolines.

Q. And these compounds are recorded in Pfizer notebook, correct?
A. Yes, they are.
Q. And Plaintiff's Exhibit numbers are identified there, is that correct?
A. That's correct.
Q. Did you look through the notebooks to confirm those compound are indeed recorded in those notebooks?
A. Yes, I did.
MR. HSING: Your Honor, I would like to move this exhibit into evidence a summary.
MR. PACELLA: We object. We haven't seen the lab notebooks. This is a huge compilation of a wholesale select document. We haven't seen the exhibit.
THE COURT: I thought the original exhibits were in front. This is part of the 192 page document?
MR. HSING: This is just a single page, your Honor.
THE COURT: Are you just admitting the single page?
MR. HSING: Yes, it's single page for now. It illustrates the modifications that were made.
All the underlining exhibits are shown on this exhibit. They have all the underlining exhibits, your Honor.

THE COURT: I'm going to admit -- I'm going to admit this page subject to your objection. If you find any issues of accuracy, we will address it.

MR. PACELLA: Yes, your Honor. I would like just for the record state that this document was presented to us as a demonstrative. It was our understanding they don't come into evidence. This was never disclosed as an exhibit that they had they intended to introduce.

THE COURT: I thought this was part of the larger exhibit. I'm really confused.

MR. HSING: Your honor, they have had this exhibit for several days.

MR. PACELLA: It was never disclosed to us.

THE COURT: Just wait a minute.

Demonstratives, either they all come in or none of them come in. I thought it was it part of the 192 summary document that you all complained about.

MR. HSING: I'm just admitting the single page for now. You can find all of these compounds in the bigger summary that they were arguing this morning.

MR. PHILLIPS: This was given to us as a demonstrative. It was never given to us that as anything other than a demonstrative. And we object.

THE COURT: I understand you object. I'm just trying to get the facts.

This is a summary of the summary?

MR. HSING: Correct.

MR. PHILLIPS: All of these compounds came from lab notebooks that were never given to us that are not exhibits.

MR. HSING: The lab notebooks were given to them. The underlying PTX numbers are there for each compound. It's identified on the exhibit list. These lab notebooks right here, they are all notebooks. These were provided to them during the course of the litigation.

THE COURT: Let's move on.

I'm going to identify it for purposes of the record at this point. I certainly don't want all the lab notebooks with all information that may or may not be relevant.

If there is a -- whether the defendants like it or not, if in fact, this was the work that was done, I need a condensed version to get it into the record.

Now, this might not be the best way to do it. Let's work on it.

So, identify it for purposes of record. We'll talk more about it. Let's not keep the witness waiting.

What is the identification number?

MR. HSING: Identification number is Plaintiff's Exhibit 555.

THE COURT: 555?

MR. HSING: Yes.

THE COURT: We'll have a further discussion.

All right.

BY MR. HSING:

Q. Dr. Arnold, did you make modifications at other positions of quinazolines?

A. Yes, I did.

Q. Do you have a slide to show that?

A. Yes.

MR. HSING: Can we have the next slide, Arnold number 15?

BY MR. HSING:

Q. Can you explain to the court what is -- what were the other modifications that you were making?

A. In keeping the anilinoquinazoline core intact, we looked at substituents at the five and eight position, quickly found that they lead to reduced EGFR activity. And then focused our attention on the six and seven position where it seemed to be tolerant to a very wide range of substitutions.

Q. Before we go to this in greater detail.

MR. HSING: Can we go back to the previous slide which has been marked as Plaintiff's Exhibit 555 for identification purpose?

BY MR. HSING:
Q. These compounds which are shown here in this slide, were they covered by Zeneca's '226 or '722 patent applications?
A. No, none of these were.
MR. HSING: Can we go back to the next slide, please.
BY MR. HSING:
Q. You said you made modifications to position six and seven, did you just say that?
A. Yes.
Q. At is some point in time you made a compound known as CP288865, is that correct?
A. Yes, on October 19th, 1993.
Q. Do you have a slide showing the structure of this compound?
A. Yes, I do.
MR. HSING: Can we go to that next slide, Arnold number 16?
BY MR. HSING:
Q. Tell us about in CP 288865?
A. This compound was different from UK 95276 in having a bromine or a chlorine substitution on the anilino ring system and also incorporating dimethoxy substitution at the six and seven positions of the quinazoline ring.
These are significant because these changes to the

molecule dramatically increase the potency over the initial lead by about 200 fold or more in the in vitro assays. It increased the cellular activity of the inhibitor.

But we were disappointed to find that this had very poor activity in our animal models.

Q. The reference to the bromine, is that the three prime position?

A. Yes.

Q. What is bromine?

A. Bromine is a halogen. It is the next largest halogen after chlorine in the periodic table.

Q. This compound CP 288865, is that also the subject of an article published by Dr. Fry and Bridges in the Science Journal?

A. Yes, it was. They disclosed exactly this molecule.

Q. Did you make this compound before the publication of the Science Journal?

A. Yes.

Q. At some point in time, Dr. Arnold, did you become aware of Zeneca's '226 patent application?

A. That's correct.

Q. When was that published?

A. I believe that was published in late 1993.

Q. Do you have a demonstrative showing the timeline?

A. Yes. I believe it was December 30th, 1993 -- I'm

sorry, October 20th, '93.
Q. Dr. Arnold, Zeneca '226 patent application disclosed this compound CP 288865, is that correct?
A. That's correct.
Q. Was this compound CP 288865 made at Pfizer before the publication of Zeneca '226 application?
A. Yes, it was.
Q. It was made one day before?
A. Yes. Although, we didn't became aware of '226 application until December of 1993.
Q. Dr. Arnold, what was your reaction when you learned of Zeneca's '722 and '226 application?
A. Well, first of all, it indicated that Zeneca was continuing their efforts on the EGFR program, that they had identified exactly the same lead molecule as we had for a second time.

In one sense it was reassuring that we were converging on the same potent selective molecules. But, of course, it was disconcerting that they were ahead of us and that we were going to be in a competitive race to identify the best EGFR inhibitor.
Q. Dr. Arnold, did you give up when you saw Zeneca's '226 and '722 patent application?
A. No, in fact, we didn't. We doubled up our chemistry efforts. Rodney Schnur joined the program at that time.

And we began to explore even more broadly the structural variations for EGFR inhibitors.
Q. Dr. Arnold, how many chemists became involved with the EGFR project at Pfizer?
A. During the peak medicinal chemistry effort, we had between 15 and 20 medicinal chemists on the program as well as resources from another lab dedicated to doing high speed synthesis to help cover more territory quickly.
Q. Let me show you what's been marked as Plaintiff's Exhibit 310. Can you turn to that?
A. Yes.
Q. What is this document?
A. This is a summary of the Zeneca '226 patent that I constructed for the EGFR project team to summarize the highlights of that patent disclosure.
MR. HSING: Your Honor, I would like to move Plaintiff's Exhibit 310 into evidence?
MR. PACELLA: Your Honor, we object as an incomplete exhibit. It purports to be a document that tends to summarize the Zeneca patent. It's only a single page.
MR. HSING: Is that was a copy mistake in his binder. We have a full version of the exhibits. That was during the deposition of Dr. Arnold.
THE COURT: All right.
Do we have one available now? Can we show him

something?
THE WITNESS: Mine is only a single page as well.
MR. HSING: Your Honor, we'll just move on for now.
THE COURT: All right.
BY MR. HSING:
Q. Now, can you turn to Plaintiffs' Exhibit 355?
A. Yes.
Q. And what is this exhibit?
A. This is the project operating plan drafted in March 1994 at year 1.5 in the program.
Q. Okay. Can you turn your attention to the heading, Changes in Research Strategy? Before we get there, did you write this report?
A. Yes. I was the co-author on this report.
MR. HSING: Your Honor, we would like to move Plaintiffs' Exhibit 355 into evidence.
MR. PACELLA: No objection.
THE COURT: Thank you.
(Plaintiffs' Exhibit No. 355 was received into evidence.)
BY MR. HSING:
Q. You note that in this program, it says that a second patent publication by Zeneca, 4Q93, effectively eliminated

any opportunity to improve on the initial 4-anilinoquinoline lead outside the confines of the Zeneca patents.
Do you see that?
A. Yes, I do.
Q. Now, the second patent publication by Zeneca, was that a reference to the '226 patent application?
A. That's correct.
Q. The initial 4-anilinoquinoline lead, is that referring to the UK 95276 compound?
A. Yes.
Q. And what did you mean by this statement?
A. Well, at the time, if you examined the specification, there's a very extensive list of substituents on the quinazoline ring system as well as on the anilino ring system. And so when we reviewed it, it looked like there was very little scope for structural variations that would fall outside of the confines of their patent.
Q. Now, this document is dated March 1994; is that correct?
A. That's correct.
Q. So according to the timeline, is it about four months after the publication of the Zeneca '226 patent application?
A. Even longer. It was about six months, I guess, since the application published in October.
Q. Now, at this time, did Pfizer think of a

4-anilinoquinoline with an ethynyl substituent at the 3 prime position?
A. No, we didn't at this time.
Q. No?
A. No.
Q. This document goes on to state that, however, we have discovered a conformationally-constrained proprietary series, exemplified by CP-292597, with good potency, high selectivity, and considerable patent opportunity.
Do you see that?
A. Yes.
Q. And what did you mean by a conformationally constrained proprietary series?
A. So by constructing a ring system that restricts the motion of this 4 prime substituent, it promotes what we consider to be the bioactive confirmation, or the confirmation in which the molecules prefer to bind to EGFR. And it locks this ring in a particular tilt, or angle of tilt, and presents the halogen in a locked position rather than having the opportunity to be either here or up here (indicating).
Q. Is this compound still a 4-anilinoquinoline?
A. No, it is not.
Q. How do you call this kind of compound?
A. This is referred to as an indolinyl ring system.

Q. And this compound has a CP number, 292597; is that correct?
A. That's correct.
Q. Did this compound become a lead compound at Pfizer?
A. Yes, it did.
Q. Now, was this compound, this indolinyl compound, covered by the Zeneca '226 or '722 patent applications?
A. No, it was not.
Q. Do you know when this compound was made?
A. This was made in November of 1993.
Q. So this was made after the '226 and '722 applications published; is that correct?
A. Yes, it was.
Q. Now, did you file a patent application on the indolinyl compound?
A. Yes, we did. On February 23rd, 1994, we filed a provisional application.
Q. Now, did you make other compounds that were not 4-anilinoquinazoline at or about this time?
A. Yes, a great number.
Q. Do you have a demonstrative showing some examples of these compounds?
A. Yes.
MR. HSING: Can we go to Arnold 21, please?
BY MR. HSING:

Q. Can you explain to the Court what are illustrated on this demonstrative?
A. Yes. So in the upper left is a series referred to as the pyridopyrimidine. This is called pyridopyrimidine because the ring system here now incorporates a nitrogen, which significantly changes this and is no longer a quinazoline. And then in the top is an amino indolyl moiety.
Q. So you're referring to the compound with the CP number 32445; is that correct?
A. That's correct.
Q. And can you go to the next one?
A. The one below it is in the series of pyrrolopyrimidine. In this case, the ring attached is contracted to a five-membered pyrrolo ring. This is no longer a quinazoline, but is now a pyrollo pyrimidine.
Q. And this number, this compound has a CP number 337774; is that correct?
A. That's correct.
Q. And can you go to the next one?
A. Yes. We also looked at the use of carbon as a linker, and this actually gave active compounds. In this case, this is a single carbon linker. We also explored constraining this so -- also into a five-membered ring, although now the linking atom is a carbon with some stereochemistry. And

this indanyl series was also explored.
Q. Now, the first -- the other -- the previous compound you were talking about, you called it a C-linked analog?
A. Yes.
Q. And that has a CP number of 323721; is that correct?
A. That's correct.
Q. And you were talking about a compound, stereochemistry. What is that compound?
A. This is also a carbon linked analog, but this is an indanyl quinazoline.
Q. And that has a CP number of 338231; is that correct?
A. Yes, it does.
Q. And these compounds, were they all made after the publication of the Zeneca '722 and '226 patent applications?
A. Yes. All of them.
Q. Are they covered by those applications?
A. No, they are not.
Q. I would like to -- can you turn to Plaintiffs' Exhibit 365.
A. Yes.
Q. And what is Plaintiffs' Exhibit 365?
A. This is a set of slides that was made to update Pfizer management at our quarterly meeting.
Q. Did you write it?
A. Yes, I did.

Q. And when was it written?
A. It was written for the third quarter of 1994, so I believe that would be June of 1994.
MR. HSING: Your Honor, I would like to move Plaintiffs' Exhibit 365 into evidence.
MR. PACELLA: No objection.
THE COURT: Thank you.
(PTX-365 was received into evidence.)
BY MR. HSING:
Q. Can you turn to page 2?
A. Yes.
Q. It has the Bates No. PFE 448294?
A. Yes.
Q. Are you there?
A. Yes.
Q. Do you see there are two compounds at the top?
A. Yes.
Q. What are those compounds?
A. So these were the four compounds in our EGFR program that gave us good oral activity in the animal models. The one on the left is an amino indazolyl compound and the other one is an amino indolyl quinazoline.
And as I mentioned before, these have good potency in vitro and cellular assays and oral activity in the animal model. So we were very excited by these

compounds.
Q. Now, these compounds, are they 4-anilinoquinazoline?
A. No, they are not.
Q. Are they covered by Zeneca's '226 or '722 patent applications?
A. No, they weren't.
Q. Now, if you go down on the same page, there's a reference to the third scoop, major competitive development.
Do you see that?
A. Yes, I do.
Q. What did you mean by that?
A. Well, this was the third time Zeneca had scooped us in the EGFR program with their most preferred compounds being disclosed as exactly the same ones I was just discussing as having oral activity in our animal models. And they claim specifically the amino indolyl quinazolines and indazolyl quinazolines.
Q. Now, this Zeneca patent application, that's not --
A. No, it is not.
Q. What was your reaction when you were scooped by Zeneca for the third time?
A. Well, definitely we were shocked and surprised. Once again, we had converged on exactly the same most preferred compounds with biological activity. If nothing else, it was a confirmation that we were doing things right and finding

the same molecules, but it was also a blow to our program because it had taken away the first two molecules with good oral activity.

Q. Did you give up at that point?

A. No, not at all. Actually, we added more medicinal chemistry support and we increased our efforts on non-anilinoquinazolines.

Q. Can you turn to the next page, page 3 of this document?

A. Yes.

Q. With the Bates number 448095.

Do you see at the top, the rebound, part one: Indolynyl quinazolines.

Do you see that?

A. Yes, I do.

Q. What did you mean by that?

A. This was our part of bouncing back and trying to recover from the blow of being scooped three times. So we had continued to optimize the indolinyl quinazoline lead compound, working to improve its oral absorption and its activity, and had identified molecules like CP-324133-27, that had in vivo biological activity and good properties.

Q. Now, this indolinyl series, is that covered by any of the Zeneca patent applications?

A. No, it was not.

Q. And so you went from CP-292597 to CP-324133. Why did you do that?
A. Well, we were working to improve the potency, also improve the solubility, and the oral absorption. And we were also looking to try and improve the metabolic resistance. So as it says below in the rest of the slide, that we were trying to improve the duration of action in the animal models and the potency in vivo.
Q. Now, did this compound, 324133, become a lead compound at Pfizer?
A. It was a representative of the indolinyl quinazolines that had good in vivo activity. As mentioned here, 82 percent of the indolinyl quinazolines were showing activity at that time in our animal models.
Q. Now, when you went from the compounds on the left to the compound on the right, did you make modifications to the, I call them tails of the 6 and 7 position of the quinazoline?
A. Yes. We examined a wide variety of substituents at those positions.
Q. Now, do you have a demonstrative showing the modifications that, examples of some of the examples of the modifications you made to the 6 and 7 position of the quinazoline?
A. Yes, I do.

MR. HSING: Can we go to the next slide, please? Yes.

BY MR. HSING:

Q. This is Arnold 23. Now, can you explain to the Court what are illustrated here?

A. So these are selected set of examples of modifications to the 6 and 7 positions, outlining the types of things that were explored, including some oxygen-linked substituents to the quinazoline ring. Also including a sulfur and halogen substitution in that position or also including things that were linked through the 6-amino position on the molecule, all with a goal to try to improve the potency, the oral bioavailability and duration of action.

Q. And each of these examples, you have a compound number underneath; is that correct?

A. Yes.

Q. And these are all recorded in laboratory notebooks?

A. Yes, they are. The notebooks are mentioned underneath.

MR. HSING: Your Honor, again, I would like to move this exhibit into evidence. I understand there's a dispute. Perhaps we can mark it for identification.

THE COURT: Mark it for identification and we'll have a discussion about how best to get this kind of evidence in.

MR. HSING: Your Honor, I would like to mark it as Plaintiffs' Exhibit --

THE COURT: We can't hear you. What is it?

MR. HSING: 558.

(Plaintiffs' Exhibit No. 558 was marked for identification.)

BY MR. HSING:

Q. Now, Dr. Arnold, at some point in time, Pfizer made a compound which is substituted with an azido group on the aniline ring; is that correct?

A. Yes, we did.

Q. Do you have a demonstrative showing examples of such azido compounds?

A. Yes.

MR. HSING: Can we go to the Arnold 24?

BY MR. HSING:

Q. Can you explain to the Court what are these compounds?

A. So these are 4-anilino quinazolines that have a substituent. In this case, at the 4-prime position, where there's a substitution with an azido moiety. Now, the azido moiety is three nitrogens linked together by double bonds with charges formally assigned to nitrogens in that substituent. And this is linked in the 4 position, and then CP-341865 is the azido compound with the substituent in the 3 prime position.

And the azido substituent extends out considerably longer than most of the other substituents that have been explored in those positions up to that time.

Q. Did the Zeneca patent applications cover these azido compounds?

A. No, they didn't.

Q. And were these compounds made after the publication of the '722 and the '226 patent applications?

A. Yes, they were.

Q. The azido group, can you say something about the characteristics of this group?

A. Well, it actually is not considered highly lipophilic. It's also considered quite polar, as you can see from the assignment of formal charges to the nitrogens in the substituent, and then also extends out significantly from the anilino ring system. And our goal was actually to try to probe the depth of the pocket.

So in terms of trying to optimize drug molecules, it's like fitting a glove to a hand, or a hand into a glove. And we want to try and probe as deeply into that glove as we can without it -- without getting too large.

Q. Now, the compound on the right, CP-341865, the azido substituted the 3 prime position; is that correct?

A. Yes.

Q. The compound on the left, which is made earlier, has the azido at so-called para position; is that correct?
A. Yes, or the 4 prime position.
Q. So why were you making compounds that were not substituted at the 3 prime position?
A. Well, we were still building structure activity relationships and exploring toleration to substitution, and it turns out that these do retain measures of biological activity.
Q. And, Dr. Arnold, is it correct that the reissued '065 patent also covered -- covers these azido substituted compounds?
A. Yes, it does.
Q. Dr. Arnold, at some point in time, Pfizer made a compound with an ethynyl substituent at the 3 prime position; is that correct?
A. That's correct.
Q. Now, do you have an illustration of this structure?
A. Yes, I do.
MR. HSING: Can you go to the next, Arnold 25?
BY MR. HSING:
Q. And what is this compound?
A. This compound is CP-319732.
Q. And when was it made?
A. It was made April 12th, 1994.

Q. And this compound has an ethynyl group at the 3 prime position; is that correct?
A. Yes, it does.
Q. Can you point to the Court where the ethynyl group is?
A. Certainly. So that refers to the substituent that has two carbons triply bonded to each other, and then bonded to a hydrogen, and the entire arrangement of atoms is presented in a linear projection from the anilino ring system.
Q. Okay. Was this compound the first ethynyl compound made in the project?
A. Yes, it was.
MR. HSING: Can we go to the timeline?
BY MR. HSING:
Q. So was this compound made after the publication of the Zeneca '226 and '722 patent applications?
A. Yes, it was.
Q. And who made this compound?
A. This was made in Rodney Schnur's lab.
Q. And who first came up with the idea of substituting the aniline with a 3 prime ethynyl group?
A. Rodney Schnur suggested it.
Q. And what was your reaction to that idea?
A. Well, we knew that at many other companies within the pharmaceutical industry, this type of substituent was forbidden. And it was forbidden for reasons based on

earlier precedence, such as ethynyl oral contraceptives that led to inactivation of critical liver enzymes, called cytochrome P450s. Inactivating those enzymes, turning livers green, and potentially leading to liver toxicity and to drug-drug interactions.

And so in general, the incorporation of an ethynyl moiety at that time was -- was discouraged, and as I said, at some sites, forbidden.

So our Pfizer U.K. site in Sandwich, England was overseen by Simon Campbell in medicinal chemistry, and he forbid the chemists at that site to even use this substituent.

Q. So why did you continue to pursue ethynyl compounds?

A. Well, the ethynyl conveyed on the molecule significant improvements in potency. It offered an alternative to the halogens, which was quite unique, and projected further from the anilino ring system than a methyl group by a significant amount. It was less lipophilic and it was more polar and seemed to convey on a simpler molecule even oral bioavailability and oral activity in our model. So the compound had exceptional properties.

Q. Now, before you knew the properties, why did you pursue them, knowing that they were ethynyl compounds?

A. Well, luckily, we were driven by data and not by dogma. We had generated activity and information using

compounds like the azido that indicated you could put larger substituents in the 3 prime position, and so we were, as I said, trying to explore getting the best fit of the hand into the glove of the binding site of EGFR.

Q. And this compound was made almost, what, six months after the publication of the Zeneca '226 application; is that correct?

A. That's correct.

Q. Now, can we go back to Plaintiffs' Exhibit 365? You can go to page 5 of that exhibit.

A. Okay.

Q. The Bates No. 448097.

So this compound illustrates the first ethynyl compound, 3192732; is that correct?

A. That's correct. This is the same molecule we were just looking at.

Q. Now, there's a heading, the rebound, Part 2: Acetylenic anilinoquinazolines.

What does that mean?

A. This refers to that core where this ethynyl moiety is often called acetylene. So this is an acetylenic anilinoquinazoline.

Q. So why did you call this a rebound?

A. Well, because we were recovering from the third scoop by Zeneca, and these compounds offered us potential

proprietary position, and also exceptional biological activity.

As you can see here, the in vitro potency was below or was less than the amount of enzyme we were using in the assay, which meant we were basically titrating all of the active sites. It had good cellular potency, reasonable solubility, and was active in our in vivo models with reasonable activity.

Unfortunately, though, the molecule had about twofold a dose that gave us efficacy also gave us toxicity in the animal. So this was not a suitable molecule to advance itself, but was a good starting point for optimization.

Q. Do you see there's a box, patent niche overlooked by Zeneca? (PC 8836 to encompass).

Do you see that?

A. Yes.

Q. What did you mean by that?

A. Well, Zeneca had covered a very extensive range of substituents in the anilinoquinazoline series and they had not claimed the azido or the ethynyl or larger alkynyl substituents or even the ethenyl substituent. So there was this -- this class was not covered by Zeneca's patent filings.

Q. Now, this compound, CP-319732, I mean, that's not

erlotinib; is that correct?
A. No, it's not.
Q. And so this memo -- was this memo prepared or drafted, or this slide drafted prior to the synthesis of erlotinib?
A. Yes, it was, by several months.
THE COURT: And before you go on, would you just give me the date in the exhibit number again?
MR. HSING: Sure. It's Exhibit No. 365.
BY MR. HSING:
Q. When was this drafted?
A. This was for the third quarter of 1994, so that would have been in June of that year.
Q. What did you mean by metabolic stabilization for increased duration?
A. Well, one of the things that I had identified using resources in my lab up to that time was the fact that many of the dimethoxy quinazoline derivatives were rapidly inactivated by liver enzymes that would remove these methoxy groups and render the molecules inactive. And we were looking for ways to try to increase that stability and increase the exposure to the active drug and increase its duration of action in animals.
Q. Now, you said that this compound, 319732, was not suitable for further advancement. Did you testify to that?
A. Yes, I did.

Q. So did you attempt to make modifications to this compound?
A. Yes. A great number.
MR. HSING: Can we turn to this exhibit on page 6 having the Bates No. 448098?
THE WITNESS: Yes.
BY MR. HSING:
Q. Illustrated here are four compounds. What are these four compounds?
A. So this would have been part of our rebound, but these were less developed series. These were what we called maturing leads that had promising in vitro activities, and in some cases, promising activity in animal models.
These different analogs were also described on that earlier slide, so these are the carbon-linked analogs in which the nitrogen was replaced here in the linking position (indicating) with a carbon atom, or in these quinazoline surrogates in which the quinazoline ring system had been replaced with a pyrrido pyrimidine or pyrrolo pyrimidine ring system.
Q. I'm sorry. These compounds, they were not 4-anilinoquinazoline; correct?
A. No, none of them.
Q. They're also not covered by the Zeneca '722 or '226 patent applications?

A. No, none of these were.
Q. Now, at some point in time, erlotinib was made; is that correct?
A. That's correct.
Q. And when was erlotinib first made?
A. It was made in November of 1994.
Q. And who made erlotinib?
A. It was made in my lab by Dr., or by John Doty.
Q. It was under your supervision?
A. Yes.
Q. So can we go to Arnold 28, the timeline, please?
So erlotinib, is it correct, was made almost seven months after the first ethynyl compound, CP-319732, was made?
A. That is correct.
Q. Now, can you go to the board and see the structure of erlotinib? Do you see that erlotinib has a 6, 7 dimethoxy ethoxy tails at the 6 and 7 position?
Do you see that?
A. Yes, I do.
Q. Now, who decided to put the methoxyethoxy tail at the 6 and 7 positions?
A. I did.
Q. Now, prior to making erlotinib with this -- with the tails, did you make a compound, another compound with a

methoxy ethoxy tail at 6 and 7 positions of the quinazoline?
A. Yes, I did.
Q. Now, can you turn to PTX, Plaintiffs' Exhibit 365? The same exhibit. Please turn to page 4 having a Bates number 448096.
Now, does this page illustrate your prior experience with a methoxy ethoxy tail at the 6 and 7 position of quinazoline?
A. Yes, it does.
Q. Can you explain?
A. Certainly. So what we were doing was using liver extracts to assess the rate at which these compounds were metabolized and inactivated.
And so what's shown here is a range of substituents where we looked at variations in the 7 position, and what we found was that if we changed this to a range of longer substituents, that all of these were metabolized within three to four minutes by the liver extracts, which is far too short for effective drug.
We could change it to some other substituents and get a slight improvement in the duration of action, but what we found was if we changed both the 6 and the 7 position, and not just one of them, then we could get unique improvement in the metabolic stability to 80 minutes. So an improvement of over twentyfold in terms of the resistance to

metabolism compared to the dimethoxy derivatives and related analogs.
Q. Now, the one with the 80-minute half-life, is that the one with a methoxyethoxy tail at the 6 and 7 positions?
A. Yes, it is.
Q. So that compound has the same tails as erlotinib; is that correct?
A. Yes, it does.
Q. But it is not erlotinib; is that correct?
A. No, it is not.
Q. Is that an indolinyl compound, as you testified earlier?
A. Yes, it is. This is an indolinyl quinazoline with the 6,7 bis-methoxyethoxy substitution.
Q. Is it better to have a longer half-life?
A. Yes, it is. We believed that we needed to inhibit EGFR activity for a good portion of the day, to have the maximal efficacious benefit, and so we were looking for molecules that would have a longer half-life, ideally consistent with once daily dosing.
Q. Now, why did you decide to put methoxyethoxy tails at the 6 and 7 positions on an ethynyl containing compound, there by making erlotinib?
A. Well, in medicinal chemistry, we're always trying to work out structure activity trends and then translate

beneficial findings in molecules into related molecules so we can combine them all into one more effective drug. And so in this case, we wanted to take the long half-life that was afforded by the bis-methoxyethoxy substitution and combine it with the ethynyl substitution in erlotinib, which also conveyed an enhancement in stability and very good potency and oral bioavailability to make a better drug molecule.
Q. Now, did Zeneca's '722 or '226 patent applications have any data or information about metabolic studies or duration of action respecting a methoxyethoxy tail at the 6 and 7 position?
A. None whatsoever.
Q. Now, what was Dr. Schnur reaction when you wanted to put the methoxyethoxy tails at the 6 and 7 position?
MR. PACELLA: Objection. Hearsay.
THE WITNESS: Well --
THE COURT: Just a minute. Are you looking -- what are you looking for?
MR. HSING: I was asking for Dr. Schnur's reaction to his suggestion to make the 6 and 7 methoxyethoxy tails. And Dr. Schnur is --
THE COURT: I understand he's not available, but that also means there's no way that the defendants can vet that issue. So if there's something recorded, if his

reaction is recorded someplace, that's fine. Otherwise, I'm not confident it's an appropriate area of investigation.
MR. HSING: Okay. All right, your Honor.
BY MR. HSING:
Q. Now, let me show you what has been marked as Plaintiffs' Exhibit 357.
What is Exhibit 357?
A. This is the project operating plan for the EGFR program in March 1995 at year 2.5.
Q. So at this time, erlotinib was already made?
A. Yes, it was.
MR. HSING: Your Honor, I would like to move Plaintiffs' Exhibit 357 into evidence.
MR. PACELLA: No objection, your Honor.
THE COURT: Thank you.
(PTX-357 was received into evidence.)
BY MR. HSING:
Q. Do you see a paragraph heading, changes in research strategy.
Do you see that?
A. Yes, I do.
Q. Do you see that sort of toward, a little bit below the middle of the paragraph, there's a sentence starting with, the current lead?
Do you see that?

A. Yes.
Q. The current lead, CP-358774. That refers to erlotinib; is that correct?
A. Yes, it does.
Q. It says, the current lead, CP-358774, incorporates two such favorable fragments to produce an orally active, potently efficacious, relatively long-lived, well-tolerated agent.
Do you see that?
A. Yes.
Q. What are these two fragments, favorable fragments?
A. So it's referring to fragments that -- that were capable of improving solubility, bioavailability and metabolic stability and duration and the two fragments were the ethynyl moiety at the 3 prime position and the bis-methoxyethoxy substitution on the quinazoline.
Q. Do you have a demonstrative showing these two favorable fragments?
A. Yes, I do.
Q. And can you explain to the Court what is illustrated here?
A. Okay. So as I alluded to before, erlotinib resulted from a combination of learnings in the indolinyl quinazoline lead series where we found that the bis-methoxyethoxy substitution conveyed resistance to metabolism and also

often produced active metabolites that could continue to the efficacy, and combined it with the finding that the alkynyl substitution in the 3 prime position also had oral activity and longer duration of action in these liver metabolism studies than the halogen related compounds.

And we put these two findings together, taking this portion of this molecule and this portion of this molecule, to combine them together into erlotinib, which had superior biological properties.

Q. Now, the compound with the methoxyethoxy, that's CP-319170; is that correct?
A. Yes.
Q. And that's the same compound that was discussed in Plaintiffs' Exhibit 365; is that correct?
A. That's correct.
Q. And when was that made?
A. This was made in April -- on April 14, 1994.
Q. And the compound CP-319732, that is the first ethynyl compound that was made; is that correct?
A. Right. It was made about two days prior.
Q. So when was erlotinib made in comparison to these two earlier compounds?
A. It was made about seven months later.
Q. I'm going to go back now to Plaintiffs' Exhibit 310.

MR. HSING: Your Honor, may I approach the

witness?

THE COURT: Yes, you may.

(Mr. Hsing handed an exhibit to the witness.)

BY MR. HSING:

Q. Dr. Arnold, what is Plaintiffs' Exhibit 310?

A. It's a summary that I constructed after reviewing the Zeneca '226 patent.

Q. Okay.

MR. HSING: Your Honor, at this time, I would like to move Plaintiffs' Exhibit 310 into evidence.

MR. PACELLA: No objection at this time.

THE COURT: Thank you.

(PTX-310 was received into evidence.)

BY MR. HSING:

Q. As you wrote -- you wrote this exhibit; is that correct?

A. Well, the second page is actually from the October 29th, 1993, Derwent abstracts, which were usually used to alert us to patent publications, and I modified that with my handwriting. And then the remainder of the document is written by me, yes.

Q. And when was this written?

A. This was written on December 2nd, 1993, shortly after I became aware of the patent application publishing.

Q. Okay. Now, if you go to page 3, PFE336971, 336971.

A. Yes.
Q. There's a reference to prior art cited at the top. So what are you discussing here?
A. So these were earlier anilino quinazolines that were cited by the Zeneca patent as prior art. And what's listed there are the therapeutic uses of those particular molecules.
Q. Okay. And let's go to page 5. PFE3369733.
There are five compounds illustrated here. What are these five compounds?
A. So these are the compounds from that specification for which there was biological data reported.
Q. So why did you write down the compounds with biological data from the Zeneca '226 patent application?
A. Well, the nature of the assays that were used in their drug discovery program were somewhat different than the ones we were using at Pfizer. And so we are always wanted go to compare their activities versus ours and identify a potential benchmark compound against which we can compare our activities and get a sense of how we're doing and who may be superior. And these were the compounds from which we could learn something in that specification.
Q. Now, as a medicinal chemist, what do you think about looking at biological data? Is that something that you do?
A. Absolutely. The biological data has to drive our --

our medicinal chemistry effort.
Q. Now, if you would turn to the '226 patent, which is PTX-8, and that is the same as Defendant's Exhibit 286. It should be in front of you, PTX-8.
A. Okay.
Q. If you would turn to page 21, lines 23 to 30?
A. Yes.
Q. Are these the compounds that have data in the Zeneca '226 patent application?
A. Yes, they are. These are the compounds that I drew out in my summary.
Q. In plaintiffs Exhibit 310; is that correct?
A. That's correct.
Q. Now, if you would turn to page 61 of Zeneca '226 patent application. Do you see claims 7 and 9 on this page? Seven and nine of the Zeneca '226?
A. Yes, I do.
Q. Now, my question to you is, did you illustrate or mention any of these compounds in your memo summarizing Zeneca's '226 patent application?
A. No, none of these.
Q. Okay. Thank you.
Let's turn to page 8 of this PTX-310. Are you there? Page 8?
A. Yes.

Q. Here you wrote, possible novel agent outside of ICI claims.
And what did you mean?
A. So these were some of the things I was proposing exploring based on an analysis of the patent and the prior art outside of them. So substituents in which there could be an alkyl on the nitrogen were to be examined and we had no data on these as yet.
I also proposed at that time that the compounds like the indolinyl quinazolines in which there was a ring fusion to the anilino ring system might also be active compounds and we did pursue these.
And then if we go down further, this proposed as the nitrogen within the center of this ring implies that we could look at pyrrolo pyrimidines in which there would be a nitrogen incorporated at one of the four positions in this ring system, that those could also be explored, and that there wasn't a lot of prior art in that area, and that we could also look at ring contracted forms of these benzenoid systems or reduced forms in which we reduced the multiple bonds within the ring system down to single bonds.
And then, finally, the comment on higher homologs referred to insertion of additional carbon atoms between the linking nitrogen and the ring system of the anilino to make a series of higher homologs, and that these

also had not been encompassed by the Zeneca patent.
MR. HSING: Could you project the whole page?
BY MR. HSING:
Q. Now, so these possible novel agents that were outside the scope of the Zeneca '226 application?
A. That's correct.
Q. Now, at this time, is there anything that you wrote in this memo about noticing that the ethynyl group was omitted from the Zeneca patent application claims?
A. No.
MR. HSING: Can we turn to Plaintiffs' Exhibit 287?
BY MR. HSING:
Q. What is this exhibit?
A. This is a quarterly report drafted by the cancer research team at Pfizer to management dated December 12th, 1994.
Q. Can you turn to the page bearing the number PFE 332727?
A. Yes.
Q. Do you see your name at the top? Contact: Lee Arnold?
A. Yes, I do.
Q. Does that mean that you wrote this page?
A. Yes it does.

MR. HSING: Your Honor at this time, I'd like to move Plaintiffs' Exhibit 287 into evidence.
MR. PACELLA: No objection.
THE COURT: Thank you.
(PTX-287 was received into evidence.)
BY MR. HSING:
Q. Now, if you take a look at the paragraph starting at the second bullet point, leads in four structural classes have been shown to be potent in vitro, in cellular assays, and active in vivo, and so on.
Do you see that?
A. Yes.
Q. At this time, was erlotinib already made?
A. Yes, it was.
Q. And the first compound, CP-358774, the first -- the first compound at the left, that is intended to convey erlotinib; is that correct?
A. Yes, it is. There's an error in the structure when it printed. The oxygens were lost at these positions.
Q. So what were these other compounds?
A. These other compounds were not anilinoquinazolines. They were representatives of the indolinyl quinazoline series, the pyrrole pyrimidine series, and the indanyl quinazoline series that all had displayed good in vivo activity.

Q. Now, why did Pfizer continue to pursue these other structural leads even after erlotinib was made?
A. Well, our goal all along was to identify the best potential EGFR inhibitor as a therapeutant, and so if any one of these would have had superior properties, we would have advanced it.
Q. Now, if you would turn your attention to Plaintiffs' Exhibit 331.
A. Okay.
Q. And what is this exhibit?
A. This is a memo drafted May 5th, 1995, to Pfizer's early development candidate management team, and it's called a candidate alert notice, referring to CP-358774.
Q. And that is erlotinib?
A. Yes, it is.
Q. So at this time, erlotinib was nominated as a clinical candidate?
A. Yes, it was.
Q. And that was on May 5th, 1995?
A. Yes, it was.
Q. Now, can you turn to Plaintiffs' Exhibit 372?
MR. HSING: Your Honor, I would like to move Exhibit, plaintiffs' Exhibit 331 into evidence.
MR. PACELLA: No objection.
THE COURT: Thank you.

(PTX-331 was received into evidence.)

BY MR. HSING:

Q. What is Plaintiffs' Exhibit 372?

A. This is a staff report for June 1995, drafted by myself, representing my lab's efforts.

MR. HSING: Your Honor, at this time I would like to move Plaintiffs' Exhibit 372 into evidence.

MR. PACELLA: No objection.

THE COURT: Thank you.

(PTX-372 was received into evidence.)

BY MR. HSING:

Q. Dr. Arnold, did you conduct studies to see what would be the metabolites of erlotinib CP-358774?

A. Yes, I did.

Q. And if you turn to page 2 of this report, can you describe what is illustrated here?

A. Yes. This is a summary of the studies of the metabolism of CP-358774, or erlotinib. And they were conducted in collaboration with my lab along with the drug metabolism group at Pfizer.

Q. And what did you find?

A. Well, what we found was that unlike other di-methoxy quinazoline derivatives that were cleaved at Position A to lead to inactive metabolites, the liver enzymes instead were able to remove the terminal methyl groups of either of the

two methoxyethoxy substituents to produce metabolites that had a hydroxy ethoxy in any of the 6 or the 7 position.

Now, both of these metabolites actually had activities that were very comparable to the parent drug in cellular and in vitro assays, and also we had shown by synthesis to confirm the structures and administration in animals, that these have activity in animal models, and would be expected to contribute to the efficacy of erlotinib within our cancer models.

We had shown also that there was metabolism on the ethynyl anilino ring system, but surprisingly not at the ethynyl moiety. So it didn't demonstrate the behavior of being a suicide substrate for the P-450 enzymes and lead to the concerns that would have caused most people not to incorporate this moiety, but instead, the metabolism was at the position four adjacent to it, with an introduction of a hydroxy by the metabolizing enzymes. And that compound also had good potency, somewhat reduced cellular activity, and also retained activity in our animal model.

So all of these metabolites of erlotinib were produced in the animals and had the potential to contribute to the efficacy and the duration of action.

Q. Now, Dr. Arnold, after erlotinib was made, did Pfizer continue to make compounds of EGFR kinase inhibitors?

A. Yes, they did, for several years.

Q. And why?
A. Well, first of all, we did want to make sure we advanced the best molecule to the clinic.
Second of all, it's quite common for a molecule that's going into these investigational new drug studies to fail in toxicology or to find some major problem with mutagenicity, et cetera. And so these are by no means a sure thing at this point. And so we always wanted to have a backup molecule that we could advance should the -- the development candidate fall down.
Q. Were you involved in those efforts to find backup compounds?
A. Yes, I was, until the time I left in November of 1995.
Q. Okay. Let me show you what has been marked as Plaintiffs' Exhibit 368. Could you turn to that, please?
What is this exhibit?
A. This is another cancer quarterly report written for the third quarter of 1995 and apparently updated September 14th, 1995.
Q. And then you received a copy of this exhibit; is that correct?
A. That's correct.
MR. HSING: Your Honor, at this time I would like to move Plaintiffs' Exhibit 368 into evidence.
THE COURT: Any objection?

MR. PACELLA: Your Honor, our only objection to this document is that it does say "draft" on the bottom left-hand corner. There's no foundation that this witness ever received this document or that this is the final document.

THE COURT: You can explore that, please.

BY MR. HSING:

Q. Dr. Arnold, have you seen this document during your employment at Pfizer? Do you recall?

A. Yes, I was. I was actually involved in drafting the document.

THE COURT: All right. It's admitted, then.

(PTX-368 was received into evidence.)

BY MR. HSING:

Q. If you take a look at the very first page of this document, I guess the Bates number is 224430.

Do you see that?

A. Yes, I do.

Q. Do you see that there's a, I guess, a table? There's a reference to backup seeking.

Do you see that?

A. Yes, I do. Right here.

Q. What does that mean, backup seeking?

A. So this describes the efforts to find alternative compounds to CP-358774.

Q. Which is erlotinib?
A. Yes.
Q. And do you see there's a bullet point in this chart, the fourth column, the last bullet point? No compounds superior to CP-358774 have been identified.
What did that mean?
A. That meant that even though we had other lead series with some promising activity that we're continuing to go through medicinal chemistry optimization, that to this points we had done no compounds that had superior activity to CP-358774.
Q. Now I would like to turn your attention to Plaintiffs' Exhibit 374.
Have you seen this document? Have you seen the slides of this exhibit?
A. Yes, I have.
MR. HSING: Your Honor, at this time I would like to move Exhibit 374 into evidence.
MR. PACELLA: No objection, your Honor.
THE COURT: All right. Thank you.
(PTX-374 was received into evidence.)
BY MR. HSING:
Q. Would you turn to the page bearing the Bates number OSI 937374?
Do you see that?

A. Yes, I do.
Q. Now, about how many compounds were synthesized at Pfizer over the course of the EGFR project while you were employed?
A. While I was there, about 1181 compounds.
Q. And how many compounds went through the high through-put screening?
A. 340,400 compounds were tested in the high through-put screening.
Q. Now, Dr. Arnold, did you review the notebooks and the data summaries that are still available and produced in this litigation recording the compounds made during the EGFR project while you were employed at Pfizer?
A. Yes, I did.
Q. And these notebooks, are they -- I think they're the three binders right next to you.
Now, are these notebooks, PTX-403, 404, 425, 406, 408, 409, 411, 412, 413, 416, 419, 524, are these the notebooks? You looked through these notebooks?
A. Yes, I did.
Q. And data summaries that you looked at, are these PTX-377, 381, 385, and 526?
A. Yes.
Q. And these exhibits are quite voluminous; is that correct?

A. Yes.

Q. Now, do you have a summary of the compounds made during the project and recorded in these notebooks and data summaries?

A. Yes, I do.

Q. And is that plaintiffs' Exhibit 548?

A. Yes, it is.

Q. Now, does that Exhibit 548, does that accurately and fairly summarized the EGFR project compounds as recorded in these exhibits, 13 notebooks and four data summaries?

A. It summarizes the compounds that were made by direct synthesis that are summarized in these notebooks. It doesn't cover many of the compounds that were made in high speed synthesis.

MR. HSING: Your Honor, at this point I would like to move that summary, plaintiffs' Exhibit 548, into evidence, so that I don't have to move all of these other notebooks and data summaries into evidence.

MR. PACELLA: Your Honor, we would like the opportunity to cross the witness on it.

THE COURT: All right.

MR. PACELLA: We have the same objections. A massive summary that was produced late to us.

THE COURT: All right. Well, generally, this is a help to the Court, but certainly you may -- and so I am

going to admit Plaintiffs' Exhibit 548 subject to the defendant's continuing objection and cross-examination.

(PTX-548 was received into evidence.)

MR. HSING: Your Honor, if that were the case, I would have to reserve my right to move in these notebooks.

THE COURT: Of course.

MR. HSING: And data summaries.

THE COURT: Of course.

MR. HSING: I'm not going to do that at this time.

THE COURT: All right.

MR. HSING: I would like to do that later.

THE COURT: All right.

BY MR. HSING:

Q. If you would take a look at Exhibit 548, how is that arranged?

THE COURT: Actually, before we start this, this might be a good time to take a morning break.

MR. HSING: Okay.

THE COURT: So I'm going to do that. And I have to get out of my computer, so you may go.

MS. BEN-AMI: Thank you, your Honor. May the witness step down?

THE COURT: Certainly. The witness may step down.

(Short recess taken.)

- - -

(Proceedings resumed after the short recess.)

THE COURT: You may continue.

BY MR. HSING:

Q. Dr. Arnold, if you would turn to Plaintiffs' Exhibit 548.

A. Yes.

Q. And this is the summary of the notebooks that -- and data summaries that we discussed. How is this arranged?

A. So it's arranged in order of ascending CP number.

Q. So what does that mean?

A. So that the approximate order in which compounds were prepared and registered in the Pfizer corporate data base.

Q. So does that mean that a lower number would generally mean that a compound was made earlier?

A. Generally, yes.

Q. And how many compounds are there in this exhibit?

A. 571.

Q. Could you turn to page 109?

A. Yes.

Q. Does erlotinib appear?

A. Yes, it does. It's No. 328.

Q. Dr. Arnold, when was Tarceva approved by the FDA?

A. In November of 19 -- sorry. November of 2004.

MR. HSING: Can we have Arnold 33, please?
BY MR. HSING:
Q. So when was erlotinib first made?
A. In November of 1994.
Q. And Tarceva, which has erlotinib, has the active ingredient; is that correct?
A. Yes, it does.
Q. How long after erlotinib was first made was Tarceva proved by the FDA?
A. More than ten years.
Q. And Tarceva also received another indication approval by the FDA for pancreatic cancer; is that correct?
A. Yes. In November of 2005.
Q. Now, Dr. Arnold, when you first made erlotinib, you were employed by Pfizer; is that correct?
A. That's correct.
Q. Now, when Tarceva was approved by the FDA, you were employed by OSI; is that correct?
A. Yes, as Vice President of U.S. Research.
Q. What was your reaction, Dr. Arnold, when you heard that Tarceva had been approved by the FDA?
A. It was great joy and fulfillment, and this is basically a medicinal chemistry, is to deliver a molecule that can afford benefit to patients with cancer.
MR. HSING: Your Honor, I have no further

questions. I just want to sort of list the exhibits I moved into evidence to make sure I, indeed, moved them into evidence, if I can.

THE COURT: All right. Just hold on. Let Francesca get set. All right.

MR. HSING: JTX-one, PTX-353, 291, 310, 355, 365, 357, 287, 331, 372, 368, 374, and 548, which is the summary of the laboratory notebook, and also I marked two exhibits for identification purposes. 558 and 555.

THE COURT: All right. Thank you.

MR. HSING: Thank you.

(Exhibits received into evidence.)

THE COURT: Cross examination.

MR. PACELLA: Thank you, your Honor.

CROSS-EXAMINATION.

BY MR. PACELLA:

Q. Good morning, Dr. Arnold.

A. Good morning.

Q. Now, you're one of the inventors of the '065 patent; is that correct?

A. That's correct.

Q. And you understand that the '065 patent is a reissue of what was the '498 patent?

A. That's correct.

Q. And so you're an inventor on the '498 patent? That's

the original patent that claimed erlotinib; is that correct?
A. That's correct.
Q. And when the original patent application that you submitted to the Patent Office, or that was submitted to the Patent Office was filed, you filled out a declaration as the inventor that everything in the patent application was true; is that right?
A. I did sign a document, yes.
Q. And at the time you made that oath to the patent office that you claimed an invention including erlotinib, you believed the statements that were in the patent application were true? Is that fair?
A. I had actually left Pfizer at the time of that filing and so I wasn't entitled, according to them, to review the document, so I had to sign the document, assuming that it was consistent with what I had seen before.
Q. So you signed a declaration to the Patent Office that you were an inventor on an invention and you never reviewed the patent application?
A. I had seen the earlier provisional draft, but the final submitted application, I hadn't seen.
MR. PACELLA: Could we have JTX-3, which I believe has been previously admitted.
BY MR. PACELLA:
Q. This is the '498 patent; is that correct?

A. Yes, it is.
Q. That's the patent that led to the reissue of the '065 patent that you are an inventor of?
A. Yes.
Q. Now, at the time you filed this patent -- at the time this patent application was filed on your behalf, you believed that the compounds claimed in the patent were useful for the treatment of cancer? Is that a fair statement?
A. I believe it says they could be adapted for use in treatment of cancer.
Q. Okay. Let's take a look at column 14, lines 1 through 10, please. And it says there, the active compounds of this invention are potent inhibitors of the erbB family, it goes on, including protein tyrosine kinases such as the epidermal growth factor receptor, EGFR.
And then it goes on to say, and thus all are adapted to therapeutic use as anti-proliferative agents, e.g., anti-cancer agents in mammals, particularly humans.
Do you see that?
A. Yes, I do.
Q. And that is a true statement?
A. I'm sorry? What's a true statement?
Q. Do you agree with that statement, that that is an accurate statement?

A. I agree that these compounds are inhibitors of the erbB family of kinases and -- and by virtue of that, are useful for -- as potential therapeutants.
Q. And it says, in particular, the compounds of this invention, reading from line 6 now -- in particular, the compounds of this invention are therapeutants or prophylactics for the treatment of a variety of human tumors.
Do you see that?
A. I do see that.
Q. That's an accurate statement?
A. We believed and we hoped that the foundation was there, that these could be useful in that regard, yes.
Q. And you told the Patent Office specifically that lung cancer was one type of cancer, that the compounds of the invention were therapeutants or prophylactics for the treatment of; is that correct?
A. It was one of a long list of cancers given here as well as other hyper plastic conditions that were non-malignant.
Q. The answer to my question, however, was that, in fact, lung cancer was pointed out as one of the -- one of the conditions for which these compounds are therapeutants; is that correct?
A. It was one of the cancers where we believed these

compounds, the compounds of the specification could have therapeutic utility.
Q. And the reason they could have therapeutic utility is because they were active inhibitors of EGFR, is that correct, of the EGFR tyrosine kinase?
A. We believed that that would be their mechanism of action.
Q. And you told the Patent Office that erlotinib was a specific -- an example of a specifically preferred compound of the invention; isn't that right?
A. Could you point to that?
Q. Sure.
MR. PACELLA: Could we go to Column 3, line 47? Actually, just call up the page that has columns 3 and 4. If you could blow up on the left lines 47 or so on the left.
BY MR. PACELLA:
Q. Okay. There, you are calling out specific preferred compounds of the formula. Do you see that?
A. Yes.
Q. And you're listing a number of compounds by name?
A. Yes.
Q. Could you go to column 4, line 6 through 10, please? I'm sorry. Lines 8 through 9.
Do you see erlotinib on that list?
A. I see erlotinib listed here along with many other

specifically claimed compounds.
Q. Okay. But erlotinib is a specifically preferred compound, according to your patent; is that correct?
A. It's a long a list of specifically preferred compounds.
Q. Right. So erlotinib is a specifically preferred compound; is that correct? It's a yes-or-no question, Doctor.
A. Yes, it would be.
Q. And you actually specifically claimed erlotinib by name in one of your claims. Do you understand that to be the indication?
A. Yes. Among other compounds.
Q. I understand, but erlotinib was specifically listed and called out in one of the claims.
A. Can you point to that reference?
Q. Sure. Let's go to claim 8, column 40, line 1, at the very top.
And this is a continuation of claim 8. If you want to look in the document on your -- you should have -- well, maybe you don't have it. Let me hand it to you.
MR. PACELLA: May I approach, your Honor?
THE COURT: Yes, you may.
(Mr. Pacella handed an exhibit to the witness.)
BY MR. PACELLA:

Q. So I have just handed you what is JTX-3, the '498 patent, and I'm referring your attention on the left-hand side around midway down.
Do you see where claim 8 starts?
A. Yes.
Q. And so am I correct that on the following column, lines 1 through 2, you specifically called out, among some other compounds, the name of erlotinib?
A. It was called out amongst about 105 compounds.
Q. Where do you see 105 compounds on that list?
A. Well, I'm trying to count quickly, but certainly more than a few.
Q. But it's not 105, is it?
A. I can't be certain without counting.
Q. Okay. And you also specifically claimed the use of the compounds of the invention for treating cancers, including lung cancer, isn't that right, in this patent application?
A. Cancers and hyperproliferative diseases, yes.
Q. Well, go to claim 29. That claim specifically includes -- it's the treatment of conditions, one of which is lung cancer; is that correct?
A. It lists a group consisting of renal, liver, kidney, colorectal, brain, lung, skin, bladder, gastric, pancreatic, breast, head, neck, esophageal, vulval, gynecological and

thyroid cancers.
Q. Those are all EGFR-expressing cancers to your knowledge; isn't that right?
A. Yes, they are.
Q. And one of the listed cancers is lung cancer?
A. One of them listed is lung.
Q. Okay. The reason it was listed is because lung was associated with EGFR overexpression?
A. Some lung cancers are. Not all.
Q. Understood. Okay.
So you applied for this patent in May of 1996, if you look on the face of the patent?
A. Yes.
Q. Is that correct? That's when it was filed in the U.S. Patent Office?
A. Yes.
Q. And it's a continuation of an application that was filed in June 1995; is that correct?
A. That's correct.
Q. Okay. At that time, erlotinib hadn't been tested in humans, had it?
A. At which of those times? I'm sorry.
Q. Either one. Let's go with 1995.
A. In 1995, definitely not.
Q. And how about 1996?

A. I had left Pfizer at that point, so I don't know for certain.
Q. Okay. So that brings me to my next question. You can set that aside. Well, let me just ask one more question on this.
You mentioned in your testimony, I believe, that one of the attributes that you were looking for with these compounds was things like oral bioavailability?
A. Yes.
Q. All right. The only data in this patent that provides what the compounds do, or what properties the compounds have, is the $IC_{50}$ values for in vitro EGFR tyrosine kinase activity; isn't that correct?
And if I could refer -- let me refer your attention to Column 3, at 15, lines three -- sorry. Column 15 at lines 3 to 10.
MR. PACELLA: Can you put that up?
THE WITNESS: I see that.
BY MR. PACELLA:
Q. Right. So you are referring there to that the compounds have $IC_{50}$ values in a range of .0001 to 30 micromolar; is that correct?
A. That's correct.
Q. And that is the inhibitory property of the compound that's being disclosed in this patent, the compounds fall

within that range; correct?
A. Yes.
Q. There's no in vivo data provided in this application that provides any values of what the in vivo data for these compounds would be; isn't that correct?
A. If you highlight the next paragraph, it outlines that the activity of the active compounds in vivo can be determined by the amount of inhibition of tumor growth of a test compound relative to control. So it outlines the animal model --
Q. Right.
A. -- in which you could evaluate the activity of these.
It also goes on to mention the routes of administration being intraperitoneal, or oral, routes of administration.
Q. It's not limited to oral administration, is it?
A. No, it is not.
Q. So it could be intravenous?
A. It could.
Q. And pharmacokinetics of intravenous dosing would be different than oral; is that correct?
A. Yes.
Q. So what you were really relying on -- and there's no actual data for these in vivo results stated in the patent. The only values that are given are for the $IC_{50}$ that we just

looked at; is that correct?
A. That's correct.
Q. So what you were really looking at in terms of the key property of these compounds at the time you claimed was an invention and the time the patent was filed was the $IC_{50}$ values?
A. No, that's not correct.
Q. Okay. The $IC_{50}$ values are the only information that you provided as to the properties of these compounds; isn't that correct?
A. That's correct. We provided support for the claim that these were -- that these were potent EGFR inhibitors. And by virtue of that, could have usefulness in cancers expressing EGFR.
Q. Okay. Now, you mention that you are one of the two inventors of the '065 patent?
A. Yes.
Q. Okay. And along with Dr. Schnur?
A. Yes.
Q. And both of you are medicinal chemists?
A. Yes.
Q. Neither of you are biologists or pharmacologists?
A. Actually, I have two-and-a-half years of research experience in biochemistry and biophysics and eight publications in that field.

Q. Okay. When was that?
A. That was during the period 19 -- 1980 to '83.
Q. All right. But you are not a pharmacologist. Neither you nor Dr. Schnur were pharmacologists; correct?
A. Well, actually, I've overseen oncology biology and oncology chemistry at OSI for three years, and served as the director of both of those departments as well as the VP of U.S. research. So I had a very extensive career in oncology and have overseen entire drug discovery programs at Pfizer, at OSI, and at Abbott and at BASF.
Q. Okay. Neither you nor Dr. Schnur are medical doctors. I'm pretty confident of that; is that correct?
A. That's correct.
Q. And your invention in the '498 patent was a series of compounds, including erlotinib, that were potent EGFR inhibitors based on the $IC_{50}$ values that were disclosed?
A. Yes.
Q. Now, you left -- you talk a little bit about, at least you mentioned how long it took to get from when erlotinib was identified as a clinical candidate, which happened before -- which happened around the time that you left Pfizer?
A. No. Actually, it was nominated as a -- a candidate in May of 1995.
Q. Okay. So you left Pfizer in around 1998 sometime; is

that correct?
A. No. In November of 1995.
Q. Sorry. Okay. So from November of 1995 through I think you said around April of 2003, you were somewhere else other than at Pfizer or OSI; isn't that correct?
A. That's correct.
Q. And that's where the majority of the clinical development in terms of clinical trials took place for erlotinib; isn't that right?
A. Yes. I wasn't reunited with the erlotinib effort until I joined OSI in early 2003, at which point it was in Phase 3 clinical trials.
Q. Okay. And you were not involved in designing those trials, or you can't explain why it took as long as it took to get from point A to point B, from candidate status through approval; isn't that correct?
A. Not with firsthand knowledge.
Q. All right. Let's talk a little bit about the chronology.
MR. PACELLA: Why don't we go ahead and put up slide 6, Arnold slide 6. I think that's 5. Oh, the numbers changed.
Can you put up the -- well, let's just do it this way. All right.
BY MR. PACELLA:

Q. So in 1991, Pfizer, around that point, Pfizer initiated its EGFR project. Is that about right?
A. That was the collaborative effort with OSI, so at the time a project is initiated, it really didn't have any medicinal chemistry support. It was really the screening effort.
Q. All right. So let's talk about the screening effort. If I understood it correctly, what you did at the beginning of the project, which I believe you refer to as HTS, which began in December of 1991?
A. That's correct.
Q. And this high through-put screening is basically you took the entire -- basically, all the compounds you could get your hands on that were in the Pfizer library, run them through the same assay to determine which ones had the desired activity; is that correct?
A. Not entirely. The Pfizer compound collection excluded things that we knew were blatantly reactive or not drug-like and undesirable. So it was a collection of drug like molecules that was tested.
Q. Okay. Hundreds of thousands of compounds?
A. Correct.
Q. You just ran those all through the same assay?
A. Yes, I did.
Q. You got a hit from a compound that had activity, an

$IC_{50}$ value that you gave you confidence that it was an EGFR inhibitor, correct?
A. Eventually, after conducting secondary assays and confirmatory experiments, yes.
Q. Right. But the first hit that you focused on was the compound that you referred to as UK 95276?
A. That's correct.
Q. That was one of the hundreds of thousands of compounds that was run through this screen?
A. Yes, it was.
Q. And you found it interesting because it had a good potency, at least in the in vitro assays?
A. It had good potency but also exceptional selectivity. So we had expected anything binding at the ATP site of the kinase as this did would have activity against many of the 500 kinases in the human genome. We were amazed to find that it didn't.
Q. Selectivity is good because it's something that would lead you to have less concern about toxicity than if it was less selective, isn't that correct?
A. It would have less off target effects and lesser undesirable pharmacology, we would hope.
Q. Toxicity?
A. That's one way in which it could manifest, but not the only way.

Q. As it turns out, the compound UK 95276, that was your first identified compound of interest in the EGFR program that was as it turns out disclosed shortly thereafter in a patent application filed by Zeneca, correct?
A. That's correct.
Q. Let's go to DTX-11 -- actually, I think this was 353 which was used by the plaintiff today and has been admitted.
MR. PACELLA: Can we put up PTX-353? I'll be more clear, 353.
BY MR. PACELLA:
Q. And this is the project operating plan for the EGFR project for the first year that you testified about earlier today?
A. Yes, it is.
Q. If you look down, this document was one of the early memorializations of what the project was, why you were doing it and where it was going, is that a pretty fair characterization?
A. Yes. This was probably the first document outlining our operating plan for the use of resources within Pfizer.
Q. And earlier you testified that there was -- early on in the program there was concern that -- I believe you testified there was just some skepticism generally that an EGFR inhibitor would lead to some sort of toxicity? I believe that's what you said. Did I get that correct?

A.    Our concern was that EGFR while it's often overexpressed in human tumors, is also expressed in normal cells, in the skin, hair follicles, gastrointestinal tract.

It looked like it played an important role because it was turned on at certain times, for example, in the regeneration of your GI tract.

And so our concern was that we weren't sure what margin of safety we would have between inhibiting the growth of the tumor driven by EGFR and the effects on normal tissue.

Q.    That was the concern that you had at this time before you had sufficient information?

A.    Well, actually that concern extended all the way into the clinical trials, and, this fact, it was associated with the reason why it was suspended.  When they did start to see effects on the skin, they were concerned about whether there were other things that might be going on as well.  And they didn't continue the clinical trials.

Q.    You were not there when this thing about the skin, toxicity came up?  Were you there?

A.    No, I wasn't.  I was informed.

Q.    Thank you.  The question was, were you there and you were not.

Let's take a look at the very last paragraph of that page.  We're looking at the first page of 353.

That says an expected advantage of this approach over existing cancer therapy would be reduced toxicity because of the more selected targeting of specific growth regulatory process, do you see that?

A. That's correct.

Q. And then you mention two distinct lines of evidence that suggests that this is not going to be a problem?

A. Yes, we did go into that in detail.

Q. Now, you have this UK 95276 compound. It's something that you want to pursue, correct?

A. Yes, it was.

Q. Okay.

It turns out that unfortunately you were scooped by Zeneca's '722 patent?

A. Well, I think in retrospect, it was probably fortunate. It lead to us a more potent, more efficacious molecule.

Q. You were disappointed at the time that Zeneca had beat you to the compound -- class of compounds that encompassed this compound that you found in your screening process, true or false?

A. At this time, it was true that we were disappointed that they were competing ahead of us.

Q. Right.

And let's go to the second page -- second paragraph

under approach/status. This is where you say that this was an unfortunate event that you got scooped, correct?

A. Yes.

Q. And then you go on to say, the narrow scope of this patent may, however, make identification of a related but novel series possible?

A. Yes.

Q. So at that point in time oppose -- let me strike that.

ICI was the predecessor to Zeneca, correct?

A. That is correct.

Q. So you're looking at the Zeneca patent you're analyzing the scope of the claims, correct?

A. Yes.

Q. And your goal at that time is to identify something that would be outside the scope of those claims?

A. Yes. That would be the goal of any pharmaceutical research would be to not overlap our program with somebody else's composition of matter.

Q. But, in any event, UK 95276 was the starting point for what lead to Erlotinib, correct?

A. That did launch the medicinal chemistry effort that eventually lead to Erlotinib.

Q. UK 95276 patent was the starting point from which Erlotinib was discovered, is that correct?

MR. HSING: Counsel may have made a mistake.

MR. PACELLA: I'll restate.

BY MR. PACELLA:

Q. UK 95276 was the starting point from which Erlotinib was discovered, correct?

A. It was the starting point for the medicinal chemistry program in which Erlotinib was discovered.

Q. Let's take a look at your deposition.

MR. PACELLA: May I approach, your Honor?

THE COURT: Yes, you may.

BY MR. PACELLA:

Q. Doctor, can you turn to page 11?

A. Yes.

Q. Starting at line 19?

A. Yes.

Q. You were asked some questions about UK 95276. And you were asked whether you, Zeneca UK 95276 was the parent compound for Erlotinib, do you see that?

A. I do.

Q. And then you see that your answer to that question was, it was the starting point from which Erlotinib was discovered?

MR. HSING: Objection, your Honor. This is not impeachment. He's reading the deposition.

MR. PACELLA: He would not answer the question directly that it was the starting point. I'll go on, your

Honor.

THE COURT: All right.

BY MR. PACELLA:

Q. So, Pfizer couldn't file for a patent application on UK 95276 because that had already been done by Zeneca, correct?

A. That would be correct.

Q. All right.

Now, at that point in time, referring back to your year one analysis, Plaintiff's Exhibit 353, you were telling the Pfizer management that the '722 Zeneca patent had narrow scope?

A. Yes.

Q. So your goal was to find proprietary, novel analogs that were outside that narrow scope?

A. Yes. That would be the goal of any medicinal chemist in the program.

Q. After you got scooped by Zeneca with the '722 patent, you decided -- I think you discussed it in great detail, you made a lot of different changes to various parts of that particular molecule, right?

A. Yes, we did make many changes to the molecule, changing the ring system. Changing the anilino system in an effort to try to identify the best possible therapeutant.

Q. One of those variations was a series -- I'm probably

not going to pronounce this correctly, indolinyl?
A. Indolinyl.
Q. Indolinyl, thank you.
Is that correct, that was one of the approaches?
A. Yes, it was.
Q. Ultimately, Pfizer never pursued that series as a clinical compound, correct?
A. It's correct that candidate was never nominated from that series. They continued work on that series even after I departed as a back up series.
Q. Right. When you left Pfizer, there was no -- that series, indolinyl series had not been adopted by Pfizer as a clinical candidate?
A. No, no clinical candidate had been advanced from that series.
Q. So, after you got scooped by Pfizer with the '722 patent, you went on and you did this other work and, I believe, in October 1993 is when you identified another, 4-anilinoquinazoline that you said had the number CP 28865?
A. 288865, yes.
Q. And that one was different from the UK 95276 because it had -- what was the difference?
A. It had a bromine in place of the chlorine at the three prime position of the aniline system. It had a dimethoxy substitution in the six and seven positions.

Q. And that compound had good in vitro tyrosine kinase inhibiting characteristics, correct, $IC_{50}$?
A. Yes, it did.
Q. I believe according to your timeline, you don't have to show it. I believe you said that it was literally the next day that another patent application was filed by Zeneca that disclosed that compound that you just described?
A. Actually, it was the next day that the patent application published from Zeneca.
Q. Right. You didn't became aware of it until late November, early December of 1993?
A. Yes.
Q. About a month after it published?
A. Yes, at that time, we didn't have an electronic data base. We went based on paper copies of Derwent abstracts to monitor disclosures by competitors.
Q. So, you were scooped by Zeneca a second time with the -- this was '226 patent application, correct?
A. Correct.
Q. And that patent application had an example, the example compound was the CP 288865 compound, correct?
A. That's correct.
Q. So when you saw that -- well, let me just call up -- I believe at one point you said you were shocked and surprised when you got scooped the second time by Zeneca?

A. I believe that was with reference to the third scoop.
The second one, quite honestly, you know, 288865 was one of the first compounds that we had actually made following up on the UK compounds. It wasn't too surprising to me that Zeneca also would have followed that same path. But we were definitely disappointed.
Q. All right. Let's -- you should have in front of you Plaintiff's Exhibit 291, which I believe was previously admitted, and that is your chemistry plan dated November 1st, 1993, correct?
A. Yes.
Q. That's where you are focusing on making changes to the UK 95276?
A. That's correct.
At this point, we didn't know the CP 288865 disclosure in the Zeneca patent applications.
Q. Okay. So when you found that you are -- when you found that you were scooped the second time by Zeneca with the '226 patent application, you set out, again in different directions to try to get far afield from what was claimed in that application, is that correct?
A. No, we had actually already been pursuing all of these directions, so the impact on our plan was that we didn't dwell on the high potency of CP 288865 but instead started working beyond that.

And so, it was probably, again, a good thing in retrospect that we didn't spend a lot of time on that molecule.

Q. CP 288865, by the way, that's also the Parke Davis compound that was disclosed in a science paper in 1994 by Dr. Fry?

A. Yes, I believe in August of 1994.

Q. And that was noted as the most potent EGFR inhibitor of its time?

A. Yes, they had actually done experiments to look at just how potent it was, and claimed it was picomolar.

As I mentioned before, it had very high patency in vitro, good cellular activity, but it did not have good properties or behavior or efficacy on our animal models.

Q. CP 288865 became Pfizer's benchmark compound for judging the potency of its EGFR inhibitors, correct?

A. We certainly --

Q. I'm asking a simple question, sir.

A. It certainly defined a high potency compound against which we compared others, if that's what you're asking.

Q. It was the Pfizer benchmark?

A. In in vitro assays, it defined a potency that was hard to beat. I think it's important --

THE COURT: Excuse me, sir, he can explain his answer as I allowed your expert to explain.

THE WITNESS: I think once we got to a certain potency level in and our in vitro assays we couldn't differentiate between compounds.

So our concentration of enzyme assays was one nanomolar. In theory to get 50 percent inhibition you needed half nanomolar compound concentration. And these were showing activity of less than point 3 nanomolar. We couldn't differentiate. When we got to a certain point they all looked the same as the in vitro assays. And we can't differentiate.

BY MR. PACELLA:

Q. So you couldn't differentiate that any of the compounds that you worked on at Pfizer were better in potency than the '226 patent application compound that you called CP 288865?

A. Well, actually, there was no biological data for CP 288865 in the Zeneca patent disclosure.

Q. Right. But it was disclosed by Dr. Fry in the science paper, wasn't it?

A. Yes, after a year when we made and characterized it.

Q. I understand that.

My question was that you could not differentiate between the potency of compounds once you got to a certain point?

My question was, did you ever find a compound that you

could differentiate that was better than the Zeneca 226 compound with the bromine?

A. You're referring to CP 288865?

Q. Yes.

A. Yes, absolutely we found compounds that were better than that.

Q. I'm talking about potency.

A. Well, potency is identified in a variety of ways. In vitro potency against purified enzyme, no, we couldn't differentiate. We had molecules that were as potent such as 319732, the first ethynyl derivative that we mentioned. We couldn't tell the difference between that an 288865 in the in vitro assay.

In the cellular assay, we had superior potency in the tens of nanomolar range.

In the in vivo assays, we were dramatically better. We could differentiate. But that's why you use the drug discovery cascade and you don't make all your decisions with an in vitro assay.

Q. All right. Let's look at DTX-12.

Do you recognize this, Doctor?

A. Yes, I do.

Q. Okay. This is a document that you created in the fourth quarter of 1993?

A. Yes.

Q. And you're describing the chemistry issue with respect to the EGFR project?
A. Yes.
Q. And you say there that the chemistry issue is identification of proprietary analog of UK-95276 and CP-288865?
A. Yes.
Q. So your starting point was first UK-95276, and then CP-288865; is that correct?
A. Those were two representative compounds that were illustrative of the potent EGFR activity.
Q. All right. And so you were working off of those to find other analogs?
A. Yes, we were, but as we disclosed before, we were looking at many things that did not fall within the anilinoquinazoline series of compounds.
Q. Okay.
MR. PACELLA: Your Honor, we move DTX, or Defense Exhibit 12 into evidence.
MR. HSING: Your Honor, I don't have any objection except I think the PTX version is actually better because there's a redaction at the second page from the last, which we then produced a fully unredacted version. So I would prefer to use the unredacted version.
THE COURT: What PTX number is that?

MR. HSING: I was just looking around for it. I can identify it. Just give me a moment. Maybe I could do it a little bit later.
MR. PACELLA: We would probably exchange that informally, if that's all right with your Honor.
THE COURT: Good enough.
MR. PACELLA: All right. Let's take a look at DTX-82. Actually, sorry. Plaintiffs' Exhibit 310, which was just admitted this morning, your Honor.
BY MR. PACELLA:
Q. This is your summary of the Zeneca '226 patent application?
A. Yes, it was.
Q. And you're sending it to the entire EGFR project team?
A. Yes.
Q. And you went in detail through some of this. I won't repeat it. But at the back you have an analysis where you identified, on the very last page, some possible novel agents outside of ICI's claims?
A. Yes, I did.
Q. And by March 1994 -- strike that.
This document was done on December 2nd -- was generated on December 2nd, 1993?
A. That's correct.
Q. And that is several months before you're familiar with

an abstract by Dr. Barker that described one of the compounds in one of his patent applications?
A. I'm familiar with two abstracts from Dr. Barker.
Q. All right. And you read one of the abstracts yourself shortly after it was published; is that correct?
A. I believe it came to my attention in -- one of them in May and one in June of 1994.
Q. So this patent analysis was done prior to -- well, let me just make sure this is clear. You understand that those were -- those presentations took place in March of 1994?
A. They're reported as abstracts of presentations given at meetings held at that time.
Q. Okay. And that is after you did your '226 patent analysis that's shown on this page; is that correct?
A. That is correct.
Q. You also testified about that you had, I think you -- well, you certainly have studied the claims, because you're analyzing what might be outside the claims; is that right?
A. I had studied the claims, yes.
Q. And we're talking about the '226 patent application; correct?
A. Yes, we are.
Q. And so you're listing here on this sheet, which ends in page 976, on the bottom right, several possible novel agents, and these are significantly different in structure

than the 4-anilino quinazolines disclosed by Barker in the '226 application; is that correct?
A. Yes. It was my opinion that these would fall outside of the scope.
Q. They're different ring structures; correct?
A. Some of them are.
Q. They're not 4-anilinoquinazolines?
A. Actually, the first one is.
Q. Okay. But it has got an alkyl group off the nitrogen; correct?
A. That's correct, but it's still a 4-anilinoquinazoline.
Q. All right. But you are putting additional groups off the central nitrogen, the purple section in the diagram to your right?
A. That's correct.
Q. So it is not the same core structure?
A. How is it not?
Q. All right. So now you looked at the claims. And did you notice that one of the claims of the '226 patent application expressly disclosed a compound and claimed a compound that had the methoxyethoxy group there that's on the left of the diagram for erlotinib?
A. I'm aware that there was a compound with that substitution, yes.
Q. In the claim?

A. Yes. I believe it was exemplified as Example 51.
Q. Okay. And also in the claim?
A. I believe there's a claim that covers it.
Q. All right. So going to DTX -- no. Let's use Plaintiffs' Exhibit 355, which was admitted earlier today as well.
This is your project operating plan for year 1.5?
A. Yes, written in March of 1994.
Q. All right. So this is where you're describing to the Pfizer management you are going to have a change in research strategy? That's on the fourth paragraph down?
A. Yes.
Q. And you conclude there that the second patent publication by Zeneca, the '226, effectively eliminated any opportunities to improve on Pfizer's initial 4-anilinoquinazoline lead?
A. That's what's written, yes.
Q. And so you decided at that point you were focusing on this compound on the right as a lead?
A. Certainly a good fraction of our medicinal chemistry resource was on the indolinyl quinazolines at that time.
Q. And that compound on the right is one of those indolinyl quinazolines?
A. Yes, it is.

Q. So your team believed that the indolinyl quinazolines had good potency; is that correct?
A. Yes.
Q. And they were selective?
A. Yes, they were.
Q. And you also viewed them as a considerable patent opportunity?
A. Yes. We were not aware of any prior art on indolinyl quinazolines.
Q. And so -- but you were still looking at other things during this time? Other types of potential structures?
A. A very broad range, yes.
Q. But this was your lead series, the indolines?
A. Yes.
Q. And then you, I believe you say here in this document that you rapidly drafted a patent application. You filed that in February of 1994?
A. Yes, that's what it says.
Q. All right. If you look at -- let's look at Defendant's Exhibit 96.
MR. HSING: Your Honor, at this time, the exhibit which is the fuller version -- I'm sorry. This is the wrong one. I will sit down.
(Pause.)
BY MR. PACELLA:

Q. Now I'm going to go ahead and -- I don't believe this has been admitted.
MR. PACELLA: Can we pull up DTX-98? May I?
THE COURT: Yes.
(Mr. Pacella handed an exhibit to the witness.)
BY MR. PACELLA:
Q. That is Defense Exhibit 98. Is that a -- do you recognize that as a memo from James Moyer to a Dr. Bacopoulos at the department of cancer and neurosciences at Pfizer?
A. Yes. It's dated March 1st, 1994. This is representing Jim Moyer's lab's activities over the last quarter.
Q. And Dr. Moyer was the head of the biology team for the EGFR project?
A. Yes.
Q. And Dr. Bacopoulos was the head of the Department of Cancer and Neurosciences?
A. Yes. Dr. Jim Moyer reported to Nick Bacopoulos.
Q. Okay. And this report, you're one of the recipients?
A. Yes.
MR. PACELLA: Your Honor, I move to admit DTX-98.
MR. HSING: No objection.
THE COURT: Thank you.

(DTX-98 was received into evidence.)

BY MR. PACELLA:

Q. If you would go to the fourth page ending in 833.

It says there that, in the second paragraph, the potencies of the indoline series are listed in Table 2 and the anilino series in Table 3.

Do you see that?

A. Yes.

Q. And then it says, our proprietary anilino series has not yet equaled the potency of CP288865, the most potent compound in the anilino series owned by Zeneca; is that correct?

A. That's correct.

Q. And Dr. Moyer is reporting, however, several of the anilines, and he lists several compound numbers, appear to be comparable to other preferred Zeneca compounds, and it lists two Zeneca compounds.

A. That's correct.

Q. So some of Pfizer's indolinyl quinazolines were at least of comparable potency to the Zeneca compounds?

A. They were comparable, yes. At this time, I don't think there was anything that exceeded the activity of 288865. However, for a drug molecule to succeed, it does not have to be the most potent in vitro. In fact, often the most potent in vitro are classified by biologists as brick

dust and really are inactive in animal models. And so the key to drug discovery is to find the right balance of sufficient potency, selectivity and activity in animal models.
Q. But right now, Dr. Moyer is focusing on potency; isn't that correct?
A. His contribution to the project was to measure the in vitro and cellular potencies of the molecules, and so his report of focus on that.
Q. All right. But this potency data, the $IC_{50}$ data that is being presented in this document, it's the same type of data that's disclosed in the -- that we discussed earlier with the '498 patent; correct?
A. That's correct.
Q. So at least at this point in time, you had not found better potency compounds to any of the Zeneca compounds; is that correct?
A. Not better, but certainly as he mentions in his last sentence there, all of these compounds meet project team expectations for in vitro potency of less than 20 nanomolar. Considering that the enzyme is one nanomolar, we're in the same concentration range as the enzyme.
So, you know, we realized we didn't need to be sub-nanomolar in activity in this assay to have compounds that would have good animal activity going forward.

Q. All right. So you can have a number of compounds that exhibit a range of $IC_{50}$ values that are all deemed acceptable in terms of potency; is that correct?
A. That's correct. So usually what we did was define a threshold that they needed to meet in order to advance to the next level of the drug discovery cascade, which would be cellular activity, and then after that, in vivo pharmacokinetics and efficacy models.
Q. All right. Doctor, I'm handing you what has been marked Defendant's Exhibit 14 (handing exhibit to the witness).
So now we're heading into June of 1994; correct? This is a June 1994 document?
A. That's correct.
Q. That's another document from a Dr. Moyer to Dr. Proctor?
A. Yes. At that time, he had switched his reporting to Dr. Alan Proctor.
Q. And Dr. Moyer is reporting the -- it's a staff report that he's reporting, and you're one of the recipients of this report?
A. That's correct.
MR. PACELLA: Your Honor, we move to admit Defendant's Exhibit 14.
MR. HSING: No objection.

THE COURT: Thank you.

(DTX-14 was received into evidence.)

BY MR. PACELLA:

Q. If you look in the, I believe it's the fourth page in ending in 859 at the bottom, here, if you look in the first full paragraph, there, Dr. Moyer is reporting that several novel series had been shown to be active.

A. Yes.

Q. And at the very last sentence there, it says, in addition, an anilino compound not covered in Zeneca's patent CP-319732 was found to be highly potent; correct?

A. That's correct.

Q. And what is -- what type of compound is CP-319732?

A. As we showed in the demonstrative early -- earlier, it's the first ethynyl anilinoquinazoline compound.

Q. Okay. But it's a 4 anilinoquinazoline?

A. That's correct.

Q. Okay. And you at that point were still considering the indoline series?

A. Yes, we were. In fact, if you look at his report, objective one is to support the discovery efforts on the CP292597 series with cellular and kinase assays. And 292597 was the prototype indolinyl quinazoline.

Q. Okay. And then you got scooped again by Zeneca; correct?

A. Not on either of these two compounds to which you're referring.

Q. All right. But at that point in time, you -- well, let me do it this way.

If you look back to Defense Exhibit 14 at the fifth page, which ends in 860. So this is a table that follows the page that we were just looking at. And there's a long list of compounds and gives some $IC_{50}$ values and nanomolar numbers. The middle column there is the $IC_{50}$ values; correct?

A. Yes. In the in vitro kinase assay.

Q. About three-quarters of the way down or a little less, that's where it lists CP-319732?

A. That's correct.

Q. And then there's a note to the right of that, the very right column, that says acetylene. That's the column that has the ethynyl group?

A. That is, yes.

Q. And Dr. Moyer has a question mark there that says Zeneca question mark?

A. That's what is certain, yes. That reflects Dr. Moyer's uncertainty because he hadn't reviewed the Zeneca patent.

MR. PACELLA: I didn't ask you a question.

Your Honor, I move to strike. I know you don't

strike. Understood.
BY MR. PACELLA:
Q. All right. Let's go back to DTX-84. Strike that. I'm trying to keep the record without too many exhibits.
This is PTX-365, Plaintiffs' 365, which was previously admitted today. And this is another document that was prepared by you?
A. Yes, it was.
Q. And here is where you are reporting third quarter '94 concerns with the EGFR project?
A. Yes.
Q. And this is the document that shows the rebounds from the second -- from the third Zeneca scoop; is that correct?
A. That's correct.
Q. And so rebound number one, you said was the indoline family?
A. Yes.
Q. And rebound part two was the acetylenic anilinoquinazoline compounds; correct?
A. That's correct.
Q. Okay. I had one question on -- a couple questions here. But you say active in vivo ED50, and then you list a value right under -- right -- no, next page.
So we're looking at 097, the right-hand side. I believe you mention this is a compound that you -- well, it

was something about toxicity and you pointed to that section. I just wanted to clarify.

There's nothing on this document that talks about toxicity of this compound, is there?

A. Not in this document, no.

Q. Okay. And you mention a patent niche overlooked by Zeneca; is that correct?

A. With a question mark.

Q. Right. And so you recognized that there was something -- and when you say Zeneca, you're talking about the '226 application; is that correct?

A. And the '726, or '722.

Q. The two 4-anilinoquinoline patents by Zeneca?

A. Yes.

Q. And so you were looking at those and you recognized there may be a gap in the coverage of those claims; isn't that right?

A. No. All we knew was that they had chosen to exclude the ethynyl, the higher alkynyl, the azido and the alkenyl substituents from their list of anilino substituents.

Q. Right. So if their claim for the coverage for the three prime position of the aniline ring, you recognized at that time that there was a gap in the coverage of that claim that included the ethynyl group?

A. We noted that the substituents I just mentioned were

not included in the Zeneca filing.
Q. And this document does not mention any concern about the toxicity of using an ethynyl group; is that correct?
A. I don't believe it does.
Q. And you mentioned some rules or other companies might be having policies for not using an ethynyl group?
A. Yes, I did. I did.
Q. You have not pointed to any document memorializing such a policy at Pfizer, have you?
A. There are documents from the Pfizer Sandwich U.K. site on a list of substituents that they are not allowed to incorporate. The alkynyl was on that list. We didn't have such a list at the Groton site.
Q. Unfortunately, we don't have access to those documents.
my question, sir, is, can you point me to a document that says the ethynyl group should not be used by Pfizer because it's toxic?
A. No. I can point you to documents in the literature that outline the toxicities of molecules and drug molecules that incorporate the ethynyl moiety and the mechanism of their action in -- in manifesting toxicity.
Q. I really -- that's not my question. My question was simply whether you can point to any Pfizer document and the answer is no?

A. No. It's well-known in the field.
Q. Can you point to me any document that says, don't use an ethynyl group that was in the policy of any of these other companies that you mentioned?
A. Actually, I know from discussions with somebody who was in a development group at AstraZeneca --
THE COURT: I'm sorry. I'm sorry. That's hearsay and I think we can move on.
(Pause.)
MR. PACELLA: All right. Your Honor, I'm going to hand the witness Defendant's Exhibit 93, which has been previously admitted (handing exhibit to the witness).
BY MR. PACELLA:
Q. Dr. Arnold, this is a document that is in your handwriting?
A. Yes, it is.
Q. And this document is dated June 28th, 1994?
A. That's correct.
Q. And it's from you to the entire EGFR project team?
A. Yes, it is.
Q. And at the top part of the document, it's an abstract, number 104, and this abstract relates to very potent 4-anilinoquinoline EGFR inhibitor?
A. Yes, it does.
Q. And that compound is actually the P.D., the

Parke-Davis compound that you talked about. It's a Parke-Davis compound that's being discussed in this abstract; is that correct?
A. I believe it was, based on the notes I received from Dr. John Lowe, who is a colleague at Pfizer.
Q. All right. And this is actually the CP-288865 compound; is that correct?
A. That is the number that we assigned to it when we synthesized it in October of 1993.
Q. Right. And that's the one that was already covered by the -- was covered by the '226 patent application?
A. Yes.
Q. And so here you are -- Dr. Lowe went to this conference where this presentation was conducted; is that correct?
A. Yes. He attended.
Q. And he was one of the chemists at Pfizer?
A. Yes.
Q. And so he brought this back to you as the head of the EGFR chemistry team because -- and asked you if you were interested in it?
A. He shared his impressions from the poster where he took notes.
Q. Right. So he took some notes and he gave his notes to you?

A. Yes.

Q. And then you wanted to share that information with everyone on the EGFR project team?

A. Yes.

Q. Because it was important information of interest to the EGFR project team?

A. Well, they had taken the time and the effort to titrate down the potency of a molecule that we just decided to say was less than .3 nanomolar in most cases and they had found it was 29 picomolar. Finding something with that high affinity is fairly exceptional, so we were interested in comparing our notes with theirs, but this really didn't teach us anything new.

Q. Well, you were interested enough to take that down and say -- take what Dr. Lowe gave you and put it on this document to send around to everybody else on the project team, pointing out what Dr. -- what you understood had been presented at the conference about the properties of various constituents?

MR. HSING: Objection, your Honor. Mr. Pacella is trying to convey again that these notes are prior art, that they were actually presented at a conference, and your Honor has already decided this is not. And that's not prior art and that's what he's trying to convey.

MR. PACELLA: Your Honor, I'm just trying to

convey that the witness thought this information was important and wanted to convey accurate information to his team.

THE COURT: That's how I understand the question, and since I've already made the ruling, this question isn't going to change my ruling. And your objection is noted for the record.

MR. PACELLA: I forgot the question.

THE COURT: It was a long one.

MR. PACELLA: Maybe I should restate it.

BY MR. PACELLA:

Q. When Dr. Lowe gave you these notes and you decided that you wanted to share this information with the team, you thought that this was information that they could find useful; is that correct?

A. Well, yes. We were in a competitive program. This alerted us to the fact that not only was Zeneca in the race, but also Parke-Davis, and that gave us a basis for a comparison of our findings of potency and selectivity on CP-288865 with our own internal data.

And we found that they had also found it very potent, very selective, and had some cellular activity that was comparable to what we had determined, and that they had reported it was competitive with regard to ATP, so that it was binding at the same site that we had determined. But it

really didn't teach us anything new.

Q. All right. But you wrote down that electron donors provide maximum potency? You put that on your notes; correct?

A. It's written here, yes.

Q. And you put it in that lipophilic sub is preferred at that 3 prime position; is that correct?

A. That's correct.

Q. And you but a box around the lipophilic sub-preferred?

A. Yes, I did.

Q. And you sent it around to the whole team?

A. Yes, I did.

Q. Now, I believe you said that erlotinib was first made at Pfizer on November 11th, 1994?

A. I'm not sure of the exact date.

Q. I'm sorry.

A. But it was made November 1994.

Q. Early November 1994?

A. Yes.

MR. PACELLA: All right. Could you put up DTX-103?

BY MR. PACELLA:

Q. I'm handing you Defendant's Exhibit 103. Do you recognize that?

A. Yes, I do.

Q. This is your rendition of Example 51 of the Zeneca '226 patent on the top and erlotinib on the bottom?

A. Yes.

Q. Now, did Pfizer make Example 51 of the Zeneca patent application?

A. I'm not aware that it was synthesized during my time at Pfizer.

Q. Are you aware whether it was synthesized ever by Pfizer?

A. Not with certainty.

Q. I'm handing you Plaintiffs' Exhibit 415 (handing exhibit to the witness).

Does that appear to be a copy of a laboratory notebook of a Ms. Sobolov?

A. Yes, it does.

Q. And Ms. Sobolov was one of the chemists in the Pfizer Cancer Group?

A. Yes. She joined the program when we were in the candidate selection phase.

MR. PACELLA: Okay. Your Honor, we move to admit Plaintiffs' Exhibit 415.

THE COURT: Is it a whole notebook?

MR. PACELLA: It is. We certainly only have to rely on one page, so we can submit an excerpt, if the plaintiffs have no objection.

THE COURT: All right. Just run the excerpt by them. But I certainly don't need whole lab notebooks in the record.

BY MR. PACELLA:

Q. But it is a lab notebook; is that correct?

A. Yes, it is a lab notebook.

Q. Okay.

MR. PACELLA: Your Honor, I understand this is admitted?

THE COURT: Yes. I take it there's no objection?

MR. HSING: No objection.

THE COURT: All right. But we will get it winnowed down to what's relevant in this case?

MR. PACELLA: Yes, your Honor. I am going to be very brief in this document.

(PTX-415 was received into evidence received.)

BY MR. PACELLA:

Q. If you could turn to page 91200. It's towards the back. And you can look on the right. Let me let you catch up with me.

A. Yes.

Q. All right. And in the very right top, there's an entry that refers to February 20th, 1996, work in Pfizer's lab?

A. That's correct.
Q. And that compound right there on the right, that is example 51 of the '226 application?
MR. HSING: Objection. Dr. Arnold had already left Pfizer at this time, so I don't really see the point of these questions. It's dated February 20, 1996. Dr. Arnold left --
THE COURT: I understand your objection. I'm not sure of the point of this, with this witness anyway.
MR. PACELLA: We just need to get the document in, your Honor.
BY MR. PACELLA:
Q. But anyway this is Example 51?
A. The structure is the same as Example 51, but as was mentioned, it was made after I departed Pfizer. I don't know any of the biological data for it. And it was already after erlotinib had entered development phase.
Q. Okay. And just one more question. This PROD equals 1.75 grams --
MR. HSING: Objection, your Honor. I don't see why he's asking Dr. Arnold about interpretations and entries in the lab notebook when he had already left Pfizer.
THE COURT: This does not seem to be the right witness for this, but -- well, for purposes of the record, ask a question, because the objection interfered with the

question. Ask the question.
MR. PACELLA: Yes, your Honor.
BY MR. PACELLA:
Q. That PROD equals 1.75 grams. Based on your experience as to the Pfizer procedures, does that mean that there were 1.75 grams of that material made that was -- that was what came out of the process?
MR. HSING: Objection.
THE COURT: And would he not know this based on his experience at Pfizer?
MR. HSING: I don't think -- he wasn't there.
THE COURT: Well --
MR. HSING: This is at least three months after he left Pfizer.
THE COURT: I know, but generally there are ways that lab notebooks are kept company to company. If he does not know what it means, that's fine. If he does, I will allow him to answer the question.
THE WITNESS: This would suggest that 1.75 grams of this material was produced.
BY MR. PACELLA:
Q. And could you take a look at Plaintiffs' Exhibit 548? That's the listing, 192-page listing of 571 compounds.
A. Well, honestly, even though that's the initial yield, I don't know if that's a pure material, et cetera. I would

have to spend more time reviewing this.

THE COURT: For purposes of my take on this, I understand that he does not know because he didn't write this.

MR. PACELLA: Understood, your Honor.

THE COURT: All right.

MR. PACELLA: I think we were talking past each other. I was moving on to another topic.

BY MR. PACELLA:

Q. I apologize, Dr. Arnold. Why don't we move on to another topic.

A. Okay.

Q. If you could pick up PTX-548, that's the big long list of all the compounds from the notebooks.

A. Yes.

Q. Do you have that in front of you?

A. I do.

Q. All right. So now I think you mentioned on your direct that these were not -- this didn't reflect all the compounds that were actually made. There were some robotic compounds or something to that effect. They were not included?

A. There were compounds made using high speed synthesis that were summarized in a different type of notebook, and I don't believe there was access to those notebooks.

Q. Okay. So that information is not available in here; is that correct?
A. That's correct.
Q. And did you personally go through all the lab -- did you create this chart yourself?
A. Not by myself, but I did verify the accuracy by spot checking various compounds throughout this list.
Q. Okay.
A. Crossing them with the notebooks.
Q. So you spot checked it?
A. Yes.
Q. And Example 51 -- or let me just ask you if you know.
Do you know if the data that corresponds, if any, to Example 51 is reflected in this?
A. I don't believe so, but I would have to check.
Q. I don't want you to have to go through the whole thing. To your knowledge, does it include it?
A. Well, it's important to me to answer the question accurately.
(Pause.)
THE WITNESS: I don't think it's reflected in here because this summarizes compounds only up until my departure in November of '95, and so it wouldn't be encompassed in here.
MR. PACELLA: Could we have Slide 11, please,

the Arnold slide?

BY MR. PACELLA:

Q. So this is your slide of modifying the linker. That was one of the things that you did to try to get around the Zeneca patents?

A. It was one of the things that we did in modifying UK 95276 to build structure activity relationships. Remember at the time that this was proposed, we didn't know anything about the Zeneca patent filing, so this was our medicinal chemistry approach.

Q. Okay. But there's nothing that suggested to you from the '226 patent that said, take this approach?

A. Certainly, these compounds were outside of the scope of that specification, but that doesn't -- that doesn't tell us anything. And our policy was to not accept anybody else's biological data, but to generate our own guiding information so we're not misled or misinformed.

Q. All right. But I just wanted to make clear that the directions that you took to avoid the Zeneca '226 application were not suggested to you from reading the '226 application. That was your analysis of the claims and ways to avoid those claims?

A. Well, as I said, this was a medicinal chemistry approach to understand the potency and selectivity and activity of the lead compound. At the time it was proposed,

we didn't know about the Zeneca patent application.

Q. Okay. So it didn't affect your analysis? All right. Let me -- you have not pointed to any documents where within Pfizer there was a skepticism that by putting an ethynyl group onto the 3 prime position of the 4-anilinoquinoline structure would decrease the potency of the compound; is that correct?

A. So you're asking if there was a document that existed that suggested putting in an ethynyl moiety would decrease the potency of the compound?

Q. Right. You didn't point to any document that said that; is that correct?

A. Well, first of all, that wouldn't be an accurate statement. And, second of all, why would we be disclosing some information that would be negative?

Q. Well, you certainly have not pointed to any document that anyone within the Pfizer chemistry team said don't use an ethynyl group because it will kill the potency of the compound?

A. No, but the real concern was not about the potency of the compound. The concern was about the metabolic activation of the ethynyl moiety as a suicide substrate for critical liver enzymes cytochrome P-50s that are involved in metabolism of drugs.

Q. And you have not pointed to any Pfizer document that

said, don't use the ethynyl group because it's going to result in metabolic instabililty?

A. Well, no. As I mentioned before, it was well-known in the field. So in 1983, Montellano published an extensive review describing four ethynyl bearing oral contraceptives that turned livers green and activated P450 enzymes. Simple phenyl acetylenes had been disclosed as suicide substrates for P450s.

There was ample reason to be concerned about incorporating that moiety in molecules. Nothing to your question, though, about destroying the potency of the EGFR inhibitors.

Q. I really still don't think you answered my question. I just want a yes-or-no answer. You've had your explanation.

A. I'm struggling to understand your question.

Q. Well, I thought it was pretty clear. Can you point us to any document within Pfizer where anybody at Pfizer said, don't use the ethynyl group because it may lead to toxicity?

A. Okay. You've changed your question. Your question before was about --

THE COURT: Well, let's just try to answer that. Just try to answer that question because he has asked it before. If you can, answer it yes or no.

THE WITNESS: No. Our policy was -- was not to

speculate, but rather generate data. So we conducted the appropriate experiments to look and see whether the ethynyl moiety introduced any toxicities or was metabolically activated. And we do have documents from the collaborative efforts with Dr. Teresa Smolarek.

THE COURT: So the answer is no, there are no documents that express skepticism? I think you answered no.

THE WITNESS: There are no documents that express skepticism.

THE COURT: Fine. That's all we want to know.

MR. PACELLA: Thank you.

Your Honor, I see it's almost 1:00 o'clock. Is it a good time to break.

THE COURT: Yes, because I was going to break in two minutes anyway.

All right. I need to get out of my computer, so consider yourselves on break.

MS. BEN-AMI: Thank you, your Honor.

(Luncheon recess taken.)

\- - -

(At this time court reconvened after the luncheon.

THE COURT: You may continue your cross examination.

MR. PACELLA: Thank you, your Honor. Just a

couple of housekeeping matters.

There was an issue with Defendant's Exhibit 12 and plaintiff's raised a matter of redaction. We would ask to move Plaintiff's Exhibit 525 into evidence that corresponds to that exhibit.

MR. HSING: No objection.

THE COURT: All right.

(Plaintiff's Exhibit 525 entered into evidence.)

MR. PACELLA: Your Honor had asked that you did not want the entire lab notebook. That was Plaintiff's Exhibit 415.

And we would ask, which I believe, the plaintiffs have no objection to designate Plaintiff's Exhibit 415A as the cover page of that exhibit, PFE 91143 production number and page PFE 91200.

THE COURT: All right. Good. Thank you.

MR. HSING:

BY MR. PACELLA:

Q. Welcome back, Dr. Arnold. I have just a couple of quick questions.

MR. PACELLA: Could you put up DTX-107, please?

BY MR. PACELLA:

Q. And this has been previously admitted.

Dr. Arnold, if you could go to the -- I believe it's last page. Do you see abstract 120?

A. Yes, I see it.
Q. Is that one of the abstracts by Barker from the March 1994 presentation that you mentioned earlier that you had seen shortly after its publication?
A. It is. I believe the publication date on the front page was May 17th of 1995, was it? '94, I'm sorry.
Q. But you don't remember the specific date when you first saw it?
A. It was late May or June of 1994.
MR. PACELLA: Let's put up DTX-112.
BY MR. PACELLA:
Q. And this is a British Journal of Cancer abstract book, correct?
A. That's correct.
Q. Let's go to the next page, abstract 6.6.
Is that the other Barker abstract that you said that you had seen shortly after its publication?
A. Yes, I believe I saw this in May of 1994 as well.
MR. PACELLA: No further questions, your Honor.
THE COURT: All right. Redirect.
REDIRECT EXAMINATION
MR. HSING: Can I have DTX-103, please?
BY MR. HSING:
Q. Mr. Pacella mentioned that you were scooped by Zeneca. And there's an example 51. That's the compound illustrated

that's the one from Zeneca '226 application, is that correct?

A. That's correct.

Q. Now, do you know whether this compound has ever been advanced as a clinical candidate?

A. While it was within Zeneca's patent application, they would have been the only one who could advance it. I have not seen anything, or any biological data on this compound.

And it wasn't a highly preferred compound from what we could tell in the prior art.

Q. There's also a discussion about the compounds CP 288865. And that is also covered by Zeneca's '226 application, correct?

A. That's correct.

Q. Did you make that compound before you became aware '226 application?

A. Yes, I did.

Q. Now, do you know whether that compound has ever been approved by the FDA?

A. No, it hasn't.

Q. You mentioned there was a race -- strike that.

Do you know what compound was ultimately advanced by Zeneca as the EGFR tyrosine kinase inhibitor?

A. Yes, it's called gefitinib, or Iressa as its trade name.

It's covered actually by the '226 filing but not specifically exemplified in the most preferred compound list.

Q. Do you know what happened to that compound?

A. Well, it failed to show enhancement of survival in clinical trials.

And so, while it had in early approval for improving progression free survival, I think its conditional approval in the U.S. has been withdrawn.

Q. You mentioned there was a race amongst Pfizer, Warner Lambert and Zeneca. In your view, who won the race?

A. I guess OSI did because they own and now Astellas because of the rights to Erlotinib being transferred to them.

Certainly Erlotinib has been shown to be the better drug in clinical trials.

Q. Now, let's go through the Barker abstract, DTX- 107.

MR. HSING: Can I have the first page, please?

BY MR. HSING:

Q. You said that you became aware of this abstract sometime around May or June of 1994?

A. That's correct.

Q. And the date on this abstract is May 17, 1994, correct?

A. That's when this library received it, yes.

MR. HSING: Can we go to DTX-112, please?
BY MR. HSING:
Q. This is the second Barker abstract, British Journal of Cancer, correct?
A. Yes.
Q. There is a date here April 29, 1994, is that right?
A. That's correct.
Q. Did you become aware of this journal sometime in late April or May of 1994, as well? I think that's what you testified to?
A. I think sometime in May of '94.
MR. HSING: May we have Arnold slide number 30, please?
BY MR. HSING:
Q. Dr. Arnold, when the first ethynyl compound was made, it was in 1994, correct?
A. Yes.
Q. That was made before the Barker abstract was even published, is that correct?
A. Yes, that's correct.
Q. And the first methoxy ethoxy compound was made on April 14, 1994, is that correct.
A. I'm not sure if that was the first methoxy ethoxy compound, but certainly the indolinyl methoxy ethoxy compound was made then.

Q. And that compound was made before the publication of the Barker abstract, correct?
A. Yes, it was.
MR. HSING: Now, can we take a look at DTX-93?
BY MR. HSING:
Q. Now, DTX-93, when did you write -- this is the abstract with your notes about the abstract.
When did you write your notes?
A. On June 28th, 1994.
Q. So, at this time, had you already made the first ethynyl compound?
A. Yes, it has been made.
Q. And had you already made the compound with the methoxy ethoxy tails at the six and seven positions?
A. Yes, we have.
Q. There's a reference to our CP 288865. Do you see that?
A. Yes.
Q. Why did you say our CP 288865?
A. Because the compound that's drawn here was known in the Pfizer collection as CP 288865. And we had made it back in October of 1993.
Q. Thank you.
Let me turn to DTX-14, please.
This is the report dated June 1st, 1994, from James

Moyer, do you see that?
A. Yes.
Q. And Mr. Pacella referred to page PFE 225860, do you see that?
A. Yes, I do.
MR. HSING: Can we zoom in on the reference to CP 319732, that compound?
BY MR. HSING:
Q. Mr. Pacella asked you questions about that compound, CP 319732?
A. Yes.
Q. That is the first ethynyl compound, is that correct?
A. That's correct.
Q. That's not Erlotinib?
A. No, it's not?
Q. Is James Moyer, is he an medicinal chemist?
A. No, he's not.
Q. What was he?
A. He was the cancer biology support for the EGFR program.
Q. Now, there was some discussion about toxicity of CP 319732 during the cross, do you remember that?
A. Yes, I do.
Q. Can you turn in front of you to PTX-382?
A. Yes.

Q. Do you see a reference to CP 319732, do you see that?
A. Yes.
Q. What is that compound?
A. That's the first ethynyl compound in the series. And it's listed here as having a kinase potency of less than .3 nanomolar.
Q. Does it say it's cytotoxic?
A. Yes, it does.
Q. What does that mean?
A. That means in the cellular assay we measured a potency for it, but we were also noting that it was the killing the cells in the time course of the assay which suggested that the compound is likely to have toxicity.
Q. This was the first ethynyl substituted compound, is that correct?
A. Yes.
Q. Turn to the next page, page 33. Again, towards the bottom of this page there's a reference CP 319732?
A. Yes.
Q. Can you read that sentence?
A. There's a couple of them, I guess.
We should also discuss the impact of cytoxicity on the further evaluation of CP 319732.
Then also it mentions CP 319732 is active in vivo but has the wart of cytotoxicity.

Q. And that is again referring to the ethynyl substituted compound?
A. That's correct.
Q. That's not Erlotinib, correct?
A. No, it's not.
Q. Can you turn to PTX- 287?
A. Yes.
MR. HSING: Your Honor, I would like to enter PTX-382 into evidence.
MR. PACELLA: No objection.
(PTX-382 was entered into evidence.)
BY MR. HSING:
Q. Do you recall we discussed this exhibit previously?
A. Yes, I do.
Q. Can you turn to the page bearing the number 332727?
A. Yes.
Q. And the very first bullet point there is a reference to 319732, do you see that?
A. Yes.
Q. Again, that is the first ethynyl substituted compound?
A. Yes, it is.
Q. Tell the court what was being stated there?
A. It indicates that there was inhibition of EGFR kinase activity and tumor growth arrest, but at 50 milligram per kilogram dose given twice daily for five days.

However, there was also 56 percent of animals were killed when we doubled the dose to a hundred milligrams per kilogram.

MR. HSING: Can we go to DTX-103 again?

BY MR. HSING:

Q. I want to clear this up. Maybe there was some confusion about the date, August 3rd, 2010, do you see that?

A. Yes.

Q. That's the day you were deposed?

A. Yes, it was.

Q. Not the day Erlotinib was made?

A. No, it was not.

MR. HSING: Thank you, no further questions.

THE COURT: All right. You may step down. Thank you.

You're all done. You may step down.

(Witness excused.)

MS. BEN AMI: Defendant had not closed its case because they were going to include Dr. Arnold's testimony. I think they have to close their case now before our next witness.

THE COURT: Are you ready to close?

MR. PACELLA: Yes, your Honor. We close our case and reserve our right to rebuttal.

MS. BEN AMI: With that, your Honor, I make a

rule Rule 50(c) motion.

I would like to make one point with respect to something specific there. The claims in the '065 patent, is a compound patent, your Honor. There are claims that go -- genus. There are claims to the compound are Erlotinib. There are claims 34 and 35 are Erlotinib with salt and then with a specific salt.

The only evidence that was put in with regard to the last two claims, the salt -- with the specific salt was a conclusory statement by Dr. Heathcock that would be obvious on that first slide, summary opinion. That is all he said. He never testified as to why. He never did anything with regard to those claims.

I believe there is case law that says that in a complicated case, that a conclusory statement would have been obvious is insufficient as a matter of law.

THE COURT: I'll tell you what. If you want to risk the fact that I'm not going to go back and confirm that that is what happened and if you don't want to put evidence on about it, that is your prerogative.

MS. BEN AMI: That is exactly what I was going to say to you, your Honor. As to that issue of the salt, I am not going to open the door on that.

I would ask that if I do object that it's beyond the scope of the direct -- I'm telling you if they now

decide they are going to go ahead and ask my expert questions now, I will object for that reason. That's why I'm giving up the heads-up.

Your Honor, we expect, and we are going to continue on our case about the fundamental compound.

THE COURT: All right.

MS. BEN AMI: With that, your Honor, we call Dr. Alexander Bridges.

... ALEXANDER JAMES BRIDGES, having duly sworn as witness, was examined and testified as follows ...

MS BEN AMI: May I give the witness a bottle of water?

THE COURT: Yes, you may.

MS. BEN AMI: Your Honor just a brief transition. You've heard the name Dr. Bridges before over the last few days. He was one of the scientists at Parke Davis, and he will be appearing here has an expert witness with regard to prior art.

THE COURT: All right.

DIRECT EXAMINATION

BY MS. BEN AMI:

Q. Dr. Bridges, would you please state your name and address for the court that?

A. My name is Alexander James Bridges. I live at 3301

Textile Road, Saline, Michigan.
Q. Could you briefly describe your educational background to the court?
A. I have a bachelor's degree in chemistry and PhD in organic chemistry from the University of Oxford in England.
I did three post-doctoral stints prior to getting full time employment.
Q. Can you explain your work experience?
A. I was employed first for six years at the Northern Illinois University as an Assistant Professor in chemistry.
I then went into the pharmaceutical industry in 1984. And I have worked at Warner Lambert, Parke Davis. At ACI Research Institute of Boston and then back at Warner Lambert, Parke-Davis again. Then I worked at Pfizer for 3 years when Pfizer took over Warner Lambert, Parke-Davis.
In 2003, I moved to a small start-up pharmaceutical company by the name of Quadrix Pharmaceuticals.
I worked there until about two years ago.
In the last two years, I've been a full-time consultant in medicinal chemistry.
Q. Could you briefly describe your professional experience within the pharmacy, your area?
A. Yes. I started off as a bench chemist, so that means I was making a lot of drugs and also obviously learning a lot of the biology-related stuff in the pharmaceutical

industry. After a year or so, I started to really seriously design the compounds, understanding the biology, and then I would do things, like supervising which compounds got tested and constructing what we call the structure activity relationships of compounds in order to find better compounds.

At later times, I ended up in more of a leadership role where I was no longer working on the bench, but I was -- the chemistry bench, your Honor. But I was in charge of several chemists, and later on I was in charge of whole programs, including the chemistry and the biology.

Q. Have you obtained any patents on your work?

A. Yes. I have obtained about 30 patents on my work.

Q. And has your work resulted in any compounds being advanced into the clinic?

A. Over the years, at least half a dozen compounds, which I've been involved with, have been advanced into the clinic.

Q. Have any went into human efficacy trials?

A. Several have been into human efficacy trials. At least three that I can think of.

Q. Do you know what level of trial?

A. Two of the compounds I've been involved with have gone into Phase 2 trials for cancer and another one is currently in Phase 3 trials for cancer.

Q. Have you ever done work on EGFR tyrosine kinase

inhibitors?
A. Yes, I have.
Q. During what period?
A. During the period 1992 to 2003. During that time, I was heavily involved in an EGFR tyrosine kinase program, and there was an intermission in 1998/2000, where I was rather peripherally involved, but I became more fully involved again in 2000.
Q. And where were you doing this work? What company?
A. This work was all done at Warner-Lambert Parke-Davis. The two -- Parke-Davis was the pharmaceutical research division of the Warner-Lambert Company, so the two get used interchangeably.
Q. And what was your role in this project, the EGFR tyrosine kinase inhibitor project?
A. During the years in question, my role was probably very similar to that of the previous witness. I was a medicinal chemist. I was making compounds. I was picking compounds, targets to be made by myself and by others. I was correlating biological data and deciding how we move the program forward.
Q. Do you have any patents on your EGFR research?
A. Yes, I do. I believe there are about a dozen patents which have issued from that program.
Q. Do you have any publications related to your EGFR

research?
A. Yes. There are also about a dozen publications in peer-reviewed journals.
Q. Now, did your EGFR research result in any clinical candidates?
A. It resulted in two clinical candidates.
Q. And can you describe those candidates and the results to the Court, please?
A. The first candidate was a compound which was called CI 1033. That stood for clinical investigation, and it was a Parke-Davis designation. And it went into Phase 1 and then into Phase 2 clinical trials before being dropped.
Q. Okay.
A. The second compound was a compound, PF 0299804, which I was more peripherally involved with, which -- in fact, I was head of the cancer group when that compound was discovered. And it is currently in Phase 3 clinical trials for lung cancer.
MS. BEN-AMI: Rather than go through much more, your Honor, I would offer this witness, Dr. Bridges, as an expert in medicinal chemistry at this point.
THE COURT: All right. Any objection?
MR. DOWD: No objection.
THE COURT: All right. Thank you.
BY MS. BEN-AMI:

Q. Doctor, do you understand that the defendants are arguing that the chemical compound erlotinib would have been obvious in light of the prior art in the time period 1994/1995?
A. Yes, I do.
Q. And do you agree with that opinion?
A. No, I do not.
Q. Can you just tell us why -- have you prepared a slide to go through the summary of your opinion?
A. Yes, a slide has been prepared under my direction.
MS. BEN-AMI: Can I have Bridges 1, please?
BY MS. BEN-AMI:
Q. Can you briefly summarize your opinions and then we'll go through them.
A. Yes. Sorry. There are five points to make here. The most important is the prior art taught, I believe taught halogens at the 3 prime position. I also believe that the prior art correctly read teaches away from modifying the 3 prime position. And that, furthermore, the person of ordinary skill in the art would have, and, indeed, did modify other positions in preference to the 3 prime position.
And, fourthly, I will testify that a person of ordinary skill in the art would not have selected an ethynyl, or at least been rather reluctant to select an

ethynyl.

And, lastly, I want to just briefly talk about the difference between erlotinib and everybody else's candidates.

Q. Now, do you understand that you are testifying today from the standpoint of a person of ordinary skill in the art during the period 1994/95?

A. I do so understand.

Q. And in your opinion, what would be the qualifications of such a person?

A. Such a person would need to have at the very least a Bachelor's degree in organic chemistry, and preferably either a -- a Ph.D. in either synthetic organic chemistry or medicinal chemistry, followed up by a certain number of years of experience in a drug discovery milieu, the best of which would probably be a pharmaceutical company.

Q. Can you tell us whether or not you are a person of ordinary skill in the art during this 1994/95 time frame?

A. I believe I was.

Q. Now, the next question, Dr. Bridges, I'm going to ask you to assume that the person of ordinary skill in the art conducted a search in the prior art during this time frame, up to 1995, and focused on the anilinoquinazolines.

Can you do that for me?

A. Yes, I can.

Q. So before we actually go through this in detail, can you look at the board for me, please, that's to your right, and just explain the various parts of the anilinoquinazoline, that core part for the Court?
A. Certainly. The pair of hexagons in yellow here (indicating) are the quinazoline, where we have the two nitrogens shown here. So this is the quinazoline core.
The next sort of part of the anilino part is the orange hexagon here is actually a phenyl ring. But when it is attached to a nitrogen, I'm afraid we're confusingly calling it an aniline, because this whole unit here would be called an aniline in nomenclature when, in fact, what we really have to get is a phenyl ring and an amine linker. So this is the amine linker. So these three parts between them form the core of an anilinoquinazoline.
At the 6 and 7 positions, we have what we're going to refer to hear as the tails. These are side chains which come off of the 6 and 7 positions, and they will be coded in green.
And, lastly, we have the substituent at the 3 prime position, which will be coded in red, and in this case, this is the anilino -- sorry. This is the ethynyl substituent. So this is erlotinib.
Q. So just as we go through the art, because there are so many rings in all these compounds, the hallmark, we know

it's the anilinoquinazoline ring is having the two rings at the bottom with those two nitrogens and that particular position?
A. That is correct. Two hexagons with the nitrogens here and here will be a quinazoline. Anything else will be a different core.
Q. So when we see those two rings together, but the ends are in different places, it's not a quinazoline?
A. It is no longer a quinazoline.
Q. And so when we see the aniline ring portion, the orange is called what?
A. This is a phenyl group.
Q. So we see a lot of those rings all over the place. We've seen them for two days. But the hallmark of the aniline ring is what? It's the phenyl with what?
A. The -- the aniline, first of all, it's a single ring. It does not have another ring fused onto it anyway, so it has to be a single ring, and it has to be connected via nitrogen. Then it is an anilino substituent.
Q. So just for context, when we go forward, when Dr. Arnold was saying he was taking that linker and turning it into a C?
A. At this point?
Q. Yes. Was it then an aniline ring?
A. No, it would not be called an anilinoquinazoline then.

Even though the phenyl ring is still a phenyl ring, we would not refer to it as an anilino.

Q. And so when we looked over the last few days those rings with the Ns and the Ns are in the other -- in the left-hand ring, is that a quinazoline?

A. No. Those are called pyridopyrimidine.

Q. And so as we walk through all of this, because these are a lot of scientific words, we're really looking at where these Ns are and what these rings are; right?

A. Yes.

Q. Now, I would like to focus on the 3 prime position, which is that red that we've talked about.

A. Yes.

Q. Okay. And can you explain to the Court why it's number three?

A. Well, certainly. When you connect things together, you will start by numbering the connecting atom as 1, and then you will count around the rings, so this becomes 1, 2, 3, 4, 5 and 6.

Q. And so in the discussion we're having today, we're talking about the three position; is that right?

A. Yes.

Q. Okay. Do you understand that it is Dr. Heathcock's opinion that the prior art taught that methyl substituents were preferred in the 3 prime position because of their

potency?

A. I do.

Q. Do you agree with that opinion?

A. I do not.

Q. And can you tell us, based on your view of the prior art, what was preferred in that position?

A. At the 3 prime position here, the prior art taught in my view strongly towards halogens, bromine or chlorine.

Q. Now, when you say that the prior art taught towards, what do you mean?

A. What I mean is if you looked at what data was available in the prior art, that the compounds which you would have pulled out of the prior art would have had that particular substitution patent which you're describing.

MS. BEN-AMI: Can we have Bridges 3, please?

BY MS. BEN-AMI:

Q. Now, just for reference, I've pulled up a periodic table. Everyone has been using this term "halogens." Can you tell the Court what halogens are?

A. Yes. Halogens are this particular group in the periodic table and they contain fluorine, chlorine, bromine and iodine normally, and so they are all chemically related to one another, and they are referred to as the halogen family.

And we will be mainly -- well, probably

exclusively talking here about chlorine and bromine, two of the halogens. And you can see by contrast that the carbon, which is the fundamental atomic substituent of both the methyl group and the ethynyl group, is in a different period in the periodic table.

Q. So we have not been talking much about carbon. But in all these rings where at the angles, if we go back to the picture, Doctor -- in all these rings of the angle, if there's nothing there that's like an N or something like that, what's there?

A. So, for instance, if we look at this particular position here (indicating), because there is nothing stated here, this is a carbon atom, and actually there will be a hydrogen here, which we don't draw at all, because we always have to make up the valency to 4.

So if you see a line going to something, it means that there's a carbon at either the end of the line or at the apex between two successive lines, and that if it adds up to less than four lines going to that thing, there are hydrogens to make up the difference.

Q. Now, assume that the person of ordinary skill in the art in this time frame reviewed the prior art and focused only on the anilinoquinazolines, what prior art would have been looked at?

A. There were, I think, six pieces of prior art. There

are two applications from Zeneca, called ICI at the time. There are two abstracts from the Zeneca Group. And there is a paper in Science from our group. And there is an abstract of the talk given by a member of our group at the conference.
Q. Let me ask you to look at the Zeneca '722 application. It's PTX-7, also DTX-772.
Do you have that, Doctor?
A. Yes, I do.
Q. And just, did that publish on December 30, 1992?
A. Yes. Its publication date is the 30th of December 1992.
Q. Now, just to set the background here, were you familiar with this patent application during your work at Parke-Davis in this time frame?
A. Yes, I was.
Q. And did you review it in this time frame?
A. Yes, I did.
Q. What conclusions would a person of skill in the art, of ordinary skill in the art, in the time frame of 1994, 1995, what would they learn with regard to the 3 prime position from this patent application?
A. They would have learned that halogens are the most potent substituents of the 3 prime position, which are shown in this patent application.

Q. And what is your basis for that statement?
A. That of the compounds for which data is given, the halogens are the most potent.
Q. Have you caused a demonstrative to be created that shows the data?
A. Yes, I have.
MS. BEN-AMI: Can I have Bridges No. 4, please? There we go.
BY MS. BEN-AMI:
Q. Can you explain this demonstrative to the Court, please? And instead of saying "here and here," can you use enough words that the record indicates where you are talking about?
A. Certainly. There are four compounds here on this slide and we are going to look at the three on the left-hand side of the slide. I want to point out that here we have the chemical structures of them and below we have the potency of the assay in nanomolar. And as you can see, these numbers get smaller, and smaller numbers represent more potent compounds, and therefore are of more potential interest.
And --
Q. So if we look at the numbers, what would they tell someone of ordinary skill in the art at this time?
A. If we look at the numbers, we can see that the most

potent to our 20 nanomolar and the third most potent is 40 nanomolar. And if we look at these three compounds here, what we can see is the 20 nanomolar compound is associated with a bromine at the 3 prime position, the 40 nanomolar with a chlorine. And the less potent one, 180 nanomolar, with a methyl, $CH_3$. The rest of the molecule is absolutely identical in all three cases.

Q. So how many differences are there among the -- strike that.

So just so we're clear, the only difference between the first, second and third compounds is in that 3 prime position?

A. That is correct.

Q. And so what does that tell you about that position?

A. It tells us that in this small series, that chlorine is four-and-a-half times more favorable for binding to the enzyme than is methyl. It also tells us that bromine is nine times more favorable for binding to the enzyme than is methyl.

What it does not tell us, because there is a missing compound here, with a hydrogen at the 3 position, it does not actually tell us whether methyl increases the potency of this compound or not.

Q. Well, when you say missing, you mean what?

A. I mean no data was given for the parent compound.

Therefore, you cannot conclude from this data, for instance, that methyl is an activating substituent, because that would require you to have data to say activated by comparison with what?
Q. Why do you care about the data?
A. Because that is the useful stuff in the patent usually.
Q. Why?
A. Well, we would use patents for two reasons. One is to try and learn what the useful activities of the compounds in the patent are, and for that, you require data. And so the data has a very high priority.
The other thing we would normally look at would be the broadest genus, because we want to know what activity, or what patent space the other company is trying to carve out for itself.
Q. So in terms of developing your own drug, what would a person of ordinary skill in the art look to as most important?
A. I think they would look to this and learn two things.
First of all, as has been discussed earlier, that these compounds have generally a superior sort of overall profile to most of the leads which had gone previously.
And the second thing they would look at is the

halogen of the 3 position leads to the most potent and interesting compounds in this class.
Q. Does the '722 application disclose the use of an ethynyl?
A. No, it does not.
Q. Now, did Zeneca subsequently file another patent application?
A. They did.
Q. I'm going to ask you to look at PTX No. 8, which is the '226 application, which I believe has already been admitted as a DTX number.
MS. BEN-AMI: And we'll give that to you in a second, your Honor. I apologize.
MR. DOWD: That's DTX-286, your Honor.
THE COURT: Thank you.
BY MS. BEN-AMI:
Q. Are you familiar with this exhibit, Doctor?
A. Yes, I am.
Q. And did you see this publication during your work in the applicable time?
A. Yes, I did.
Q. Now, this application is published in October 1993; is that correct?
A. That is correct.
Q. What conclusions would someone of ordinary skill in

the art during the 1994/95 time frame reach regarding the most substituent -- most potent substituents of the 3 prime position from the '226 application?
A. They could not have come to a conclusion as to what the most preferred substituent was at the 3 prime position.
Q. Why is that?
A. Because there is no data available to make that judgment.
Q. Did you prepare a demonstrative to explain your position and your understanding of this, this data?
A. Yes, I did.
Q. This lack of data?
MS. BEN-AMI: Can we look at Bridges No. 5, please?
BY MS. BEN-AMI:
Q. Can you tell us -- strike that.
How much data is in this '226 application?
A. The '226 application has data in it for five different compounds.
Q. So is Bridges 5 a summary of all the data in that application?
A. It is a summary of all the enzyme data given by the Zeneca inventors in that patent application.
Q. So you just said that this does not teach us more about the 3 prime N. Can you explain that to the Court?

A. Well, we already have the '722 patent application, so we know -- we know that halogen is of considerable interest.
And what we see here is we have four compounds with the methyl substituent on them, so the first four all have this $CH_3$, or methyl substituent. And the fifth one has a CF3, which is a so-called trifluoro methyl substituent.
None of them have a chlorine or a bromine at that position, so one cannot make a comparison because it isn't there.
Q. Now, do you understand that -- you were in the court for Dr. Heathcock's testimony; correct?
A. Yes, I was.
Q. Do you understand that Dr. Heathcock has opined that a person of ordinary skill would look to Example 51 of the '226 patent application as a starting point?
A. I am aware of his testimony on that.
Q. Does the '226 application contain any data for Example 51?
A. No, it does not.
Q. In your opinion, would that be a starting point?
A. Not much -- no more than any of the other compounds in here. In fact, less so, because you don't know anything about it.
Q. Now, going back to the five compounds that have data disclosed, what does this data tell you, if anything?

A. What I would read this data to tell you is there's one relatively trivial point which, of course, may or may not be correct because there's only one example, and it suggests that methyl is slightly more potent than trifluoromethyl at the 3 prime position.

But the major lesson to be learned from this is you can get more potent compounds in the anilinoquinazoline series than was demonstrated in the '722 application, and one has the suspicion here that these substituents of the 6 and 7 positions are responsible for the increase in potency.

Q. And did the '226 patent application disclose using an ethynyl?

A. It did not.

Q. Now, was there subsequently another publication regarding compounds disclosed in the '226 patent application?

A. Yes, there was.

Q. Now, what was that called?

A. That was a Science paper.

Q. So I would ask you to look at what's in your binder as Plaintiffs' Exhibit 43, which is DTX-203, admitted earlier.

Do you have that, Doctor?

A. Yes. Yes, I do.

Q. I think it's 43.

A. Yes, it was slightly buried.

Q. That's a big binder.
Do you know this document, sir?
A. Yes, I do.
Q. All right. Were you involved in this document?
A. Yes I was. I'm one of the authors on this paper.
Q. And when was this paper published?
A. This paper was published in August of 1994.
Q. And what does this paper show with regard to the anilinoquinazoline structures?
A. This paper shows a compound with a 3 prime bromo anilinoquinazoline with quite extraordinary potency.
MS. BEN-AMI: So can I have Bridges No. 6, please?
BY MS. BEN-AMI:
Q. Is this what you are referring to?
A. Yes. So on 6 here, we have the structure of PD-153035, which we also have seen a CP number for which I have not memorized.
And what we see here is it is an anilinoquinazoline. It has 6 and 7 substitutes, which are methoxy. It has the bromine at the 3 prime position, and it has a potency of 0.029 nanomolar, which we would refer to as 29 picomolar. So it is an extraordinarily potent compound.
Q. What conclusions, if any, would a person of ordinary skill in the art make based on this article with regard to

the 3 prime position?
A. That the most desirable substituent at the 3 prime position with respect to at least to potency would be bromine.
Q. So now we're -- we went I think in chronological order. So we have the '722 and then we have the '226 and then we have this Science paper?
A. That is correct.
Q. So would a person of ordinary skill in the art at the time that we're talking about, late '94 and into '95, would they have all this information?
A. They would.
Q. So if you look at all this information together, what does all this information together tell the person of ordinary skill in the art about the 3 prime position?
A. It tells the person of ordinary skill in the art that halogen will give you the most potent compounds at the 3 prime position.
MS. BEN-AMI: Now, can we look at Bridges No. 7, please?
BY MS. BEN-AMI:
Q. And Bridges No. 7 now has the Fry Science information and the '226 patent information?
Can you explain to the Court what this data tells one skilled in the art at this time?

A. Yes. If one makes the assumption that this Zeneca patent application has revealed one of the most potent quinazolines, you can see here, they have an $IC_{50}$ of five nanomolar, which is really very potent. And we have the $CH_3$ or methyl at the 3 position.

However, if you look at PD-153035 in the Science paper, what we see is an absolutely identical molecule with the exception that the halogen bromine is now the 3 prime position and the potency is now 29 nanomolar, which is approximately 170-fold more potent than this compound. Therefore, one would conclude from the prior art that halogen is, at least for potency, a highly preferred substituent of this position over methyl.

Q. Now, did this Science paper, which we call the Fry Science paper, disclose the use of an ethynyl substituent?

A. No, it did not.

Q. Now, after the Zeneca 720, did the Zeneca inventors publish anything else regarding this work?

A. Yes. They published a pair of abstracts.

Q. So let's go to the Barker abstracts, which the Court has seen before, and I would ask you to look at PTX-45, which is DTX-107.

Do you have that, Doctor?

A. Yes, I do.

Q. You have your glasses?

A. Now I have my glasses, yes.
Q. And your pointer?
A. And my pointer.
Q. All right. Can you tell us what this document is?
A. This is an abstract for a talk or poster given at a conference by Andrew Barker, one of the inventors on the two patents we've just been discussing from Zeneca.
Q. And were you familiar with this abstract when you were actually working in the field at this time?
A. I probably was familiar with this abstract.
Q. So have you prepared a demonstrative to help explain what is in this abstract?
A. Yes, I have.

MS. BEN-AMI: Can we look at Bridges No. 8, which is the -- the abstract is incredibly small.

So, your Honor, just so we're clear, the portion that is typed in little boxes, it's identical, but when you blow it up, it's so unclear, we just had to retype it.

And counsel can certainly make certain that that is correct.

THE COURT: All right.

MS. BEN-AMI: At least to my eyes. I could never read it.

BY MS. BEN-AMI:
Q. Can you tell us what this abstract is showing in the

picture?
A. Yes. The generic picture high is an anilinoquinazoline with a substituent on the aniline ring.
Q. Now, what is the example that is shown in terms of the 3 prime position?
A. Only one piece of data from one compound is discussed in this, and this is the compound with the chlorine at the 3 prime position of the anilinoquinazoline.
Q. So what does this abstract tell one skilled in the art about the use of a substituent in the 3 prime position?
A. Well, it tells a couple of things. The first is, it's very suggestive that this abstract is taken from the '722 patent application. But, secondly, it suggests that these halogenated compounds are probably the most potent in this series that the author is going to talk about.
Q. And there's a second Barker abstract, which we will ask you to look at, which is Plaintiffs' Exhibit 46, DTX-112.
Can you take a look at that for a moment, Doctor?
A. Certainly.
Q. And can you tell us what is taught about the 3 prime position in that abstract?
A. This abstract is very similar to the other abstract, and it also teaches towards the use of a halogen at the 3

prime position.
Q. So when you look at these two Barker abstracts, what does it tell the person of ordinary skill in the art put all together they should do in terms of that 3 prime position?
A. It is strongly suggestive that halogen was the preferred substituent in that position.
MS. BEN-AMI: Now, can we look at Demonstrative Bridges No. 9, which is the second abstract, just blown out.
BY MS. BEN-AMI:
Q. Do you see there that there is some talk about small non-polar meta substituents?
A. I do.
Q. Do you have -- you heard that Dr. Heathcock's opinion was that someone of ordinary skill would read that and understand that it was teaching using a small nonpolar substituent, like a methyl at the 3 prime position?
A. I understand that was his position.
Q. Do you agree with that?
A. Not in this case.
Q. Why?
A. Because, again, the only data they give has a meta chloro substituent at this position, and although meta chloro is a small substituent, it is not a nonpolar substituent.
Q. What is it?

A. It is a polar substituent.
Q. Now, can you explain to the Court what polarity is?
A. Polarity occurs when the sharing of electrons in a bond isn't exactly equal between the two atoms at either end of the bond, so that one of the atoms pulls more of the electron pair towards itself, or at least the electron pair spends more of their time close to that particular atom than the other atom. That results in that end of the bond picking up a bit of a negative charge. And since you've stolen some electron density from the other end of the bond, it must pick up slight positive charge.
Q. All right. That was a lot. So let's see if we can break that down.
We have two atoms; right?
A. Yes.
Q. They are bonded; right? And now what happens?
A. One of the atoms pulls the electron cloud a bit more towards itself, so that -- since the electron cloud is negatively charged, that end of the bond picks up something of a negative charge.
Q. So the electrons are negative?
A. Yes.
Q. And they go to one of the atoms?
A. They go more towards one end.
Q. Which makes that one more what?

A. Negatively charged.
Q. And makes the other one more?
A. Positively charged.
Q. Do you know the determine dipole moment?
A. Yes, I do.
Q. Can you explain that to the Court?
A. A dipole moment is essentially a measure of the separation of the negative and positive charges.
Q. Have you looked at the dipole moments of halogens?
A. I have.
Q. Let me show you -- do you have PTX-232, Doctor?
A. Yes, I do.
Q. Can you tell the Court what that is?
A. This is a standard reference book for chemistry laboratories, called the CRC Handbook of Chemistry and Physics.
Q. And would that be available to those skilled in the art during this time period?
A. Yes, it was.
MS. BEN-AMI: I would offer that, your Honor.
THE COURT: The whole handbook?
MS. BEN-AMI: No. Just the statements that he's going to be talking about, your Honor.
THE COURT: Any objection?
MR. DOWD: No objection, your Honor.

THE COURT: All right. Thank you. I guard my record jealously.

MS. BEN-AMI: I appreciate that because it would be heavy either way.

(PTX-232 was received into evidence.)

BY MS. BEN-AMI:

Q. Doctor, is this the type of information someone of skill in the art would rely upon at this time?

A. Yes, they would.

Q. And what do the pages of the -- that we have given you show?

A. These show dipole moments of various bonds and compounds, actually of compounds, because you can only experimentally measure the dipole moment of a compound.

Q. And have you had a demonstrative created which explains this concept of dipole using this chart?

A. Yes, I have.

MS. BEN-AMI: Can we look at Bridges No. 10, please?

BY MS. BEN-AMI:

Q. And can you explain what you are showing here to the Court?

A. Yes. Here I have taken the phenyl part of the site anilino side chain, so we're just looking at the very localized top end of the molecule. And I have got the

methyl benzene here, $CH_3$. Chlorobenzene and bromobenzene. And underneath we see the measured dipole moments of these concepts. So this is measuring sort of the separation of positive and negative charge, and most of it along this bond (indicating).

And what we can see here is methyl benzene is not actually itself completely nonpolar, but it has quite a small dipole moment. So this number is under .4 whereas both chlorobenzene and bromobenzene have rather larger numbers, around 1.7.

So this means that dipole moments of these molecules are approximately four times that of methyl benzene and therefore they are considerably more polar.

Q. In your opinion, Doctor, would someone of ordinary skill in the art who was working in this field and reading all this have any interest in this polarity issue?

A. Yes, they would.

Q. Why?

A. Because electrical dipole moments are rather like magnets. If you take a magnet and -- or two magnets and you allow them to go north pole to south pole, of course, they attract and pull together, whereas if you try and make them go north pole to north pole and south pole to south pole, they repel and push away from one another.

Q. And so what does that have to do with EGFR inhibitors?

A. Electrical dipole moments behave in exactly the same way. And we saw yesterday some description that these inhibitors tend to bind in very closely to the surface of the protein. And the protein itself contains many polar bonds, which also have dipoles.
Q. Okay. So we just through in some more words. Let's try to break that down, too.
So we're talking about an inhibitor and we're talking about an enzyme; is that right?
A. Yes.
Q. And you threw protein in. What's the protein?
A. The protein would be the enzyme.
Q. All right. So a person skilled in the art is trying to figure out how to make an inhibitor; right?
A. Yes.
Q. And they have this information about the preferred substituent being polar; right?
A. Yes.
Q. And what would that tell them with regard to this issue about the enzyme?
A. Well, what you hope it tells you, and because you're looking for any kind of data you can get at the moment, is you hope it tells you that there is a corresponding dipole in the other direction right in the region where this thing binds, so that the two opposed dipoles attract one another,

and therefore you get a stronger binding.

Q. And so why would this chlorine bromine potency issue impact a person of skill in the art?

A. Because they would then assume, maybe not correctly, but they would assume that there is a dipole moment favorable to interacting with the dipole moment of the chlorine or bromine in the meta position.

Q. Now, did any of the prior art we've looked at teach or suggest to you using an ethynyl substituent?

A. No, it did not.

Q. So still focusing on the 3 prime position, would the person of ordinary skill in the art, looking at this prior art, reach any other conclusions about the 3 prime position from the prior art?

A. Yes. There are other conclusions one could draw other than simply that the halogen is highly preferred.

Q. Now, what would that be?

A. There are various size conclusions one might be able to draw.

Q. Now, have you caused a demonstrative to be created showing the changes in the 3 prime position in the various patent applications you looked at?

A. Yes, I have.

MS. BEN-AMI: Can we look at Bridges No. 11, please?

THE WITNESS: Yes.

BY MS. BEN-AMI:

Q. Now, what does this information -- can you explain what this information is that you've put on this?

A. Certainly. What we're doing here is we're looking first at the original Zeneca '722 patent application, and then we're looking at the '226 patent application. And it's important to realize that these are two slices in time from the same program, so we're getting a sort of snapshot of where the program was when the original patent was filed, probably at least a year earlier, and then when the second one was filed.

So when we look at the two -- the two patent applications, what we've looked at is where they are claiming substituents. And what you can see in the original patent application, they actually claimed 11 different groups of the 3 prime position, which is a modest number, but only four groups altogether at the 6, 7 -- or actually, 5, 6, 7 and 8 positions, because they didn't specify where. So this is a very small number of groups.

However, when you come onto the '226 patent application, what you see is things have changed quite considerably. And here I must apologize. This is a typo. We did not go -- they did not go from only 11 groups to only 16 groups. In fact, they went from only 11 groups to only

14 groups claimed at the 3 prime position.

So they had very little increase in what they claimed at the 3 prime position, suggesting that there is not a great deal of variety which is tolerated here, and that they have been in the program for a considerable amount of time and found very little increase here.

However, at the 6, 7 positions, especially -- and, again, they don't fully specify, but it's mainly at the 6 and 7 positions, they've now expanded from four groups to greater than 350 groups claimed in this patent application. Therefore, we can assume that they found that huge amounts more variety were tolerated at the 6 and 7 positions of the quinazoline ring.

Q. So when you say we can assume that, what would someone of ordinary skill in the art take from this piece references?

A. They would take from them that it's very limited what you can do at the 3 prime position, and it's virtually unlimited what you can do at the 6 and 7 prime position because there's a huge number of groups already claimed here.

Q. So you said that the 3 prime position, the substituents changed from 11 to 14?

A. That is correct.

Q. And I think yesterday we went through with Dr.

Heathcock, that they added a hydrogen and a hydroxy and a nitro?
A. No. A hydrogen, a hydroxy and an amino substituent.
Q. There we go.
Can you tell us what those additions tell you about the 3 prime position, if anything?
A. Well, yes. All three of the substituents are all small. In fact, all three of them are smaller than methyl. Two out of the three, hydroxy and amino are polar.
Q. And Dr. Heathcock said something yesterday that I think I understood, but it might be a little unclear. He said, well, they added hydrogen, which is nothing.
Can you explain that?
MR. PACELLA: Objection. That mischaracterizes Dr. Heathcock's testimony.
MS. BEN-AMI: I apologize. I will ask it a different way.
BY MS. BEN-AMI:
Q. Can you explain what the hydrogen addition was?
A. I think he was simply saying what any organic chemist would say at this point, that we really don't regard hydrogen as a substituent. It's there, and as I explained earlier, whenever we have less than four, we know that there's a hydrogen there, because that is our convention. So he was simply reiterating the organic chemist's

convention at that point.

Q. So to be clear, then, the addition of, in the '226 application was to substituents which were smaller than methyl or no substituent at all; is that right? Is that what you are saying?

A. Yes.

Q. And of the two substituents that were added, what can we learn about polarity?

A. They were both polar substituents. And actually they weren't lipophilic either.

Q. Now, Doctor, were you aware of all this art at the time that you were doing your work?

A. Yes, I was.

Q. And were you a person of ordinary skill in the art at that time?

A. I believe I was.

Q. And what conclusions did you reach at that time when you were at Parke-Davis with regard to the teachings of the prior art?

A. The prior art taught us that these anilinoquinazolines were a very promising basis for developing EGFR tyrosine kinase inhibitors. They taught us that it was limited SAR of the 3 position. They taught us there was virtually unlimited SAR in these positions. And apart from that, they didn't really teach us very much else.

Q. What did they teach you about what should be put at the three position?
A. They taught us that they should be very small groups and preferably halogens.
Q. In connection with forming your opinions in this case now from the standpoint as a person of ordinary skill in the art at this time period, 94/95, did you look at the public work of other pharmaceutical companies as it was coming out in this field?
A. Yes, I did.
MS. BEN-AMI: Can I have PTX-180?
BY MS. BEN-AMI:
Q. Would you look at PTX-180? Do you have that, Doctor?
A. Yes, I do.
Q. Can you tell us what this is?
A. This is a publication in the journal, Experimental Cell Research, authored by Dr. David Fry on erb B, which includes EGFR tyrosine kinase inhibitors.
MS. BEN-AMI: I would offer Plaintiffs' Exhibit 180, your Honor.
MR. DOWD: Your Honor, we would object to the extent that this is being offered to show the state of the art back in 1994. This is a 2003 publication, I believe.
MS. BEN-AMI: This is a publication, your Honor, which goes through many of the compounds that were in

development. It goes through contemporaneous invention and it goes to failure of others.

THE COURT: All right. It's admitted with the defendant's objection noted.

(PTX-180 was received into evidence.)

MS. BEN-AMI: So you can put it up on the screen now.

BY MS. BEN-AMI:

Q. Doctor, can you tell us what this article is about?

A. Yes. It is a review article on -- discussing the compounds which have been brought in to development as EGFR tyrosine kinase inhibitors.

MS. BEN-AMI: And can we look at page 132? And the picture, please.

BY MS. BEN-AMI:

Q. And we focus now on the top left picture, the Iressa.

Doctor, do you know that Iressa?

A. Yes, I do.

Q. Does it relate to this case at all?

A. Yes.

Q. Go ahead.

A. Iressa is the compound that Zeneca took from their program and took into the clinic and got provisional approval for.

Q. And can you tell us what this Iressa compound

discloses with regard to the 3 prime position?

A. At 3 prime position, Zeneca used a halogen in Iressa.

Q. What kind?

A. It was a chlorine.

Q. And can you go down to the next one going down, please? Can you blow it back out and go to the compound that is CL 1033, please.

BY MS. BEN-AMI:

Q. Can you tell us, in this compound, what the 3 prime position is?

A. Yes. This is CI 1033.

Q. I'm sorry.

A. And at the 3 prime position, they have also halogen substituent, the chlorine.

MS. BEN-AMI: And if we can blow that back out again and go to the picture that's on the bottom.

BY MS. BEN-AMI:

Q. And can you tell us what this compound is?

A. This compound is the Glaxo Wellcome compound, GW2016, which is currently approved for breast cancer and is called Lapatinib.

Q. And what is the 3 prime structure there?

A. They have the halogen chlorine at the 3 prime position.

Q. Can we go -- continuing on in the counterclockwise

circle, can you tell us what this is?
A. Yes. This compound is Wyeth's first clinical candidate in the EGFR field and it is EKB 569.
Q. And can you tell us what is in the 3 prime position in this EKB 569?
A. Yes. This also contains the halogen chlorine at this position, and I will draw your attention just to the fact that in this case, this is no longer a quinazoline, since there is not a nitrogen at this position. This compound is a 3 cyano quinolone.
MS. BEN-AMI: Can we look at PTX-179, please? Okay.
BY MS. BEN-AMI:
Q. Can you tell us what this is?
A. This is a paper in the European Journal of Cancer from 2002, discussing the Phase 1 results on a compound called BIBX 1382, which was, in fact, the first EGFR clinical candidate from the drug company Boehringer Ingelheim.
MS. BEN-AMI: I would offer 179, your Honor.
MR. DOWD: Your Honor, the same objection.
THE COURT: All right. Your objection is noted. You may proceed, however.
MS. BEN-AMI: Thank you.
(PTX-179 was received into evidence.)
BY MS. BEN-AMI:

Q. Did you review this document in considering what others did with the 3 prime position?
A. Yes, I did.
Q. And what does this article show?
A. This article shows that they produced a lead compound, clinical candidate, which had halogen to it, chlorine, at the 3 prime position. And, incidentally, this compound is not quinazoline, it is a pyrrolidine.
Q. What happened to this compound?
A. This compound went into Phase 1 and then I believe was dropped for lack of efficacy.
Q. Now, Dr. Bridges, in your opinion, would someone skilled in the art at the time, looking at the prior art, have, as Dr. Heathcock said, leave everything the same from the Zeneca applications and simply change the 3 prime position?
A. No, they would not have.
Q. What would someone have done?
A. Well, by and large, they would have -- most of them, and certainly most of them did, they would have left the 3 prime position unchanged, and they would have altered mainly the tails or they would have altered the quinazoline core.
Q. What was done at Warner-Lambert?
A. We mainly altered -- if we look at the quinazoline core, most of our effort went into altering the quinazoline

core for several years. We also looked a bit at the linkers, a very small amount changing the aniline ring, and somewhat changing the 6, 7 tails.

Later on, when we had somewhat different set of ideas, we came back to the quinazoline core and changed the 6, 7 -- the 6, 7 tails.

Q. So I would ask you to look at a demonstrative that was created, Bridges No. 20.

Can you explain to the Court what Bridges No. 20 indicates?

A. Yes. Bridges 20 is taken from a pair of patent applications which were first filed very early in 1994. And what this shows is a whole series of changes to the quinazoline core.

So I won't go through these all, but you can see we've added nitrogens to several of them. We've added sulfurs and shrunk them down from a six-membered ring to a five-membered ring. And then on the bottom row, you can see that we've actually fused a third ring on here.

So instead of being by cycles with two cycles, these are, in fact, tricyclic cores, and you can see some of the variety of the things we looked at here.

So this demonstrates that we spent a great deal of time finding separate cores to replace the quinazoline.

Q. So could you look at PTX-20 in your binder? You may

be in another binder.
A. I think it probably is. Yes.
Q. Can you tell us what PTX-20 is?
A. PTX-20 is a PCT application WO95/19774.
Q. Are you one of the inventors listed on this application?
A. Yes, I am.
Q. And in the priority dates, or the early applications, can you tell us what the earliest priority date is?
A. Yes. The earliest priority date is the 25th of January 1994.
Q. So is this in the time period that we're talking about?
A. Yes, it is.
MS. BEN-AMI: I offer PTX-20.
MR. DOWD: Same objection, your Honor. It's not prior art.
MS. BEN-AMI: This filing is January 1994.
THE COURT: All right. It's admitted. Defendant's objection is noted.
(PTX-20 was received into evidence.)
BY MS. BEN-AMI:
Q. Does this application relate to the picture you just showed the Court?
A. Yes, it does. It shows -- the first two rows of

structure shown on the previous slide were, in fact, claimed in this particular application.
Q. So could you just explain to the Court which ones, because when you were talking, the picture wasn't up.
A. Yes. So all of these by cyclic, different by cyclic nuclei are, in fact, claimed in the '774 patent application.
Q. And since the demonstratives don't come into evidence, can you just tell the Court what the names of those different cores were?
A. Okay. Can I leave out the numbering?
Q. Yes.
A. There are three pyridopyrimidines here. There is a pyridopyrimidine. And there are two different thienyl pyrimidines. And this compound is called an adenine because we like to confuse people.
Q. And for that, your punishment will be to spell all of this for the Court Reporter at some point.
A. Yes.
Q. Doctor, do you have plaintiffs' Exhibit 23?
A. Yes, I do.
Q. Okay. Can you tell us what that is?
A. It is another PCT application, W09519970.
Q. Okay. And are you an inventor on this?
A. Yes, I am.
MS. BEN-AMI: We'd offer this, your Honor,

Exhibit 23.

MR. DOWD: Same objection, your Honor.

THE COURT: All right. Objection noted.

(Exhibit 23 was received into evidence.)

BY MS. BEN-AMI:

Q. Doctor, can you tell us whether this application is involved in the demonstrative we just discussed?

A. Yes, it is.

MS. BEN-AMI: Can we go back to the demonstrative, please, Mr. Fisher? Thank you.

BY MS. BEN-AMI:

Q. And can you tell us how?

A. Yes. The tricyclic compound, tricyclic nuclei on the bottom row are all amongst compounds claimed in this patent application.

Q. And will you name them just for the record, please?

A. The first one is reasonably simple. It is an imidazo quinazoline.

The second one is a thionyl thienyl pyrimidine. And my apologies to the reporter here.

The third one is an indolinyl pyrimidine.

And the last one, we would have called it a pyrrozino quinazoline. Sorry.

Q. Doctor, can I ask you to look at Plaintiffs' Exhibit 108 in your book? Do you have that?

A. Yes, I do.
Q. Can you tell the Court what that is?
A. This is a publication from our group in the Journal of Medicinal Chemistry from 1995.
Q. And the date received is March 9, 1995? Look at the first page.
A. Yes, it is.
Q. And can you tell us the subject matter of this paper?
A. This paper was looking at structure activity relationships around the aniline quinazolines that are under discussion here.
MS. BEN-AMI: Your Honor, I would offer Exhibit 108. Plaintiffs' Exhibit 108.
MR. DOWD: Same objection, your Honor.
THE COURT: The objection is noted.
(PTX-108 was received into evidence.)
BY MS. BEN-AMI:
Q. Dr. Bridges, do you have a demonstrative relating to plaintiffs' Exhibit 108?
A. Yes, I do.
MS. BEN-AMI: May I have Bridges 21, please?
BY MS. BEN-AMI:
Q. And can you tell us what Bridges 21 shows?
A. Bridges 21 shows the core structures of three of the compounds disclosed in this Journal of Medicinal Chemistry

paper. And this shows simply changes in the linker. So here we have changed the nitrogen of the linker to an oxygen, and this would be -- would not be an anilinoquinazoline, it would be a phenoxy quinazoline.

Here we have added a carbon atom between the phenyl ring and the nitrogen, so this would now be a benzyl amino quinazoline.

And in this case, we have looked at adding two carbon atoms between the phenyl ring and the nitrogen and the linker, so this would be a phenethyl amino quinazoline.

Q. So when we looked at the board before that's to your right, Doctor, you told me that you have an aniline ring, anilinoquinazoline.

A. Yes.

Q. You had to have that and an H attached to the phenyl; is that right?

A. Yes, for it to be called an anilinoquinazoline, it needs the nitrogen to be attached there.

Q. And with knowledge of the prior art, did you retain that structure as indicated in this article, 108?

A. I'm sorry. I don't fully follow.

Q. Sure. Looking at Bridges 21 and the parts you highlighted in purple, can you explain to the Court what those changes did to the structure?

A. Yes. All three of these, we have substituted the NH

by some other linker group. So these are not anilinoquinazolines.
THE COURT: Would this be an appropriate time for an afternoon break?
MS. BEN-AMI: Certainly.
THE COURT: 15 minutes.
(Short recess taken.)
- - -
(At this time, court reconvened.)
THE COURT: You can continue.
BY MS. BEN AMI:
Q. Dr. Bridges, I'd like to turn now to look at what other pharmaceutical companies were doing with knowledge of the Zeneca application.
Do you have PTX-29?
A. Yes, I do.
Q. Can you tell the court what this document is?
A. This document is a PCT patent application WO 9631510.
Q. Can you tell us what the company is that is the assignee of this application?
A. Yes, this company is Ciba Geigy who later became Novartis.
Q. Can you tell us the priority date of the application?
A. Yes. The original priority date is the third of April 1995.

Q. Can you tell us the subject matter of this application?
A. This application reveals small molecule inhibitors of the receptor tyrosine kinase.
MS. BEN AMI: Your Honor, I would move Plaintiff's Exhibit 29.
MR. DOWD: Same objection, your Honor.
THE COURT: Objection noted.
(Plaintiff's Exhibit 29 entered into evidence)
BY MS. BEN AMI:
Q. So. Actually, doctor, have you caused a demonstrative to be created with regard to it application?
A. I have.
MS. BEN AMI: Can we bring up Bridges 22, please?
BY MS. BEN AMI:
Q. Can you tell the court what Ciba Geigy did in this application?
A. In this particular application, I believe that what we see are this compound here where what they have done -- they have changed the quinazoline core to a so called pyrrole pyrimidine core.
Q. do you have the exhibit now, the actual exhibit 29?
A. 29, yes.
Q. Can you look at the last two pages, please?
A. Yes.

Q. Do you see there that '226 patent application is considered?
A. Yes, the '226 patent is cited in their international search report.
Q. Now, can you look at PTX-33, please?
A. Yes.
Q. Can you tell the court what this is?
A. This is an another PCT application WO 9702266, also from Ciba Geigy.
Q. Was the priority date July 6th, 1995?
A. Yes, it was.
Q. And the subject matter of this is what?
A. This is also small molecule inhibitors of the EGFR receptor tyrosine kinase.
MS. BEN AMI: I would offer PTX-33, your Honor.
MR. DOWD: Same objection.
THE COURT: Objection is noted.
(PTX-33 was entered into evidence.)
BY MS. BEN AMI:
Q. Doctor, being someone skilled in the art at the time, did you have an understanding of how well known the Zeneca applications were in the field?
A. Yes.
Q. How was that?
A. Because you would talk to people at conferences who

were working in the same area and because when you read a lot of people's patent applications, they would cite the Zeneca applications.

Q. What was your understanding about how well known Zeneca's applications were?

A. Within the area of people working in kinase inhibitors, I would say that the Zeneca applications were well -- very well known and understood.

Q. So, can you tell us what Ciba Geigy did in this application, which is Plaintiff's Exhibit 33 with regard to the structure of the inhibitor molecules?

A. Yes. Here -- there are four that came out of this particular patent application. You can see here they have fused a third ring.

You can think of putting this five membered ring containing nitrogen between the two rings of the quinazoline.

Here they've introduced an extra nitrogen into the distal ring. And here what you see is they have shrunk down the second -- the phenyl ring of the quinazoline to a five membered ring. And they put a nitrogen in it making a pyrrole pyrimidine.

And in this last case they've done the same thing to the quinazoline core. All of these different quinazoline cores. But in this case, they also changed the

linker from a simple amino to adding another extra carbon atom again.
Q. Do you have Plaintiff's Exhibit 25, doctor?
A. Yes, I do.
Q. Can you tell the court what this is, please?
A. This is another application, PCT application, WO 96/09294.
Q. Can you tell us who the applicant is?
A. The applicant is the Welcome Foundation, which is the owner of the pharmaceutical company Burroughs Welcome.
Q. What company is that now?
A. It is now part of Glaxo.
Q. The priority date of this application is September 1994?
A. That is correct.
Q. Can you tell us -- have you caused a demonstrative to be made with regard to this exhibit?
A. Yes, I have.
MS. BEN AMI: Can I have Bridges 23, please?
BY MS. BEN AMI:
Q. Is this application related to EGFR inhibitors?
A. Yes. This application covers basically EGFR and erb2 inhibitors.
Erb2 is a receptor tyrosine kinase which is generally considered to be the closest related to kinase to EGFR.

So, it's another member of the family as we heard discussed the other day.
Q. What changes, if any, did Welcome make?
A. Well, in this case, if we look at the very first compound here, the top left, you can see that they have change the quinazoline nucleus to a quinazoline nucleus by removing the nitrogen from this position. The other four compounds are all quinoline.

But what they've done in these cases is they changed the linkers. So, here they have added another extra carbon atom. This is a now a benzyl aminoquinazoline

Here they have added another extra carbon atom and changed the nitrogen atom to an oxygen. This would be a benzyloxyquinazoline. Sorry.

Here, they have put the linker in as a sulfur atom rather than as a nitrogen atom. And here, they have put in the oxygen atom instead of the nitrogen atom as a linker.

MS. BEN AMI: Your Honor, I offer Plaintiff's Exhibit 25.

MR. DOWD: Same objection.

THE COURT: Objection is noted.

(Plaintiff's Exhibit 25 was entered into evidence)

BY MS. BEN AMI:
Q. Doctor, do you have Plaintiff's Exhibit 226?

A. Yes.
Q. Can you tell the court what this is?
A. This is a PCT patent application WO 95/15758.
Q. Can you tell us the applicant?
A. The applicant is Rhone Poulenc Pharmaceutical?
Q. Is that part Aventis now?
A. I believe they are part of Aventis which is now part of Sanofi.
Q. And so forth and so on.
The priority date there is what?
A. The first priority date is the 10th of December, 1993.
Q. And the subject matter of this application?
A. This is a patent application for tyrosine kinase inhibitors.
MS. BEN AMI: I offer 226, your Honor.
MR. DOWD: Same objection.
THE COURT: The objection is noted.
(Plaintiff's Exhibit 226 was entered into evidence).
BY MS. BEN AMI:
Q. Have you caused a demonstrative to be created regarding this one?
A. Yes, I have.
MS. BEN AMI: Can I have Bridges 24, please?
BY MS. BEN AMI:

Q. Can you tell this court what Rhone Poulenc did?
A. In this case, we're looking at a series of tyrosine kinase inhibitors which did include anilinoquinazolines.
You can see here in this application, they retained the quinazoline ring and they made substantial changes to the linkers, so they replaced NH with an oxygen atom with a sulfur atom. Again, they put in the extra carbon between the nitrogen and the phenyl ring.
Here's somewhat of a more interesting substituent where they actually bonded directly to another carbon atom here.
Here is another case where they've sort of used a phenyl group as the linker here.
And here is a case where they simply replaced NH with a carbon atom. So this a $CH_3$ here.
MS. BEN AMI: This might be the last one. Can we have Plaintiff's Exhibit 34?
BY MS. BEN AMI:
Q. Doctor, can you look for Plaintiff's Exhibit 34?
A. Yes.
Q. Can you tell the court what this is?
A. This is another PCT patent application WO 97/03069.
Q. Who is the applicant?
A. This is from Glaxo group.
Q. What is the priority date?

A. This is the 13th of July 1995?
Q. Can you tell us the subject matter?
A. This is another patent application for small molecule receptor tyrosine kinase inhibitors. In this case, I believe EGFR and its sister receptor erb2.
MS. BEN AMI: Your Honor, I offer Plaintiff's Exhibit 34.
MR. DOWD: Same objection, your Honor.
THE COURT: All right. Thank you.
(Plaintiff's Exhibit 34 was entered into evidence)
BY MS. BEN AMI:
Q. Doctor, have you had a demonstrative created with regard to this exhibit?
A. Yes, I have.
MS. BEN AMI: Can I have Bridges 25, please?
BY MS. BEN AMI:
Q. Can you tell us what Glaxo did?
A. In this application, what you can see is that Glaxo -- they retained the quinazoline. They retained the nitrogen linker. What you see here is a whole series of different bicyclic heterocycles used to replace the phenyl part of the anilino molecule. None of these compounds are anilinoquinazolines.
They include things like indolinyl amino

pyrrolidines -- quinazolines, sorry. And here we have a benzomethylaminoquinazoline. Here we have been one indazomethylaminoquinazoline.

This is another isomeric that is connected to the different position in the indozoloaminoquinazoline.

Here are a couple of other examples. So they have an extensive repertoire of bicyclichetero aromatic replacements for the phenyl ring of the anilino part of the molecule.

Q. Doctor, we've now gone through a whole series of what other companies did and what Warner Lambert did.

Was all this in your expert report?

A. I believe it was.

Q. Doctor, Dr. Heathcock had the opportunity to rebut this in his second report, did he?

A. I do not remember these points being addressed.

Q. So, looking at all of the prior art and contemporaneous art and we've shown what was done with companies that were aware of the Zeneca applications.

Based on your knowledge and experience, what would someone of ordinary skill in the art in this time frame have done with the knowledge of all the prior art if they were trying to get away from the Zeneca applications?

A. They would have made a whole series of possible different changes at all sorts of parts of the molecule,

especially the quinazoline core. We looked at the changes in the linker. We haven't really discussed the tails.
Q. Doctor Jorgensen is going to talk about tails. We don't want to duplicate.

Dr. Bridges, for the next set of questions, I just want you to assume that a person of ordinary skill in the art started with the anilinoquinazoline, and was chosen to modify the three prime position?
A. Understood.
Q. The hypothetical is that they have chosen to change the red segment.

Now, do you understand that Dr. Heathcock's opinion is that the person of ordinary skill in the art would have chosen to put an ethynyl on that three prime position?
A. I understand that.
Q. Do you agree with that position?
A. No, I do not.
Q. Can you tell the court why?
A. Well, there are three basic reasons why I would have been very reluctant to a put a ethynyl group at that position.

The first is toxicity issue, which was widely known in the art at the time. And it's important to emphasize it isn't completely black and white.

It was well known in the industry at the time that

these compounds tended to be toxic.

A second problem was they were also known to be rapidly metabolized, so one would expect poor pharmacokinetics.

Both of these tie into a suspicion that the acetylene may prove to be a very chemically reactive group.

The third thing is from my reading of the two Zeneca patent applications, I would not expect the ethynyl group to have been efficacious.

Q. Why?

A. Because if one looks at the two Zeneca applications, I believe they teach away from using groups even as small as ethynyl.

Q. Dr. Bridges, in your opinion, would a person of ordinary skill in the art have chosen an ethynyl at the three prime position?

A. No, they would not.

Q. Dr. Bridges, you're actually someone who was involved in this field at the time?

A. That is correct.

Q. Do you remember when you first learned of Erlotinib?

A. Well, I was, first of all -- we had seen the applications obviously from Pfizer, but we actually learned of the structure -- actually learned of the structure and the profile of Erlotinib at the AACR conference in the

spring of 1997.
Q. Do you recall what your reaction was?
A. Yes, I do recall what my reaction was.
Q. What was your reaction?
A. I was very surprised.
Q. Why?
A. Because I had done both the analysis which I believed showed me that something like ethynyl would not be efficacious. And these compounds had low nanomolar potency.
I also believed that a compound with a ethynyl on it would be rapidly metabolized and would have a very poor biological half life.
One of the things I distinctly remember from that post presentation was that the half life of the compound in the animals was at least 24 hours.
MS. BEN AMI: I'll pass the witness, your Honor.
THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MR. DOWD:
Q. Good afternoon, Dr. Bridges.
A. Good afternoon, sir.
Q. Now, if I understand your testimony correctly, you have worked in the EGFR area for quite some time?
A. Yes, I did.
Q. And you've worked in that particular area since about

1992; is that right?
A. I worked in that area starting in 1992, yes.
Q. And that was while you were at Parke-Davis; right?
A. Yes.
Q. And almost the entire time you've been at Parke-Davis, you've worked on EGFR inhibitors; is that right?
A. To some extent, yes. I worked full-time on them until 1998 and then I had always at least sort of one finger in the pie thereafter.
Q. But for the most part, your work at Parke-Davis was focused on EGFR inhibitors?
A. The majority of the work I did at Parke-Davis was on EGFR inhibitors, yes.
Q. And a lot of your knowledge about the EGFR field comes from your personal experience at Parke-Davis; right?
A. A lot of my knowledge does, yes.
Q. And part of what you've been asked to do in this case is to provide the history of the research regarding tyrosine kinase inhibitors around the time of the invention, including my own work in the field; is that right?
A. That is correct.
Q. Okay?
MR. DOWD: Could you bring up DTX-107, please? And could you go to abstract 120, please and blow that up?
BY MR. DOWD:

Q. And this is the -- one of the Barker abstracts that you discussed on direct. Right, Doctor?
A. Yes, it is.
Q. And you are pretty familiar with this document; is that right?
A. Yes. I believe I have -- I probably saw this document at the time, and clearly I have been reintroduced to it recently.
Q. And you understand what you have been asked to do here today is to provide your opinion as to what a person of ordinary skill in the art would know; is that right?
A. That is correct.
Q. And you understand that it's your job to tell the Court what a person of ordinary skill in the art, how they would interpret this document; is that correct?
A. That is correct.
Q. But because of your personal knowledge of Parke-Davis information, you have difficulty interpreting this document, don't you?
A. In the end, what I had to do here was go to what data was published, because that would have been what was available to one skilled in the art at the time.
Q. And specifically you can't tell the Court how one of ordinary skill in the art would interpret the word small as used in the Barker abstract, can you?

A. I believe that I can, because I believe there was enough information published in the two documents, the Zeneca '722 and the Zeneca '226 patent applications for one to be able to see what Zeneca meant by small. And, indeed, that is pretty much -- we actually pretty much took Zeneca's word for what really meant, was really meant by small.
Q. I appreciate that, Dr. Bridges, but that didn't answer my question.
Again, are you able to give me an opinion as to how one of ordinary skill in the art would interpret the word small as used in the Barker abstract?
A. Certainly. If we want to go to the Zeneca patent applications, I can explain to you precisely how one would have interpreted small there.
Q. Okay. You have not answered my question yet, have you, Doctor?
A. Could you repeat the question?
Q. Certainly.
A. I thought I gave it a rather precise answer.
Q. The question is: Are you able to give me an opinion as to how one of ordinary skill in the art would interpret the word "small" as used in the Barker abstract?
A. Yes.
Q. Okay. Now, you remember back on December 10th of 2010, you had your deposition taken?

A. Yes, I do.
Q. And you were sworn to tell the truth; correct?
A. I was.
Q. And you did your best to tell the truth at that time; right?
A. Yes, I did.
Q. Okay. And do you remember being asked that same question?
A. I do remember being asked that same question.
Q. All right.

MR. DOWD: May I approach the witness, your Honor?

THE COURT: Yes, you may.

(Mr. Dowd handed a deposition transcript to the witness.)

MR. DOWD: Counsel, this is at 202, line 16.

BY MR. DOWD:
Q. And, Dr. Bridges, can you see on page 202, starting on line 16, and I've handed you a copy of your deposition transcript.
A. Yes, I can see it.
Q. Okay. And line 16 begins: Are you not able to give me an opinion as to how one of ordinary skill in the art would interpret the word "small" as used in both of these abstracts?

A. Yes.
Q. And do you see where your answer reads: It is -- it is somewhat difficult for me because I carry with me a great deal of knowledge, which would not have been able to -- which would not have been available to one skilled in the art at the time, and I have some difficulty separating out what I know that was not known to what one skilled in the art and what -- that which is not.
A. Yes, I do see that.
MS. BEN-AMI: Your Honor, may I ask that the next question and answer be read, or is that your normal practice, or do I do it on redirect?
THE COURT: No. I usually allow it now.
MS. BEN-AMI: Doctor, would you read the next -- would you like me to read it and the witness to confirm or the witness to read it?
I'm sorry, your Honor.
THE COURT: I generally require the examining lawyer to read.
MS. BEN-AMI: Thank you, your Honor.
MR. DOWD: Okay. Where was that?
MS. BEN-AMI: I would ask you to read this to hear (indicating).
BY MR. DOWD:
Q. Starting on line 6, the question is: So if you can

answer my question from the perspective of one of ordinary skill in the art, it's possible for you to do, then I would ask that you do that. If it's impossible for you to do because you can't separate out your own experience from how one of ordinary skill in the art would have thought at the time, then -- then you can tell me you can't answer my question.

But my question is how one of ordinary skill in the art at the time have interpreted Barker's reference to small in his two abstracts.

Answer: I believe that one of ordinary skill in the art would have read the '226 patent application and they would have noticed from the patent synthesis within the '226 patent application that nothing was produced at the 3 prime position in the '226 application which was larger than bromine. Therefore, they would have assumed that small could mean up to the size of bromine.

Is that right?

A. That is correct.

Q. So you admit that it's difficult for you to separate out your personal knowledge from what was known in the art?

A. Yes, it was difficult at that time. I had only come a day or two earlier to understand exactly what the hypothetical person of ordinary skill in the art of 1994 meant.

Q. Okay. And with respect to the person of ordinary skill in the art, you mentioned priority dates earlier; correct?
A. Yes, I have mentioned some priority dates.
Q. And if we could bring up PTX-029. And if we could blow up the left hand box with the priority date.
Dr. Bridges, is it your understanding that this document constitutes prior art?
A. It is not my understanding that this document is prior art.
Q. Are you relying on this document for your opinion on obviousness?
A. Not on -- well --
MS. BEN-AMI: Your Honor, may I object just for the record? I don't think this witness is competent to decide whether something is prior art as a matter of law.
THE COURT: Well, that is true, so I guess the question --
MR. DOWD: I could rephrase the question.
THE COURT: All right. Rephrase the question.
BY MR. DOWD:
Q. Dr. Bridges, is it your understanding that this document -- this is PTX-029. Is your understanding that PTX-029 is prior art?
A. I do not expect it to be considered as prior art.

Q. So you're not forming your opinion based on PTX-029?
A. I am using PTX, whatever it is, to demonstrate how people responded to the prior art.
Q. That didn't really answer my question, Doctor.
MS. BEN-AMI: Your Honor, I think it did answer the question.
THE COURT: Well, I mean, I thought he had more than one opinion. I thought one of the opinions was failure of others. Another one of his opinions was -- so when you say did it inform his opinion, I guess the question is which opinion.
MR. DOWD: Okay.
BY MR. DOWD:
Q. Dr. Bridges, are you using this document solely for your opinion on failure of others?
A. When I put my opinion together here, I was dealing with a suggestion that one of ordinary skill in the art would have made 20 compounds and magically arrived at erlotinib. I am using this to show what people who were of ordinary skill in the art were actually doing at that time in response to the Zeneca patent applications.
Q. Okay. So you are using this document, PTX-039, 029, to tell the Court what a person of ordinary skill in the art would have done in view of the Zeneca applications; correct?
A. I think that is a reasonable interpretation.

Q. Thank you, Dr. Bridges.
MR. DOWD: Can we have PTX-033, please?
BY MR. DOWD:
Q. And you discussed PTX-033 during your direct examination. Correct, Dr. Bridges?
A. Yes, I did.
Q. Are you using PTX-033 as a basis to tell the Court what a person of ordinary skill in the art would have done in response to the Zeneca applications?
A. Yes. If one assumes that all ordinary -- people of ordinary skill in the art responded to the Zeneca applications, this would be another example.
Q. So this is an example, in your opinion, of what a person of ordinary skill in the art would have done in response to the Zeneca application?
A. Well, at the end of the day, I'm not inside the heads of any of them, but I would assume that they had taken the Zeneca applications into their thinking when they were running their programs at this time.
Q. But you are just assuming that. You don't know, do you?
A. No, I do not know.
Q. Okay. Thank you, Dr. Bridges.
By the way, just to be clear, during your direct examination, you talked about what would have happened in

the time frame of 1994 to 1995; correct?
A. Yes.
Q. What is the relevant prior art date in this case?
MS. BEN-AMI: Objection, your Honor. Calls for a legal conclusion.
MR. DOWD: Let me re-ask the question.
BY MR. DOWD:
Q. Dr. Bridges, what is your understanding of the relevant prior art date for this obviousness analysis?
A. I would guess that maybe November the 2nd, 1994, would be the date for prior art.
Q. But you are not sure, are you?
A. No, I do not have legal training.
Q. All right. You are just guessing as what the relevant date is; is that correct?
A. As far as prior art is concerned, yes.
Q. All right. So if you are just guessing at the relevant prior art date, there's a possibility that you might have considered art or scientific reference or a publication that does not constitute prior art; is that correct?
A. When answering a question as to whether people followed a future trajectory, which is after all the basis of your case, I can hardly only go to before that date to refute the fact that that trajectory was followed.

Q. I'm not really sure that addressed my question, Dr. Bridges.
A. Well --
Q. Let me ask the question. You already testified and explained that you're guessing as to what the relevant prior art date is; correct?
A. I certainly know that the applications from Zeneca were prior art. We've all agreed to that.
Q. We all agree that's prior art; correct? We all agree that the '226 application is prior art; right?
A. Yes.
Q. In fact, that's probably one of the best pieces of prior art; right?
A. Yes.
Q. Now, starting with that, moving forward -- by the way, when was the Zeneca application published?
A. The first one I think was the 30th of December 1992 and the second one was around the tenth of October, or maybe a little later, 1993.
Q. So we've established that the Zeneca applications are prior art?
A. Yes.
Q. But the date after the Zeneca applications, you are just guessing as to what the relevant date is; correct? That's how you testified; is that correct?

A. Yes.
Q. Okay.
A. I do not expect these to be prior art.
Q. I think we've established that already, Dr. Bridges.
Now, given the fact, which you've admitted, that you're guessing as to the relevant prior art date, isn't it possible that you've considered other publications that might not be prior art?
MS. BEN-AMI: Your Honor, I have to object to this. The witness can't know what the invention date is as a matter of law, so this is an unfair question.
THE COURT: Well, I guess I'm unclear of what the question is. Does that mean that what was presented in court, or are you saying just generally to inform an opinion whether they were -- whether this prior art or this art was presented or not in court?
MR. DOWD: I think it goes to the fundamental basis.
THE COURT: Well, I'm not even sure what your question is, to tell you the truth.
MR. DOWD: I could rephrase it so it's clearer, if that's the case. But the fundamental basis is that under Graham, one of the first things you do is identify the prior art, and if the witness cannot establish what date is relevant, or establish what the prior art is --

THE COURT: But that is for the finder of fact to actually establish. So I think it's important for you to establish what he thought the prior date was, but I think your last question was confusing to me. So if you want to re-ask it, you may.

MR. DOWD: All right.

BY MR. DOWD:

Q. Dr. Bridges, given the fact that you're not certain of what the relevant date is for determining whether a reference is prior art or not, isn't it possible that in your obviousness analysis, you've considered references that are not prior art?

MS. BEN-AMI: Your Honor, again, I object, because if someone doesn't know what you have decided the invention date is at the end, then by definition, no one can know. I think we can get to concrete facts here.

THE COURT: Well, and, once again, I'm not sure whether you are asking about art that was identified in his report, in his deposition, in court, or just art generally that was considered in some fashion. So --

MR. DOWD: I could be a little more --

THE COURT: I think you've made your point. I mean, I understand where you are going, but I think the question is still a confusing one.

And I accept that none of us in the courtroom

know -- you might think you know, but we don't know what the prior art date is. So moving on from there, I still think that the defendants may ask a question -- the defendant's counsel may ask a question to clarify what this witness did in this regard.

MR. DOWD: All right.

THE COURT: All right. So your objection is a standing one, and we should try this question one more time, clarify it, and then move on.

MR. DOWD: Maybe I could just ask a specific question with reference to the document, your Honor.

THE COURT: All right.

MR. DOWD: Can I have PTX-34, please? Pull up the left-hand corner, please. And can we show the publication number for the witness, please?

BY MR. DOWD:

Q. Dr. Bridges, you recognize PTX-34, don't you?

A. Yes, I do.

Q. And this is a -- an international patent application that was published when?

A. The international filing date is the 11th of July 1996.

Q. And it wasn't published until January 30th, 1997; is that correct?

A. That is correct, yes.

Q. Do you know whether this document is prior art or not?
A. I do not believe this document is prior art.
Q. Have you used this document in terms of your obviousness analysis?
A. Not -- I would say -- I'm beginning to understand what you mean now. In terms of the initial obviousness analysis, I would say no.
Q. Are you changing your testimony now?
A. I believe that I am clarifying things. There are, I believe, two different points here. One is what one would have known and done in late 1994. And the other, which I understood part of my remit was, to demonstrate that the projected future that your expert brought forward had very little relationship to the actual future. Therefore, I have later documentation to demonstrate that.
Q. But, again, you are not certain what document followed by this prior art; correct?
MS. BEN-AMI: Your Honor --
THE COURT: Your objection is noted. Really, he's handling himself very well. You're protecting the record. We'll just get beyond this.
MR. DOWD: I will move on.
Could we have DTX-107, please? Go to the abstract. Abstract 120, please.
BY MR. DOWD:

Q. This is the Barker abstract again; is that right, Dr. Bridges?
A. It is.
MR. DOWD: Can you blow up the line that has the nonpolar language, please, up above the structure?
BY MR. DOWD:
Q. And, Dr. Bridges, with respect to the Barker abstract, it's your testimony that a chlorine group is polar; is that right?
A. A chlorine group clearly is somewhat polar, yes.
Q. But Barker specifically mentions nonpolar groups; is that correct?
A. He says small, relatively nonpolar groups.
Q. Okay. He says small, relatively nonpolar? Is relatively nonpolar the same as nonpolar?
A. I think you would have to ask Dr. Barker that question as to exactly what he meant there.
Q. I'm sorry if that question wasn't clear. I'm just asking you from the perspective of a person of ordinary skill in the art, would a person of ordinary skill in the art think that polar, or think that nonpolar meant the same thing as relatively nonpolar?
A. They might believe that.
Q. Would they, or would they not?
A. I think it would depend on the individual.

Q. So you don't have an opinion, do you, of whether a person of ordinary skill in the art would see a difference between polar and nonpolar, do you?
A. I think different people will parse adverbs in different ways.
Q. Again, just to answer my question, Dr. Bridges, so you don't have an opinion as to whether a person of ordinary skill in the art would see a difference between polar and nonpolar, do you?
A. I think a person of ordinary skill in the art would see a difference between polar and nonpolar.
Q. All right. Let me re-ask that question. And you don't --
THE COURT: I thought he actually answered that question.
MR. DOWD: I asked the wrong question, your Honor.
THE COURT: Darn. I thought we had a clear answer.
MR. DOWD: Sorry.
MS. BEN-AMI: We did have a clear answer.
BY MR. DOWD:
Q. But you don't have an opinion as to whether a person of ordinary skill in the art would see a difference between nonpolar and relatively nonpolar, do you?

A. There's -- they would see a difference of degree, I think.
Q. And what would be the degree?
A. They would have to actually look at the thing, because we're dealing with words here which, some of which do not have absolutely precise definitions.
MR. DOWD: Can we pull up Plaintiff Bridges 10, please?
BY MR. DOWD:
Q. And you talked on your direct about the dipole moment?
A. Yes, I did.
Q. And you understand you can't measure the dipole moment of a group directly; right?
A. Certainly, you cannot do the direct physical measurement. You can probably do pretty good quantum mechanical calculations, which will give you a pretty good idea of it.
Q. But there's no dipole moment associated specifically with a particular group such as a methyl group; is that correct?
A. If the methyl group is bonded to something, there would be a dipole associated with that bond.
Q. So, Dr. Bridges, so there's no dipole moment associated specifically with a group; correct?
A. A group has to be bonded for something to produce a

dipole moment, but then a group has to be bonded to something to produce a stable molecule.

Q. I'm just asking a simple question, Dr. Bridges, and if you don't understand it, let me know.

A. No. I think --

Q. Let me ask the question, please.

You talked about dipole moments of groups, correct, on your direct testimony?

A. Yes.

Q. Okay. And you can't measure the dipole moment of a group directly; right?

A. No.

Q. Thank you, Dr. Bridges.

Now, you do agree that the term lipophilic is synonymous with hydrophobic; is that correct?

A. I think lipophilic would generally be considered to be pretty well synonymous with hydrophobic, yes.

Q. And you do agree that an ethynyl group is an example of a lipophilic group?

A. Yes, it would be an example of a lipophilic group.

Q. And an ethynyl group would be an example of a hydrophobic group; is that correct?

A. It is hydrophobic, yes.

Q. And the ethynyl group is the smallest possible alkynyl group; correct?

A. It is.
Q. During your direct testimony, you talked about the alleged toxicity of the ethynyl group. Right, Dr. Bridges?
A. I talked about -- yes, the --
Q. Now, you have not come to court today with any documentary evidence of the ethynyl group, have you?
A. I have not come into Court with any documentation at all myself.
Q. And in your expert report, you didn't cite any evidence, any documentary evidence, that supports your opinion about the toxicity of the alkynyl group?
MS. BEN-AMI: Your Honor, may the witness have his expert report if he's being asked whether he cited anything in his expert report?
THE COURT: If you would like to look at it, I think you may.
BY MR. DOWD:
Q. Do you remember what was in there?
A. I seem to remember in my expert report, I quoted the 1983 papers on the inhibition and of the kinase name I can't remember at the moment.
MR. DOWD: May I, your Honor?
THE COURT: Yes, you may.
(Mr. Dowd handed an exhibit to the witness.)
BY MR. DOWD:

Q. Can you turn to Paragraph 69 in your expert report, Dr. Heathcock -- Dr. Bridges, please?
A. Yes.
Q. And you recognize that as the section that talks about your opinion with respect to the toxicity of alkynyl group?
A. Yes, I do.
Q. And that section goes through paragraph 73 on the next page?
A. Yes, it does.
Q. And --
MS. BEN-AMI: Your Honor, I'm sorry.
Your Honor, is this like a deposition, or do I do this in redirect?
THE COURT: You do this in redirect.
MS. BEN-AMI: Thank you, your Honor.
BY MR. DOWD:
Q. In that section, you didn't cite to any articles, did you?
A. No, I did not. But if you turn to page 39, Section 103, you will see that I cited the references.
MR. DOWD: Can I have DTX-286?
BY MR. DOWD:
Q. And you recognize DTX-286 as the '226 application; right?
A. I do.

Q. And it's your opinion that there's no useful biological data in this application; is that correct?
A. There is no useful biological information which allows you to choose, for instance, between halogen and methyl, but they did, for example, demonstrate such things as an increase in potency.
Q. This is just a simple yes-or-no question, Dr. Bridges.
A. Could you repeat it, please?
Q. Sure. I believe you testified that there was no useful data available in the '226 application in terms of biological data; is that right?
A. If I said that, I slightly overstated. With respect to certain things, there is not much useful biological data.
Q. So a person of ordinary skill in the artery viewing the '226 application would not have had a reason to select one compound versus another that was disclosed in that application based on the biological data; correct?
A. Could you repeat the question, please?
Q. Sure. Based on the fact that there's no useful biological data in the '226 application, a person of ordinary skill in the art would not have had a basis to select one compound versus the other based on biological data; is that correct?
A. For what purpose would they be selecting?
Q. Sure. The purpose of additional drug discovery.

A. It would have been difficult to, I think, decide where to go from there.
Q. Right. So the biological data in the '226 application doesn't give a person of ordinary skill in the art enough information to decide a lead compound to select from the '226 application; is that correct?
A. I do not think it does.
Q. All right. And, Dr. Bridges, I believe it's your opinion that a person of ordinary skill in the art, when reviewing the prior art, would tend to look at the claims of a prior art patent application when discerning useful information from that prior art application; is that correct?
A. They would certainly want to look at the broadest claims, because that explains what the company is trying to reserve for itself in I P space.
Q. That didn't really answer my question. Let me TRY again.
A. Well, that's for the first claim. I can go further, if you like.
Q. No. Just a yes-or-no question.
THE COURT: There are no such things as yes-or-no questions with experts, I've come to conclude.
THE WITNESS: Sorry.
BY MR. DOWD:

Q. Okay. Fair enough.

Dr. Bridges, it's true in your opinion, as a person of ordinary skill in the art, would consider what was claimed in the prior art application as useful information in deciding what compounds to select for further development; correct?

A. Not necessarily. Certainly, claim 1, which is normally the broadest claim, that tells you if you are moving into infringing other people's IP space. But there are plenty of cases where you may consider moving into somebody else's IP space, and then you have to decide whether the risk is worth it. And that can depend on many factors.

MR. DOWD: No further questions, your Honor.

THE COURT: All right. Redirect.

MS. BEN-AMI: Could you bring up the Barker abstract, please?

REDIRECT EXAMINATION

BY MS. BEN-AMI:

Q. You were asked about the Barker abstract on cross, Doctor?

A. Yes, I was.

Q. And you were asked about this language about small, relatively nonpolar?

Do you remember that?

A.    Yes, I remember that.
Q.    Can you tell us why you understand the Barker abstract to teach the halogens?
A.    Yes.  If one -- well, we have the prior art of the '722 patent application itself, where, as we saw earlier, putting a halogen at the 3 prime position led towards the most potent compounds.
We have, in the '226 application, no halogens included at all.  And then for one, the last part of the prior art, which is present is the Science paper, which teaches that the halogens are, in fact, extraordinarily potent at the 3 prime position, even with the new side chains that Zeneca has introduced at the 6 and 7 positions of the quinazoline ring.
Q.    So, Doctor, from your standpoint of someone skilled in the art, and looking at it from the perspective of someone of ordinary skill in the art, would someone focus in on those specific words, or would someone focus in on the scientific data and structure, or both?
A.    If one was of ordinary skill in the art and really had only peripheral interest in this, I think one might simply read the words.  But if one's future depends on understanding exactly what's going on, one would read the data in the patent application very carefully.
MS. BEN-AMI:  No further questions, your Honor.

THE COURT: All right. You may step down. Thank you.

THE WITNESS: Thank you.

(Witness excused.)

MS. BEN-AMI: Your Honor, our next witness will be Dr. Jorgensen.

THE COURT: All right.

... WILLIAM L. JORGENSEN, having been duly sworn as a witness, was examined and testified as follows ...

DIRECT EXAMINATION

BY MS. BEN-AMI:

Q. Good afternoon. Do you need water, Doctor?

A. I'm fine.

Q. Okay. Would you introduce yourself to the Court?

A. Bill Jorgensen. Yale University.

Q. And, Doctor, what is your current title again?

A. I'm a Sterling Professor at Yale University.

Q. What does that mean?

A. There are roughly 40 Sterling Professors at Yale. It's the highest academic rank at Yale.

Q. And in what area are you a professor?

A. I'm a Professor of Chemistry.

Q. And can you briefly describe your educational background as well?

A. Yes. I have an undergraduate degree from Princeton and a Ph.D. from Harvard.
Q. What was your undergraduate degree in?
A. Chemistry.
Q. And your Ph.D.?
A. Combination of chemical physics and chemistry.
Q. And when you were obtaining your Ph.D., who was your Ph.D. advisor?
A. Professor E.G. Corey. He's a Nobel laureate, synthetic organic chemist.
Q. Can you describe for us your professional background?
A. After I was a graduate student at Harvard, I moved to Purdue University as an assistant professor, and I remained there for 15 years, rising through the ranks.

I was a full professor sometime in the early 1980's, and then I left Purdue in 1990 to go to Yale as a Whitehead Professor and then I became a Sterling Professor in 2009. I'm also the Director of the Division of Physical Sciences and Engineering.
Q. Now, what is that division?
A. So Physical Science and Engineering at Yale are 11 departments. We don't have a dean of science. The normal dean roles for science would be covered by myself for the academic part of it, promotions, and then there's a deputy provost that deals with the financial matters.

Q. Can you describe your areas of research in terms of what the scientific areas are?
A. I have very broad interests. I always have, ranging from physics to biology. I have publications in journals from journals with titles like the Journal of Molecular Physics through Journal of Biochemistry and the Journal of Medicinal Chemistry. So I have expertise in physical, organic, medicinal, and biochemistry.
Q. Now, do you have -- can you explain a bit about your experience in the field of medicinal chemistry?
A. Yes. That has become an increasing activity in my laboratory and it is our principal activity at this time. My special talents there have to do with the use of computational methods to design compounds that are potential drugs, and this makes the drug discovery process more efficient.

And then we -- then in my laboratory we also synthesize the molecules that we design. And that, I have about 15 people that are involved in drug discovery in my laboratory. We have multiple ongoing projects.
Q. Have you ever heard the term SAR?
A. Yes.
Q. Can you explain to the Court what that means?
A. Yes. SAR stands for Structure Activity Relationships, and it's the type of data that we've been talking about.

Here, where you have a molecular structure and then associated with that is activity data, and then part of the process of drug discovery is collecting information of that sort on the way activities vary with the structures of compounds.

MS. BEN-AMI: Your Honor, I apologize, but I did not ask. Could Dr. Bridges be released?

THE COURT: Yes, he may be, if you'd like to.

MS. BEN-AMI: We don't let the witness go until the Court says the witness can go. So the witness can go. He has a plane.

THE COURT: All right.

MS. BEN-AMI: I'm sorry.

BY MS. BEN-AMI:

Q. Doctor, have you done any research with respect to protein kinase inhibitors?

A. Yes.

Q. Okay. Can you explain that to the Court?

A. We have a number of publications dealing with the theoretical aspects of computing the activity or finding affinities of protein kinase inhibitors, and then we have an ongoing experimental product, joint theoretical and experimental project in the design and synthesis of inhibitors for two protein kinases. FGFR1 kinase and KIT kinase.

In the last year or two, we published two papers that are joint computational theoretical -- computational experimental studies on FGFR1 kinase.

Q. What is that kinase?

A. It's another -- it's another kinase similar to EGFR. It stands for fibroblast growth receptor factor kinase.

Q. Thank you.

How many scientific articles have you published?

A. I think it's over 360.

Q. How many lectures have you given?

A. Invited external lectures, 6 or 700.

Q. Have you served on the editorial advisory boards of any journals related to medicinal chemistry?

A. I have many activities there. I've been on the advisory board of bio-organic and medicinal chemistry and bio-organic medicinal chemistry letters for about 20 years.

I'm the editor of two journals, the American Chemical Society. The Journal of Chemical Information and Modeling is effectively a companion journal to the Journal of Medicinal Chemistry, which I would say is a central journal for medicinal chemistry.

I have other activities. I was recently the chair of the committee to pick the new editor of the Journal of Medicinal Chemistry.

Q. Do you consult with pharmaceutical companies?

A. Yes, I have, and continue on a, you know, a sporadic basis.
Q. Okay. Can you tell us generally what companies?
A. I have consulted with over the years a number of companies, such as Upjohn and eventually Pharmacia, smaller companies, Agouron, Pfizer on short visits. I don't know if I ever had a long-term consulting contract with Pfizer.
Currently, I do have a contract with Viti in Philadelphia. I have -- I've been an associate in the area of pharmaceuticals, on their advisory board. I'm a founder of Rybex Pharmaceuticals, an anti-bacterial company in New Haven.
Q. What is the activity of that company?
A. Rybex is a structure-based drug design targeting the ribosome to develop anti-bacterial agents to treat infections, bacterial infections.
MS. BEN-AMI: Your Honor, I would offer Dr. Jorgensen as an expert in medicinal chemistry.
THE COURT: Any objection?
MR. PACELLA: No objection.
THE COURT: All right. Thank you.
MS. BEN-AMI: Your Honor, would you like us to continue now?
THE COURT: It's up to you. I mean, you either continue for six minutes or you have six minutes charged to

your account.

MS. BEN-AMI: I think I would prefer to charge the six minutes so that you have the whole picture at once tomorrow.

THE COURT: All right. Good enough.

MS. BEN-AMI: Thank you, your Honor.

THE COURT: We will recess until 9:30. I have to get out of my computer, so you all are free to go.

(Witness excused.)

(Court recessed at 4:24 p.m.)

- - -